IN THE UNITED STATES DISTRICT COURT
FOR MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

MARTHA SWANN,                          )
                                       )
    Plaintiff,                     )
                                       )          Case No.:
vs.                                    )
                                       )          JURY DEMAND
EAST ALABAMA HEALTH CARE               )
 AUTHORITY, DBA EAST ALABAMA          )
 MEDICAL CENTER,                      )
                                       )
    Defendant.                     )

## COMPLAINT

COMES NOW the Plaintiff in the above-styled case, Martha Swann, by and through her undersigned attorney, and files and serves this Complaint against Defendant East Alabama Health Care Authority, dba East Alabama Medical Center.

## INTRODUCTION

This case seeks to redress Plaintiff Martha Swann's claims against Defendant East Alabama Health Care Authority's (dba East Alabama Medical Center) violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*, amended by the Civil Rights Act of 1991 (hereinafter "Title VII"), based on Plaintiff's sex, female; for Defendant's retaliatory firing Plaintiff after she participated in activities protected by Title VII (i.e., complaining about workplace gender discrimination); and for Defendant's violations of the Equal Pay Act, 29 U.S.C. §§206(d)(1) and 215(a)(3).

## JURISDICTION AND VENUE

1.   Jurisdiction of this Court is invoked pursuant to 28 U.S.C.A. §§ 1331 and 1343:  Plaintiff brings this action under the laws of the United States, thus the district court has original jurisdiction over this case under § 1331; additionally, Plaintiff seeks to recover damages and to secure equitable relief under one or more Acts of Congress providing for the protection of civil rights. See § 1343.

2. Venue is proper as the Middle District of Alabama is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiff's claims, as described below, occurred. See,  28 U.S.C.A. § 1391.

3.  Defendant employs fifteen (15) or more people.

4.   Plaintiff filed her original Equal Employment Opportunity Commission (EEOC) Charge of Discrimination with the EEOC's Birmingham, Alabama, District Office on or around March 15, 2023. Upon Plaintiff's request, on January 31, 2024, the EEOC issued a Notice of Right to Sue (NRTS) to Plaintiff. A copy of Plaintiff's NRTS is attached hereto Exhibit A.

5.  Plaintiff files this Complaint within ninety (90) days after receiving her NRTS from the EEOC.

## PARTIES

6.  Plaintiff Martha Swann (hereafter Plaintiff or Swann) is an adult over the age of nineteen (19) years of age who resides in Chambers County, Alabama.

7. Defendant East Alabama Health Care Authority, doing business as East Alabama Medical Center (hereafter East Alabama Medical Center or EAMC) is a health care authority formed under the laws of the State of Alabama, whose primary place of business is situated in Lee County, Alabama.

FACTS

*Plaintiff Martha Swann*

8. Plaintiff Swann is a woman.

9. In 2017 Plaintiff graduated from Auburn University with a bachelor's degree in Engineering.

10. In or around March 2018, Defendant EAMC hired Plaintiff to work in EAMC's Patient Transportation Department, paying her about $8.12 per hour.

11. Plaintiff took the low-paying Patient Transportation job because she needed health insurance for both herself and her husband.

12. In or around September 2018 Plaintiff began working overtime in Defendant EAMC's Clinical Engineering (CE) Department.

13. Plaintiff was recruited by CE Department John Wiley Morris (hereafter "Morris"), EAMC's CE Department's then-Manager, who became CE Department "Director" in or around December 2020.

14. For about a year, until in or around the first half of November 2019, Plaintiff periodically worked about 12-15 hours per week overtime in the CE Department

(following her full-time shift in Patient Transportation), until on or around mid-November 2019, when Plaintiff began working full-time in EAMC's CE Department.

15.  During the period Plaintiff worked part time in the CE Department, Plaintiff was a "CE Assistant;" when Plaintiff started as a full time CE Department employee, her job title was and remained CE Department "Clinical Engineering Technician I," or "Tech I," through her final date of employment with EAMC.

16.  Plaintiff's job as an EAMC CE Tech I primarily consisted of servicing, maintaining and repairing EAMC healthcare-related equipment, as well as troubleshooting repair needs on EAMC equipment.

17.  At EAMC Plaintiff's job was substantially similar to her CE Department co-workers.

18.  EAMC's CE Department has three (3) technician levels, which, ranging from "lowest" to "highest," are Tech I, Tech II, and Tech III.

19. According to EAMC, all of its CE Department technicians' jobs, regardless of whether a technician is I, II or III, primarily consist of "repairing and utilizing health technology. Working with clinicians and patients…" That is, EAMC's Essential Job Functions for I-, II- and III-level technicians were virtually identical.

20.  At EAMC, Plaintiff's job functions, skills were on par with or exceeded those of one or more of her (male) co-workers who were paid more than her.

21.  At EAMC, Plaintiff, when measured by her combined job production,

experience, ability, training and education, possessed and employed skills on par with or exceeding those of one or more of her (male) co-workers who were paid more than her.

### Defendant East Alabama Medical Center

22.  At all times pertinent to this action and the allegations made herein, Morris was employed by Defendant EAMC and acted as its agent and representative.

23.  At all times pertinent to this action and the allegations made herein, Susan Johnston (hereafter "Johnston"), whose title was and remains "Vice President, Human Resources," for EAMC, was employed by Defendant EAMC and acted as its agent and representative.

24.  At all times pertinent to this action, EAMC adopted and ratified Morris' and Johsnton's acts and omissions as they related to Plaintiff.

25.  EAMC makes a practice of directing employees not to discuss their own wages or salaries with their coworkers.

26.  Morris made it a practice to tell CE Department employees, including Plaintiff, not to discuss their own income with one another.

27.  EAMC and Morris, as EAMC's agent and representative, violate federal workplace law and/or regulations by prohibiting employees from discussing their own income with their co-workers.

28.  EAMC's and Morris' practice of violating federal workplace law and/or

regulations regarding EAMC employees discussing their own respective incomes with one another evidences EAMC's disdain for workplace pay laws and regulations.

29.  At all times pertinent to this action, EAMC's Employee Handbook / Policies did <u>not</u> prohibit Retaliation against employees who report or complain about sex-based pay discrimination.

30.  At all times pertinent to this action EAMC's Employee Handbook / Policies were silent on prohibiting Retaliation for complaining about general gender-based terms and conditions of employment, notably including pay and disparate treatment.

31.  At all times pertinent to this action, EAMC's Employee Handbook sent a message, from EAMC's decision makers to rank and file employees to "keep quiet" about reporting or complaining about gender-based terms and conditions of employment, notably including pay and disparate treatment.

32.  At EAMC, Plaintiff's new-hire training was rushed, notably regarding workplace sex discrimination policies and practices.

33. Along with other new hires with whom Plaintiff "trained," EAMC supervisors simply encouraged Plaintiff to click through slideshows and "power through" the quizzes until they were passed. Plaintiff tried to take her time to read the slides and quiz questions, but her manager sent someone to the computer lab to ask what was taking her so long and hurry her up.

34. After that, EAMC annually directed employees, including Plaintiff, to go back through all the same or similar slideshows and take the same or similar quizzes; there was no human training regarding workplace sex discrimination.

35. Plaintiff felt like EAMC was trying to "check off a box," and not actually train and instill into employees that workplace sex discrimination was wrong and prohibited.

36. EAMC's scant and rushed online training sent a message all employees, up and down the chain, that EAMC's Human Resources department and other decision makers considered prohibiting workplace sex discrimination of little importance.

*Pay Discrimination and Retaliation*

37. Plaintiff's hourly wage was less than one or more men who also served as EAMC CE Department technicians.

38. Plaintiff's job duties, skills, effort and responsibilities, education, and experience were comparable to or exceeded those of one or more men whom EAMC paid more than her.

39. When Plaintiff became a full-time CE Tech I in November 2019, EAMC paid her $14.08 / hour, lower than the $20.00 / hour Plaintiff requested. Around this time at least one of Plaintiff's male co-workers claimed: "They're fucking her over on her pay rate," referring to EAMC and Plaintiff, respectively, which demonstrated the

obviousness of gender discrimination in pay perpetrated against Plaintiff.

40.   Morris justified the low starting pay rate by telling Plaintiff she had "the greatest potential for growth." But in following years, particularly in or around the second half of October 2022, Morris retracted and reneged on this assertion.

41.   Between her 2019 full-time hire date in the CE Department through December 2022, Plaintiff received four (4) small pay raises, but each raise was always below one or more of her male co-workers' pay rate or corresponding raise; male co-workers whose combined education, skills, experience and work duties were comparable to, or less than, Plaintiff's.

42.   In or around early April 2022 Plaintiff complained to Morris about being treated differently from her male co-workers, for example, about receiving after-hours emergency calls while she was not on "on call," yet not receiving "on call" pay. In front of Plaintiff's co-workers, Morris accused Plaintiff of being "greedy" and not having "integrity." When Plaintiff left the conversation Morris, referring to Plaintiff, exclaimed: "*Imagine being married to THAT!*" Yet Morris later called Plaintiff "aggressive."

43.   In late July 2022, Plaintiff had a meeting with Morris and told Morris EAMC "wasn't supposed to be paying a woman less than a bunch of guys," and "I'm pretty sure there are laws about that," or words to that effect.

44.   During Plaintiff's late July 2022 meeting with Morris, and in the context of pay, she added that when anyone looks at her education, merits and experience, she was

above several men.

45.  Morris' responded to Plaintiff by saying if she wasn't happy with her EAMC pay, she could look elsewhere for work; Morris also scolded Plaintiff for discussing her pay with one of her male co-workers.

46.  Morris also told Plaintiff that, in fact, he had the power to move employees up and increase their pay, following with, "Why should I do that for you?" In the context and circumstances of the moment Plaintiff's then-present sense impression was that Morris was propositioning her, or in the alternative, sought a proposition from Plaintiff. Plaintiff felt "creeped out" and was stunned silent.

47.  Finally, Plaintiff said, "I genuinely don't know what you are referring to," or words to that effect. Morris just stared at Plaintiff for a few beats. He refused to clarify.

48.  Plaintiff said something like, "I guess this is over," or words to that effect and left.

49.  Within three (3) days following this late July meeting, Morris ordered Plaintiff to cancel her scheduled training in Batesville, Indiana, so he could send someone else, a male co-worker. Morris' pretext for canceling Plaintiff's training:  She did not have a plane ticket, even though she already told Morris she was driving.

50.  Twice during the second half of October 2022, Plaintiff met with Morris about her pay. During the first meeting she mentioned the Equal Pay Act and how she believed EAMC was perpetrating sex-based pay discrimination.

51.  During her first late-October meeting with Morris, Plaintiff asked him, "Other than being a woman, why am I the lowest paid person in the shop?" Morris offered no answer in response.

52.  At the first late-October 2022 meeting, when Plaintiff raised the issue of her Bachelor's Degree, Morris refused to tell her how he and EAMC were counting or considering it.

53.  At the first late-October 2022 meeting, Plaintiff told Morris that at least *someone* in HR had figured they had to follow the Equal Pay Act, or other such non-discrimination laws, but that she wasn't happy settling for the bare minimum forever and felt they were wrong for having done that in the past. Plaintiff asked Morris, *"Other than being a woman, why am I the lowest person in the shop?"* Morris neither had nor offered any response.

54.  At her second late-October meeting with Morris, Morris told Plaintiff she was to receive a slight raise, but Morris also ordered Plaintiff not to discuss her pay with anyone else (a violation of one or more federal laws or rules). Plaintiff defied Morris' unlawful order, discussed her new rate with co-workers and discovered she would would still be paid less than one or more male co-workers with less experience and/or education and/or both.

55.  On or about December 27, 2022, Plaintiff and Morris met for the last time.

56.  In fact, on the December 27, 2022, Morris came into work on an off day and

called Plaintiff to come into his office, intending to initiate a confrontation.

57.    During the December 27, 2022, confrontation / meeting, Morris berated Plaintiff. Plaintiff told Morris that she had to work longer, had to perform better, than anyone else, but that she got paid less than anyone else. Morris told Plaintiff that he "couldn't trust" her.

58.    At the December 27, 2022, confrontation / meeting, Plaintiff complained again about a gender-based double standard in treatment and pay, specifically mentioning one of her male colleagues who just got automatic raises, with no need to endure long and confrontational meetings with Morris. Plaintiff told Morris this was because her co-worker was a man. The male-female disparity and double-standard in workplace terms and conditions was obvious, but ignored by Morris.

59.    On December 30, 2022, Morris came back into work on his off day and fired Plaintiff.

60.    Morris wrote numerous pretexts-reasons in a January 2023 Termination Document, apparently in hopes something would "stick."

61.    In his January 2023 Termination Document Morris' pretext-reasons included Plaintiff appearing "unhappy," not answering her phone soon enough; and using profanity.

62.    In fact, none of the pretexts Morris gave were valid. Plaintiff had several times explained to Morris that she was not happy with her pay -- based on gender

discrimination; Plaintiff answered her phone in no more and no less a timely manner than other CE Department Techs and in line with CE Department call policy; the profanity Morris cited was not, in fact, said by Plaintiff, moreover, most all CE Department Techs, including and in particular the woman Tech with whom Morris enjoyed a sexually-charged workplace relationship, swore like sailors.

### *Sex Discrimination and Retaliation*

63.  Morris had and has an EAMC workplace reputation of flirting with women and/or sexualizing his relationships with women at the workplace.

64.  Plaintiff declined to flirt with Morris.

65.  EAMC has, and has had, actual knowledge of credible allegations that Morris, as CE Supervisor or "Team Lead," engaged in sex at the workplace with at least one woman EAMC employee to whom Morris was not related, but declined to thoroughly investigate Morris or such allegations.

66.  EAMC, by its acts and omissions, condones Morris using his supervisory position to take sexual advantage of women employed by EAMC.

67.  About 18 months following Plaintiff's beginning her full-time job with EAMC's CE Department, EAMC hired a woman whose initials were R.F. to work in its CE Department.

68.  R.F. had two (2) years more education than Plaintiff, but Plaintiff had between

2-3 more years work experience working in the CE Department than R.F.

69.  R.F. started work at EAMC as a Tech I, like Plaintiff.

70.  Soon after R.F. came on board with the CE Department, Morris – who had previously been quite friendly to Plaintiff – began flirting with R.F., while becoming increasingly hostile towards Plaintiff.

71.  Within about 30-60 days following R.F. beginning as an EAMC Tech I, Morris began entering "coachings" into Plaintiff's employment / Human Resources file without Plaintiff's knowledge. Morris entered these "coaching" notes into Plaintiffs file in order to make a paper trail in case he later wished to have a pretext with which to backfill reasons to fire Plaintiff. Plaintiff's understanding and belief is that Morris did not make "coaching" notes into her male co-workers' files, at least not to the degree or purposed as they were in Plaintiff's file.

72.  Within about ninety (90) days of being hired, R.F. was promoted to Tech III by Morris.

73.  Morris' message to the CE Department was clear:  "Two sets of people advance in the CE Department:  first, men; and, second, women who flirt with me, who allow me to be sexually playful with them."

74.  Tech III's make more money than Tech I's.

75.  Plaintiff had 2-or-more years additional education than one-or-more of her male co-workers; but this / these less-educated men, were promoted over and past her.

76.  Plaintiff, who was married and not interested in flirting with Morris, became increasingly the subject of Morris' hostility.

77.  R.F. and Morris became an almost inseparable item within the CE Department, appearing to be "a couple."

78.  R.F. was one of the CE Department employees who swore like a sailor, not only routinely used phrases and words like "motherfucker" and "stupid bitch" in reference to specific EAMC co-workers, but Morris laughed along with R.F. whenever she swore, appearing to delight and take joy in R.F. using crude, ribald and unprofessional language.

79.  At the workplace Morris and R.F. behaved as would two people with a close intimate relationship, leaning into each other and giggling. Morris had and used a pet name for R.F.

80.  As Plaintiff kept her professional distance and kept her focus on work, not on pleasuring Morris, Morris only treated Plaintiff with more antagonism.

81.  On or about December 30, 2022, when Morris fired Plaintiff within about three (3) days of her complaining to him about sex discrimination, he not only fired her for complaining about sex discrimination, but for Plaintiff's refusing to be a sexual flirt *with* Morris.

82.  Plaintiff's complaining to Morris about workplace pay discrimination was an activity protected by the Equal Pay Act.

83. EAMC's firing Plaintiff in late-December 2022, was an adverse action such that it would have dissuaded a reasonable worker from either making or supporting a charge of discrimination within EAMC's workplace.

84. But for Plaintiff complaining to Morris about sex discrimination and pay discrimination based on sex on or about December 27, 2022, Morris would not have fired Plaintiff on or about December 30, 2022.

85. Plaintiff complaining to Morris about sex discrimination and pay discrimination based on sex on or about December 27, 2022, was at least a motivating factor in Morris' firing Plaintiff on or about December 30, 2022.

86. EAMC's firing Plaintiff in late-December 2022, through its agent and representative Morris constituted an adverse employment action.

87. EAMC's firing Plaintiff in late-December 2022, through its agent and representative Morris, constituted retaliation for Plaintiff's opposing workplace sex discrimination, both in treatment and pay.

88. Plaintiff's complaining to Morris about workplace sex discrimination was a protected activity under Title VII, for which EAMC fired her.

89. Plaintiff's complaining to Morris about pay disparity based on sex was a protected activiy under the Equal Pay Act, for which EAMC fired her.

90. In his January 2023, "Termination Document," Morris lists various ways he considered Plaintiff "disrespectful" towards him on December 27, 2022.

91.  In his Termination Document, Morris refused to note Plaintiff's again raising the issue of unequal pay based on sex; to Morris and EAMC, Plaintiff's opposing workplace gender discrimination was "disrespectful."

92.  Morris' Termination Document is rife with petty jabs at Plaintiff – e.g., "looking at her phone," "sitting around," etc. -- that neglects noting that Plaintiff's male co-workers "look at their phones" for personal reasons and "sit around," while Plaintiff's workplace productivity was as high or higher than any of her co-workers. Morris failed or refused to consider or investigate whether Plaintiff's male co-workers "look at their phones" or "sit around" as much or more than Plaintiff.

93.  In fact, Morris earlier complained to Plaintiff that she did not look at her phone *enough* – a classic, lose/lose, gaslighting technique employed by Morris.

94.  In his Termination Document Morris called Plaintiff "aggressive," when, in fact, Morris was the aggressor. Additionally, during Plaintiff's tenure in EAMC's CE Department, Morris more than once got into heated arguments with Plaintiff's male co-workers, but never gave the male co-workers write-ups, let alone fired them, in the wake of those arguments.

**Plaintiff's Post-Firing "Hearing"**

95.  In or around late January 2023, after Plaintiff objected to her firing, she attended a "hearing" on her termination with members of EAMC's leadership.

96.   EAMC Human Resources Vice President Susan Johnston conducted the hearing.

97.   Including Vice President Johnston, more than half-a-dozen members of EAMC's leadership, decision-making, team attended the late January hearing on EAMC's behalf, while Plaintiff Martha Swann was on her own.

98. By its nature, the post-firing grievance hearing's set-up and contours was, and was meant to be, intimidating to Plaintiff.

99.   Along with Vice President Susan Johnston, the EAMC leadership team arrayed against Plaintiff at her grievance hearing consisted of Greg Nichols (Executive Vice President / Administrator); Dennis Thrasher, Nicki Ware (Vice President / Quality, Chief Nursing Officer); Chris Clark (Vice President / Clinical Services); Sarah Nunelly (Executive Vice President / Chief Operating Officer); and EAMC's General Counsel, Roben Casey.

100.  EAMC's lawyer attended the hearing, while Johnston made it crystal clear to Plaintiff that she, Plaintiff, was not allowed to have counsel at the hearing. Johnston did this by both emailing Plaintiff around five (5) days before the hearing:  "We do not allow any representation at these meetings," and by telling Plaintiff the same thing at the hearing's outset.

101. During the hearing, Plaintiff tried to tell the EAMC decision-makers in attendance that one of her co-workers was freely allowed to be insubordinate towards

Morris, "Because he's a male…" but was instantly interrupted and shouted down by one or more of EAMC's decision-makers, saying, "That's not why we're here!" or words to that effect.

102.   EAMC's leadership team was not interested in and refused to consider Plaintiff's opposition to EAMC workplace gender discrimination.

103.   During the hearing, EAMC Vice President and General Counsel Roben Casey cut Plaintiff off, interrupted her, when she tried to explain how Morris prohibited CE Department employees from speaking to EAMC's Human Resources Department about issues with the CE Department.

104.   During the hearing Plaintiff tried to explain how Morris' firing her, was retaliatory, but was again cut off by one or more members of the EAMC leadership team; the leadership team became increasingly belligerent towards Plaintiff, not wanting Plaintiff to even raise the issue of or even say the word "retaliation."

105.   During the hearing, Plaintiff tried to raise the issue of her refusing to flirt with Morris for promotion and, in the end, more money, saying that Morris needed to be flirted with by women in order to be promoted, but, again, the EAMC leadership team refused to take Plaintiff at her word and investigate her charges.

106.   During the hearing, Plaintiff attempted to show Johnston a text message from a former EAMC employee about the former employee walking in on Morris having sex with a female co-worker, but Johnston refused to look, wrapped-up the hearing

quickly and told Plaintiff that Plaintiff could send the text later. Neither Johnston nor any of EAMC's leadership team assembled, wanted to discuss the issue of Morris' workplace sexual improprieties.

107.  Later that day Plaintiff emailed Johnston audio of two former EAMC employees discussing Morris having workplace sex. Johnston did not criticise Morris.

108.  During the hearing, Plaintiff raised and opposed, and/or attempted to raise and/or oppose, issues of both workplace sex discrimination and retaliation at EAMC, but EAMC's leadership team not only showed no interest in such issues, but also demonstrated hostility and contempt towards Plaintiff for complaining about matters EAMC's leadership team did not want to hear, address or investigate.

109.  EAMC conducted no investigation of Plaintiff's complaints of workplace sex discrimination, neither when made to her Director, Morris, nor at the late January 2023 grievance hearing.

110.  About six (6) days after the late January hearing, Johnston notified Plaintiff by mail that EAMC had upheld Morris' firing her.

111.  EAMC's refusing to investigate Plaintiff's complaints about workplace sex discrimination, both in treatment, promotion and wages, proximately caused Plaintiff to lose her job, lose income, lose her ability to make a living going forward, lose insurance and other benefits, and suffer humiliation, stress, mental anguish and damage to her reputation.

112.   Within a couple months of EAMC firing Plaintiff, causing Plaintiff to lose the insurance which covered both her and her husband, her husband became gravely ill and required two (2) months of hospitalization and surgery.

113.   The bill resulting from Plaintiff's husband's illness, hospitalization and surgery exceeded $250,000.00, for which, owing to EAMC's firing Plaintiff, neither Plaintiff nor her husband had adequate insurance, to cover the costs of the hospitalization and surgery.

114.   EAMC's workplace sex discrimination and retaliation proximately caused Plaintiff and her husband becoming saddled with the costs of a catastrophic illness following EAMC firing Plaintiff, an outcome that was foreseeable to EAMC if it fired Plaintiff and stripped her of her benefits, all done in violation of Title VII.

115.   Plaintiff took the first comparable job she could and is currently about 11 months employed in that job, but her new job's daily commute is 200 miles round trip, as opposed to the 26 mile round trip commute she had when employed at EAMC; damaging Plaintiff in gas expense, wear and tear on her vehicle, and lost time away from her husband, all proximately caused by EAMC's firing Plaintiff in violation of Title VII.

116.   EAMC's workplace sex discrimination and retaliation proximately caused Plaintiff to lose her job, lose income, lose her ability to make a living going forward, lose insurance and other benefits, and suffer humiliation, stress, mental anguish and damage to her reputation.

117.   EAMC's workplace violations of the Equal Pay Act were willful and its retaliation for Plaintiff's asserting her rights under the Equal Pay Act, proximately caused Plaintiff to suffer pay disparity between herself and similarly situated male co-workers.

### *Plaintiff's Male Replacement*

118.  Within weeks of firing Plaintiff, EAMC hired a male to replace her.

119.  Plaintiff's male replacement worked in the CE Department under a different job title, but Plaintiff's job duties, skills, effort and responsibilities, education, and experience were essentially the same or comparable to her male replacement's.

120.   Plaintiff's male replacement told Plaintiff his income, which was significantly more than what Plaintiff made.

121.  Plaintiff's male replacement was and remains similarly or less competent at his CE Department job than Plaintiff was when she was employed by EAMC.

122.  In the year or more since Plaintiff was replaced, her male replacement has had disciplinary and production problems, along with other workplace issues the likes of which Plaintiff never had, but EAMC refuses to fire him.

123.  In one or more documents made by EAMC and/or its agents after it fired Plaintiff, EAMC mocked Plaintiff for having previously worked in pizza delivery; Plaintiff's male replacement's own resume touts his experience as a "Domino's Pizza Delivery Expert." Even EAMC's contempt for its employees' pizza delivery experience

depends on the employee's gender, evidencing EAMC's sex-based bad faith.

## COUNT I

### Title VII – Workplace Sex Discrimination (42 U.S.C. 2000e-2)

124.  By this reference Plaintiff Martha Swann reiterates and incorporates the allegations set forth in foregoing paragraphs 6-81; 83-88; 90-116; 118-123.

125.  As a woman, Plaintiff Martha Swann is a member of a protected class.

126.  Defendant EAMC, through its policies and practices, and/or acts and omissions perpetrated by its agents and representatives, and/or by and under the doctrine of *respondeat superior* as regards Morris, Johnston, EAMC's Human Resources Department and/or other EAMC employees, discriminated against Plaintiff on the basis of sex in workplace conditions, treatment and pay.

127.  EAMC's discriminatory acts against Plaintiff and harm visited upon her through its unlawful manipulation of the terms and conditions of her employment included, but were not necessarily limited to:  Paying Plaintiff less than one or more male co-workers for the same or substantially similar work; requiring Plaintiff to do extra, additional, work for less pay than one or more male co-workers; pulling or denying training opportunities allowed for male co-workers; counting "experience" to offset a male co-worker's education deficit compared to Plaintiff, while *not* counting Plaintiff's experience compared to her female co-worker who engaged in a sexually-charged relationship with Morris (while Plaintiff refused to flirt with Morris for

promotions or raises); Morris's repeated attempts to berate, humiliate, ridicule or intimidate Plaintiff – beyond mere "civility code" violations – to keep Plaintiff quiet about pay discrimination (in stark contrast to Morris's favorable, even solicitous treatment, of one or more of Plaintiff's similarly situated male co-workers regarding pay issues and workplace conditions); moreover, the discrimination itself was also the harm.

128.   EAMC refused to adequately train and supervise its employees (such as Morris, Johnston, EAMC's Human Resources Department personnel, and its leadership team) to discourage workplace sex discrimination and to encourage employees to report and otherwise oppose Title VII violations; this refusal proximately caused the workplace sex discrimination Plaintiff describes herein.

129.   Defendant EAMC took adverse employment actions against Plaintiff, including, but not necessarily limited to, those described in this Complaint *in passim*, as well as those listed in the foregoing Paragraph No. 119 and 120.

130.  But for Plaintiff's sex, female, she would not have been mistreated and/or otherwise discriminated against as she was by EAMC, nor have been the object of the aforementioned adverse employment actions.

131.  Plaintiff's refusing to allow Morris to sexualize her in the workplace caused Morris's resentment to manifest and grow, resulting in his double standard in treatment between Plaintiff and her co-workers; for comparison, R.F. allowed Morris to sexualize her, R.F., in the workplace, and she benefited from it.

132.   Neither Plaintiff nor any woman employed in EAMC's CE Department should have to Morris's sexualizing them as a term or condition of the workplace.

133. Plaintiff's sex was at least *a*, if not *the*, motivating factor behind EAMC's adverse actions taken against Plaintiff.

134. Plaintiff's Complaint presents a convincing mosaic of facts and circumstances that, considered in their totality, show that it can be reasonably and plausibly inferred that Plaintiff's sex was at least a motivating factor in the adverse employment actions EAMC took against her.

135.   EAMC's herein described sex-based discriminatory treatment and pay discrimination perpetrated against Plaintiff constituted an unlawful employment practice, violating Title VII of the Civil Rights Act of 1964 (42 U.S.C. § 2000e-2).

136. EAMC's unlawful acts proximately caused, and/or as a result of EAMC's unlawful discriminatory conduct and deprivation of Plaintiff's federally protected rights, Plaintiff has suffered damages, including but not limited to back pay and front pay; loss of benefits (and the consequences arising therefrom); loss of future benefits; mileage and related damages due to Plaintiff's new, significantly increased work commute; as well as non-economic damages including emotional distress, humiliation, embarrassment, and mental anguish.

137.  EAMC is liable to Plaintiff for the foregoing damages described in this Count I, as well as for punitive damages for EAMC's intentional discriminatory acts and/or acts perpetrated with reckless disregard for Plaintiff's rights under Title VII.

## COUNT II

## Title VII – Retaliation (42 U.S.C. § 2000e-3(a))

138.  By this reference Plaintiff Martha Swann reiterates and incorporates the allegations set forth in foregoing paragraphs 6-81; 83-88; 90-116; 118-123.

139.  Plaintiff participated in one or more protected activities as described by Title VII and relevant case law, including, but not necessarily limited to, opposing sex-based workplace discrimination.

140. In the wake of Plaintiff's opposing workplace sex discrimination, EAMC took materially adverse employment actions against Plaintiff, including, but not necessarily limited to Plaintiff's supervisor, Morris, berating Plaintiff for bringing up equal pay issues; Morris directing Plaintiff to accept discriminatory pay or quit; Morris constructing pretexts to fire Plaintiff; Morris demanding Plaintiff not talk about her wage with her co-workers; EAMC (through Morris and its Human Resources Department) refusing to undertake a thorough, good faith, investigation of Plaintiff's repeated complaints about workplace gender discrimination and gender-based pay discrimination; and firing Plaintiff.

141. Based on the facts set forth in this Count II, Plaintiff demonstrates that a causal connection exists between her participation in one or more statutorily protected activities, and in the adverse employment actions taken against Plaintiff by Defendant EAMC. Additionally, Plaintiff's complaints of workplace discrimination based on sex were made in good faith and, in late October 2022, and again in late December of 2022, were temporally proximate to EAMC firing her on or about December 30, 2022.

142. Title VII prohibits an employer from retaliating against its employee (or former employee) because she has made a charge, testified, assisted, or participated in any manner in an investigation, or proceeding under Title VII, or because she opposed any practice unlawful under Title VII.

143. Defendant EAMC's retaliatory actions well might have dissuaded a reasonable employee from engaging in protected activity, and therefore constitutes retaliatory mistreatment.

144. Defendant's failure or refusal to conduct a good faith, thorough, investigation of Plaintiff's workplace gender discrimination complaints constituted retaliation under Title VII, as such failure or refusal was of a type and nature that well might have dissuaded a reasonable employee from engaging in protected activity.

145. Before Plaintiff's late January 2023 grievance hearing, she held the reasonable expectation that she could get her December 2022 firing reversed and be reinstated, if only EAMC's decision makers would conduct a good faith, thorough,

investigation into her complaints about the events leading up Morris firing her, particularly regarding her complaints regarding workplace sex discrimination, pay discrimination based on sex, and Morris's double-standards in how he treated Plaintiff and her male co-workers.

146.    The members of EAMC's leadership team who attended her grievance hearing had no intention of listening to Plaintiff in good faith, let alone conducting any good faith investigation of, workplace sex discrimination, Morris' retaliation, gender-based double standards in workplace terms and conditions within Morris' CE Department, and the like.

147.    The belligerency exhibited by EAMC's leadership team towards Plaintiff during the late January 2023 grievance hearing and failure or refusal to conduct a good faith investigation into Plaintiff's workplace discrimination complaints, constituted illegal retaliation.

148. Defendant's unlawful acts proximately caused, and/or as a result of Defendant's unlawful discriminatory conduct and deprivation of Plaintiff's federally protected rights, Plaintiff to suffer monetary damages, including but not limited to back pay and front pay; family medical bills, loss of past and future benefits; and non-economic damages including emotional distress, humiliation, embarrassment, and mental anguish.

149. Defendant EAMC is liable to Plaintiff for the foregoing damages described in this Count II, as well as for punitive damages for EAMC's intentional discriminatory acts and/or discrimination perpetrated with reckless disregard for Plaintiff's rights.

**COUNT III**

**Equal Pay Act  -- 29 U.S.C. §206(d)(1)**

150.  By this reference Plaintiff Martha Swann reiterates and incorporates the allegations set forth in foregoing paragraphs 6-62; 82; 84-87; 89; 95-104; 109-110; 117-118.

151. Plaintiff's work and Defendant are both covered under the Fair Labor Standards Act, as amended by the Equal Pay Act of 1963.

152. During the three (3) years preceding the filing of this Complaint, Defendant was, and is, an enterprise engaged in the operation of a hospital, under 29 U.S.C. § 203(s)(1)(B).

153. During the three (3) years preceding the filing of this Complaint, Defendant was an enterprise wherein two (2) or more employees, including Plaintiff and other EAMC employees in the CE Department, engaged in interstate commerce and whose employees handle and/or work on goods that have been moved in and/or produced in commerce.

154.  Defendant discriminated between Plaintiff and other EAMC CE Department employees on the basis of sex; that is, EAMC paid Plaintiff at a rate less than the rate at

which it paid wages of the opposite sex for equal work on jobs the performance of which required equal skill, effort and responsibility, and which were performed under similar working conditions.

155.   Any excuse Defendant EAMC makes for paying Plaintiff at a rate less than one or more of her male co-workers based on a seniority system (where, in fact, Plaintiff was equal or senior); a merit system (where Plaintiff's education and/or production met or exceeded one or more of her higher-paid male co-worker/s); quantity or quality of production (where Plaintiff's quantity or quality of production equaled or exceeded one or more of her higher-paid male co-workers); or on any other differential based on any other factor other than sex, was and remains mere pretext.

156.   Defendant EAMC's failure willfully violated the Equal Pay Act's / 29 U.S.C. §206(d)(1)'s prohibition of sex discrimination in pay.

157.   Plaintiff is entitled to receive back pay, interest, attorney fees, and costs of litigation under the Equal Pay Act.

158.   Defendant EAMC's bad faith violation of the Equal Pay Act entitles Plaintiff to liquidated damages in an amount double the back pay award.

## COUNT IV
### Equal Pay Act – Retaliation  -- 29 U.S.C. §215(a)(3)

159.   By this reference Plaintiff Martha Swann reiterates and incorporates the allegations set forth in foregoing paragraphs 6-62; 82; 84-87; 89; 95-104; 109-110; 117-

118.

160. Plaintiff's work and Defendant are both covered under the Fair Labor Standards Act, as amended by the Equal Pay Act of 1963.

161. Plaintiff's complaints of wage discrimination based on sex were made in good faith and, in late October 2022, and again in late December of 2022, were temporally proximate to EAMC firing her on or about December 30, 2022.

162. Defendant EAMC's firing Plaintiff for complaining about wage discrimination based on sex constituted a materially adverse employment action.

163. Defendant EAMC's firing Plaintiff for complaining about wage discrimination based on sex constituted retaliation prohibited by and under 29 U.S.C. §215(a)(3).

164. Plaintiff is entitled to recover damages under the Equal Pay Act, including reinstatement, lost wages and liquidated damages for Defendant's prohibited retaliation against her.

## REQUEST FOR RELIEF

NOW, WHEREFORE, Plaintiff Martha Swann respectfully requests the following relief after trial of this case by struck jury:

A. Regarding Count I, Title VII discrimination based on sex: Entry of judgment in Martha Swann's favor and against Defendant for compensatory damages as described and/or referenced in Count I Paragraph 136, as well as punitive damages for Defendant's

intentional discriminatory acts perpetrated with reckless disregard for Plaintiff's rights under Title VII, as described and/or referenced in Count I Paragraph 137. Plus reasonable costs and attorneys fees.

B.  Regarding Count II, retaliation in violation of Title VII:  Entry of judgment in Martha Swann's favor and against Defendant for compensatory damages as described and/or referenced in Count II Paragraph 148, as well as for punitive damages for Defendants' intentional discriminatory acts perpetrated with reckless disregard for Plaintiff's rights under Title VII, as described in Count II Paragraph 149. Plus reasonable costs and attorneys fees.

C.  Regarding Count III, Equal Pay Act violations:  Entry of judgment in Martha Swann's favor and against Defendant for backpay / pay disparity damages, as described in Count III Paragraph 157, as well as for liquidated damages for Defendant's intentional violations of the Equal Pay Act, as described in Count III Paragraph 158. Plus reasonable costs and attorneys fees.

D.  Regarding Count IV, Equal Pay Act retaliation:  Entry of judgment in Martha Swann's favor and against Defendant for its retaliating against Plaintiff for her asserting her rights under the Equal Pay Act, as described in Count IV Paragraphs 163 and 164. Plus reasonable costs and attorneys fees.

Plaintiff respectfully requests any additional relief in law or equity, which the Court may see fit to grant.

Respectfully filed on this, the 25th day of April, 2024.


 _/s/  Richard R. Newton_
Richard R. Newton (ASB-0776-w85r)
Richard R. Newton,
 Attorney at Law, P.C.
Attorney for Plaintiff Martha Swann
2100 Southbridge Pkwy – Suite 650
Birmingham, AL  35213
Tel:  (205) 356-2498
richardrussellnewton@gmail.com


## SERVICE OF PROCESS

To be Served on Defendant by and under Rule 4(h)(1) of the Federal Rules of Civil Procedure, by serving an officer or managing or general agent of Defendant and/or one or more Sections of Fed. R. Civ. P. Rule 4, as allowed and appropriate.


Dated this, the 25th day of April, 2024.


_s/ Richard R. Newton_
Attorney for Plaintiff, Martha Swann

EXHIBIT A

Martha Swann v. East Alabama Health Care Authority



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Birmingham District Office**

Ridge Park Place
1130 22nd Street South, Suite 2000
Birmingham, AL 35205
Intake Information Group: 800-669-4000
Intake Information Group TTY: 800-669-6820
Birmingham Direct Dial: (205) 651-7020
FAX: (205) 212-2105
Website: www.eeoc.gov

## DISMISSAL AND NOTICE OF RIGHTS
(This Notice replaces EEOC FORMS 161, 161-A & 161-B)

Issued On: January 31, 2024

To: Martha Swann
P.O. Box 176
Waverly, AL 36879

Charge No: 420-2023-01974

EEOC Representative and email:   CRYSTAL GIBSON
Investigator
crystal.gibson@eeoc.gov

### DISMISSAL OF CHARGE

The EEOC has granted your request for a Notice of Right to Sue, and more than 180 days have passed since the filing of this charge.

The EEOC is terminating its processing of this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, your lawsuit must be filed **WITHIN 90 DAYS** of your receipt of this notice. Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign in to the EEOC Public Portal and upload the court complaint to charge 420-2023-01974.

On behalf of the Commission,

SHERI GUENSTER  Digitally signed by SHERI GUENSTER
Date: 2024.01.31 17:14:26 -06'00'

/for Bradley A. Anderson
District Director