# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| MARTHA SWANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No.  2:24-cv-00244 |
| | ) | |
| EAST ALABAMA MEDICAL | ) | |
| CENTER, | ) | |
| | ) | |
| Defendant. | | |

## <u>DECLARATION OF ROBEN CASEY</u>

1.     My name is Roben Casey. I am over the age of 21 and am competent to testify to the facts and matters set forth herein. This Declaration is based on my personal knowledge.

2.     I am currently employed by East Alabama Medical Center ("EAMC") as its Chief Legal and Governance Officer. In January 2023, my official title was Vice President and General Counsel. I have directly reported to Laura Grill ("Grill") (EAMC Chief Executive Officer) (or her predecessor as CEO) throughout my time as Chief Legal and Governance Officer and Vice President and General Counsel. I have never reported to Sarah Nunnelly during my employment with EAMC.

3.     Sarah Nunnelly ("Nunnelly") is currently the Chief Strategy and Business Development Officer of EAMC. In January 2023, Nunnelly's job title was Executive Vice President and Chief Operating Officer. In both roles, Nunnelly has

reported directly to Grill.

4.    In January 2023, I served on a grievance panel in relation to Martha Swann's grievance of her December 30, 2022 discharge. To the best of my recollection, six (6) other EAMC employees served with me on the grievance panel. As part of my participation on the grievance panel, I attended and participated in Ms. Swann's grievance hearing on or about January 24, 2023 and lasted approximately half an hour.

5.    I have reviewed a written transcript of this January 24, 2023 grievance meeting provided to EAMC by Plaintiff in discovery. That transcript is attached to this Declaration as **Exhibit 1**. Based on my recollection, this transcript accurately reflects the general substance of the grievance meeting, though there may be some errors in the transcript that do not accurately reflect the exact words spoken.

6.    Prior to the January 24, 2023 grievance hearing, I do not recall any personal interaction between myself and Ms. Swann.

7.    I played no role in any decision making process related to Ms. Swann's rate of pay during her employment with EAMC.

8.    I also played no role in any decision to issue disciplinary action to Ms. Swann during her employment with EAMC, including the termination of her employment on or about December 30, 2022.

9.    During her employment with EAMC, Ms. Swann never made any

2

complaints or raised any concerns to me and I was not familiar with any such complaints or concerns from Ms. Swann during her employment. Accordingly, I never played any role in responding to, investigating, or addressing any of Ms. Swann's alleged complaints. I only became aware of Ms. Swann's pay-related complaints in January 2023 as a member of the grievance panel.

10.     Based on my understanding as a grievance panel member, the termination of Ms. Swann's employment had nothing to do with EAMC's Corporate Compliance Policy, which is primarily concerned with EAMC's standards of conduct for compliance with legal and ethical business practices.

11.     Attached hereto as **Exhibit 2** is a true and correct copy of a portion of EAMC's Employee Handbook, which includes EAMC's Grievance Procedure policy. This is the Policy under which Ms. Swann brought a grievance related to her December 30, 2022 termination and pursuant to which I served as a member of Ms. Swann's grievance panel.

FURTHER DECLARANT SAYETH NOT

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Dated this 6th day of June, 2025.

Roben Casey

# Exhibit 1

Susan Johnston **(0:20)**:

Hey Martha.

<sound of walking, barely intelligible introductions>

Susan Johnston **(0:48)**:

Okay. Martha. Okay, this is Martha Swann.

Martha Swann **(0:50)**:

Can I

Susan Johnston **(0:52)**:

Record? No, you cannot. Okay. This is Martha Swann and she is, um was an employee. You all have all her documentation. Martha? I'm Susan Johnston. I'm the vice president of Human Resources and I'm going to have everybody go around the room and introduce themselves to you.

Dennis Thrasher **(1:10)**:

Okay. I'm Dennis, vice President Controller.

Chris Clark **(1:13)**:

Hey Martha, I'm Chris, vice president of clinical services.

Roben Casey **(1:15)**:

Roben Casey, I'm General Counsel.

Nikki Ware **(1:18)**:

Nikki Ware, CNO.

Gregg Nichols **(1:21)**:

We met each other.

Sarah Nunnely **(1:22)**:

Hi Martha I'm Sarah Nunnely, I'm the Chief Operating Officer.

Martha Swann **(1:26)**:

All right.

Susan Johnston **(1:27)**:

Okay. So the way this works is we're going to ask you to talk to us about the event that led to your termination. Okay. So if you could tell us from your perspective what happened that day. That was the day that John came in and you all had sort of a disagreement, discussion. So if you could share with us what happened on that event, please.

Martha Swann **(1:54)**:

So that actual day, there was a lot leading up to it but on that particular day it was right after lunch. So we mostly eat lunch down there. So I had been eating lunch at my desk and I was looking at my phone while I was eating lunch for about probably the whole 30 minutes. And when I got up to leave the shop, John was sitting at his desk and he asked me to he was like "Martha, you've been on your phone all day." When he said, I was like, are you talking about when I'm eating lunch? And he's like, "No. Just every time I've looked at you today, you've been

on your phone." And I was like are you talking about when you first walked in this morning? And I was pulling up a picture while we were talking and I was asking him, well, what other times did you see me on my phone other than that?

**(2:53)**:

Or are you talking about when I ate breakfast and when I ate lunch? Because I wasn't sitting around messing around on my phone all day except for that. And I was like, <laugh> had quite a few discussions with him about if you see me doing something, please tell me right then. I don't care if other people are in the shop. If you see me and you think I'm not working, please say something at the time so that I'll correct it and not just later say oh, "many, many different times I saw you do this thing that everyone else in there is allowed to do." But it kind of went back to this long discussion, kind of long standing disagreement we had where I told him,

Susan Johnston **(3:38)**:

So wait, hang on.

Martha Swann **(3:39)**:

Sure.

Susan Johnston **(3:41)**:

We finished that event. So what happened?

Martha Swann **(3:42)**:

He snapped at me. I think that's the voice he uses to his dog was—

Susan Johnston **(3:53)**:

When you say "snapped," can you be specific?

Martha Swann **(3:55)**:

Yes, I said that, I basically said I wasn't on my phone all day. And he goes, "Don't talk back to me, don't argue with me!" And then we argued.

Susan Johnston **(4:11)**:

What was that?

Martha Swann **(4:13)**:

It started with that I brought back that I haven't been, I was eating lunch. So if you're mad that I was just on my phone, I was eating lunch for my 30 minute break. And then we went back to that part a few times. But a lot of the argument was I told him that he's not applying his rules evenly to everyone. He was singling me out.

Susan Johnston **(4:43)**:

And what words did you use during that discussion?

Martha Swann **(4:46)**:

Let's see. It was along the lines of that it doesn't matter what I do, you're always going to find an excuse to invalidate anything I've done. He would ignore — the actual work I did is ignored, just, "I saw you on your phone one time and so that means you don't work and everyone else down here is working." It's, that's not what we're talking about.

Roben Casey **(5:19)**:

Did you say, "If you pay me like shit you'll get shit,"?

Martha Swann **(5:22)**:

No, that's actually not how I worded it. What I said was, and I think this was towards the very end of us talking for the day, but I said that he pays me less than everyone else. And that if, you know, think I'm doing such a bad job you're getting what you're paying for, which I don't think I do a bad job. I think I was actually one of the better techs down there, but I told him that you're, you're picking at me over very minor things that other people are allowed to do and you're paying me less than everyone else. You're surprised that you'd think that you're getting a lower quality of work, but you're paying less. You're paying me less than everybody. And that was a probably year and a half of trying to understand why that was.

Roben Casey **(6:16)**:

So you didn't say that? "If you pay me like shit you get shit,"?

Martha Swann **(6:20)**:

I don't think I said it exactly like that. I'm sure I said shit in there at least once. <laugh> probably more than once, but I don't think that I worded it that way. But it was basically, I guess the exact same. The meaning was that you're getting what you pay for basically.

Female Speaker **(6:37)**:

Did you say that at some point in the conversation, "You're riding my ass, why are you riding my ass,"?

Martha Swann **(6:41)**:

Yeah. Which goes back to I feel like he was treating me differently, not applying the rules of the shop to me the same way he was to other people. And I had kind of a longstanding argument with him because I felt like he was bullying me and I told him, I feel like you're bullying me if you say that. I don't he would say I didn't have integrity. And I'm like, when have I ever lied about anything? And he would get annoyed if me and somebody were talking about video games. It's like, it's okay to sit around and talk, but you're just annoyed that you don't like what I'm talking about. It just seems like you're, you're annoyed by me. That's not something that I can correct that you just don't like my personality, which he used to. And he suddenly changed and never really explained to me why that was either. But yeah, we had a long standing thing where it was like, why are you on me about things that everyone else is allowed to do.

Susan Johnston **(7:53)**:

So going back to the event, you admit to using the term, "riding your ass," using the terminology "shit" in that conversation and you keep referring to an argument.

Martha Swann **(8:09)**:

Yeah.

Susan Johnston **(8:11)**:

So from a work perspective, is that appropriate in the workplace?

Martha Swann **(8:19)**:

I actually brought some things to show that that's the work environment down there.

Susan Johnston **(8:25)**:

No, we're talking about this particular situation.

**Martha Swann (8:28)**:

I used profanity and I used it in the context that profanity is used down there every day and I felt like it was an acceptable time to use it because everyone else is allowed to and no one was even in there. It was just me and John. So I wouldn't have said that in front of the whole shop.

**Susan Johnston (8:49)**:

Is John your supervisor?

**Martha Swann (8:51)**:

Yeah.

**Dennis Thrasher (8:55)**:

And I have a question. Is it a common place for the staff to discuss their pay amongst each other?

**Martha Swann (9:00)**:

It had come up. He told me before he hired Rachel that he was going to offer her $23 an hour to be a tech one, which is a lot more than I was making. And then later I accidentally saw the other tech one, the other new guy that I trained both of 'em, electrical safety, very basic tasks. And I accidentally saw something on Infor when he was asking me about something and I saw his pay rate and I was like, why am I so far below both of them when my education level's in the middle? My experience is more than both of them and I never got an answer. And that does breed. I didn't resent them for it. I was happy for them, but I felt like my boss should have been able to explain that when I asked him about it.

**(9:55)**:

But as far as John being my supervisor, I did mention a few times where "motherfucker" was used in front of him by a Tech three by Rachel. She would come in and talk about other staff, so-and-so's a bitch or so-and-so's a motherfucker and would be telling stories about that. And it's like that's not just joking, that's like you're talking about a specific staff member. So if I go to <laugh> ASC and there's a lady named Karen at the desk, then suddenly I have that like, oh, okay, so I know that this person is a "motherfucker" and say that to John? Why would I not think that I could use cuss words? Because I don't think I said one quite that strong.

**Female Speaker (10:38)**:

So I guess what I'm trying to understand, I understand the context you're explaining. I certainly hear what you're saying at face value. Is it professional in your mind to use profanity in conversation in a professional setting?

**Martha Swann (10:57)**:

I felt like it was common in that environment, and I wouldn't say that up on the floor or anything, but I felt like it was completely reasonable to think that I would be allowed to say something like that without getting fired for it. Absolutely. Because of a lot of the language that I would hear down there on a daily basis. I mentioned that Rachel came in one day and told a, I didn't even understand the purpose of the joke, but that it was "hotter than two faggots in a dryer," which I was actually so shocked to hear someone say that at work. I looked around and took a visual, who all is in here right now that just heard that? And I texted someone about it

later. So I even have a text message from the day that it was said going, wow, I can't believe she said that out loud at work.

Susan Johnston **(11:45)**:

Did you report that to anyone?

Martha Swann **(11:56)**:

No, she said it right to John and Jonathan. They were standing there laughing, so it wasn't like she said it. And I went back and told on her. I was like, well, I guess that's okay to say.

Susan Johnston **(12:05)**:

Okay, but you didn't. Okay.

Martha Swann **(12:08)**:

Did John give her a coaching session over not saying it?

Susan Johnston **(12:11)**:

Yeah, I can't share other people's.

Martha Swann **(12:14)**:

Okay. Because I got the impression that they just laughed and didn't do anything about it.

Susan Johnston **(12:21)**:

Questions from Martha related to the incident?

Martha Swann **(12:28)**:

I have some more text messages showing where profanity was used in our shop group chat and John thought it was funny and didn't tell me that I was wrong for doing it.

Roben Casey **(12:40)**:

How about the fact that it was a confrontation with your supervisor? There was a sense that from you I'm hearing that he didn't have the right to question you about your phone or . . .

Martha Swann **(12:51)**:

I didn't think that he didn't have the right to question me about my phone because I want to say December 22nd or 23rd when it was really cold, I don't have central heat in my house, so we just burned kerosene and my husband was texting me about letting the dogs out and how he was keeping the house slightly inhabitable. So I looked at the text from Steve from my husband and John was walking by and he goes, put your phone down. And I was kind of like, you know what? Yeah, that's fair because he said it. He didn't say like, a week later, "You're on your phone a lot." I was like, okay. That is literally what I wanted him to do was if you see me doing it, maybe I'm on my break or maybe I'm not, maybe I got distracted. So I thought that was what I had been asking him to please do. If you see me doing something wrong, just tell me. But the constant, we had had so many meetings where I was like, if I can't work with, three weeks later, you're saying that you saw me doing something that I can't remember. And it's vague and you don't have exact times or not even exact times, it's just say something when it happens and then that's fine. That's what I wanted.

Roben Casey **(14:06)**:

Day of your interaction did guys (unintelligible)

**Martha Swann (14:11):**

No. He said after lunch that I was on my phone all day and I was eating lunch and then he said, don't talk back to me or don't argue with me or something like that. And I was like, I think that's a fair argument to say that I was eating lunch when you saw me there.

Female Speaker **(14:25):**

But you said he didn't bring it up to you, he brought it up to you that exact day.

**Martha Swann (14:29):**

That day. But hours later when there was basically he turned five seconds of that I was on it in the morning into, I was on it all day and I was like, that's, it's something that other people are allowed to do. And if he had said, put your phone down when he came in and saw me on it, I would've put it down then.

**Susan Johnston (14:51):**

But do you think maybe you could just put your phone down yourself?

**Martha Swann (14:55):**

I did put it down after he walked in, but he didn't say right now put it down. It was more like he turned the later in the day, turned it into you've been on it all day, which wasn't true.

**Susan Johnston (15:15):**

Were you warned in October of 2022 regarding responding to text messages?

**Martha Swann (15:25):**

Yeah, and the funny thing about that is he had said I wasn't looking at my phone enough basically was what that came out of. So I started to not look at my phone. I started wearing a watch and then he's like, well, you're not getting these text messages enough. And our policy in the shop from what I understood from the handbook is the manager set the call policy and our policy was you have to answer and not necessarily be physically there, but you have to reply to a call within 15 minutes. And there were two incidents that I have text messages to show the times where it was 1, 2, 3 minutes I replied, and the problems were solved. And then he's saying, you're not answering your phone fast enough. Do you want to carry a pager? I'm like, no, I don't want to carry a pager.

**(16:27):**

That's a couple minutes. And the problem that did really, it did get to me, I let it get to me was I was in the hall, I was working, they were in the shop around the corner from me and it was calls coming to the main line. So I'm like, I'm busy I'm not on call if you answer the phone, if you don't want to go up for it, at least just step out in the hall and tell me. But he was acting like I wasn't responding. So I have the two times that I know he liked to say, oh, it was many, many different times. But the times that we talked about, I was able to print out screenshots that showed it's these two times right here is what he was talking to me about. <sound of me holding a printed out text message>

**Nikki Ware (17:15):**

And those instances, oh, sorry Chris, in those instances you were one or two or three minutes beyond the 15 minute window?

**Martha Swann (17:22):**

No, one or two or three minutes after the text was sent. I can show you the screenshots if you want to see it.

Nikki Ware **(17:27)**:

Have you ever been beyond the 15 minute window to respond?

Martha Swann **(17:30)**:

I really, really don't think I have been unless I was driving because it takes me about 25 minutes to get home. I think that might've been times, but I can't think of a specific time that happened. But oh, actually that day the day that he wrote me up that I guess I was that day, but I was running late and so I didn't look at my phone until I got into work and then I was like, I don't feel like a pager would solve that. I was late and driving because I was like, it's fair to say okay, you're getting written up for being late or whatever. But I was like, the pager thing, I didn't understand how that would solve driving to work.

Roben Casey **(18:16)**:

Is that what he was trying to address? Ways that would help you be more responsible?

Martha Swann **(18:20)**:

And when he talked to me about it I said, I don't see how caring a pager would do it. I feel like if, first of all, if I'm busy and y'all busy and y'all are sitting around talking about cars, maybe somebody could be kind of helpful. But there were times where one time back in April, Cody slept through a page. John slept through the page. I wasn't on call and I responded to the page at 1 45 in the morning and obviously John didn't punish himself or punish Cody for missing the call. And I responded to it and then John got mad at me when I asked, why are they calling me at 1 45 in the morning about I'm not on call. And he was like, well, if you have integrity you'll answer. And I was like, I, I answered it came in. But he called me out in front of the shop about not having integrity and I was like, you're the one that didn't pick up the call either.

**(19:22)**:

And I did. And there were times that there was a time where I came in the middle of the night for a Philips issue and Darien and John both know Philips, and they just stopped replying to my texts, went to sleep, and I got stuck here all night because I didn't know how to solve it and I didn't want to leave with whatever the Philips problem was. And so I was here for five hours until they woke back up and replied to me and I was like, if I'm getting in trouble for five minutes or whatever, responding to a call, I feel like not answering at all in the middle of the night or several times. I felt like that should have been addressed too. Because those two times I mean that what upset me, it wasn't even that they slept through it or whatever it was that then I'm getting in trouble later for something that other people haven't gotten in trouble for because it didn't feel like it was evenly applied.

Female Speaker **(20:20)**:

How do you know that they did not, did not get addressed?

Martha Swann **(20:25)**:

Well, John was he was the one that I was trying to communicate with both times. So I know he didn't write himself up or whatever for not responding.

**(20:42)**:

And there was also I think an issue. I think he was mad that I said I wanted to get off the call schedule because for a long time it was just me and Cody were on call and then Darien, Mike and Rachel were not on call. Rachel got promoted from a one to a three one, and once she got promoted from a one to a three, then she suddenly didn't want to, never talked about getting on the schedule again. So we had three people of 'em, two of them tech twos that weren't taking call at all. And I'm like if I'm, I'm putting ourselves at risk of getting in trouble by being on call and it's apparently it's optional for some people. It's just not optional for the two of us because as soon as I started trying to get off of it, he started getting upset with me about stuff and I felt like he was trying to punish me for trying to get off the schedule instead of putting people that he favored on the schedule because they didn't feel like it, which made it where they wouldn't have to get in trouble for, you know, didn't look at your phone for five minutes.

Roben Casey **(21:45)**:

I hear you talking a lot about other people's behavior? Comparing your behavior to others. And Susan's asked you this a couple of times, we're here to talk about your behavior, not everybody else's. And so feel your grievance is basically based on the fact that you feel like your behavior was a professional interaction and that you shouldn't have been terminated?

Martha Swann **(22:12)**:

I feel based on that interaction, I feel that I shouldn't have been terminated because I feel like John was applying the rules differently to me than everyone else. And I could tell—

Roben Casey **(22:22)**:

But was your behavior professional?

Martha Swann **(22:24)**:

I don't think it's professional to cuss at work. I think that's the environment that I worked in and I don't understand why I would get fired for something that other people are. It's basically celebrated for doing. "It's funny that you said this." I don't think it's a professional work environment that he has down there though. And I feel like it is I think it's unfair for me to be terminated over that. And I feel like that's just his way of saying, "I want to get rid of somebody and I'll just use the excuse the work environment that I've created. I'll fire you for it and protect other people for it."

Female Speaker **(23:13)**:

It's, sorry. Well there's a pattern of being argumentative with your supervisor and there was a pattern with your first warning where he, he's trying to maybe give you a page. You say, I'm not going to wear it arguing back and forth. Then we have this situation where he asked you, you wanted him to address immediately when you would be on your phone. He did it. You start arguing again with him. It, there's profanity being used in these situations, but it's the fact that you were being uncooperative and there's a lack of respect I can tell you that comes across and when you're talking about your supervisor and this grievance process is designed for you to go back to work.

Martha Swann **(24:08)**:

Yeah.

Female Speaker **(24:10)**:

So do you want to go back to that work environment of work for this hospital because that behavior that you exhibited is not acceptable.

Martha Swann **(24:20)**:

I feel like when I got written up and when I got terminated he just wanted to come up with a reason to do it. And he didn't care what it was. He was going to manufacture an issue, which was arguing because other people are allowed to argue with him. They don't get written up, they don't get in trouble for it. I enjoyed working down there a lot and I had hoped that John, I didn't understand why he went from really, really, really liking me all the time, being happy with me to, he just suddenly decided he was not happy with me and that he was going to stir up problems that didn't really exist. But I really did actually enjoy my job a lot.

**(25:12)**:

But yeah, the argumentative stuff like that, that was another thing. Darien's allowed to argue. Darien's allowed to say, "That's stupid. I'm not going to do that." One thing I could think of that you could actually look and see proof of when we had to go back and do equipment acceptance forms for stuff, Darien said, "I'm not, that's stupid. I'm not going to do equipment acceptance forms on old equipment that's been here for 10 years. That's stupid. That's a waste of time." And he wasn't going to do it. And he didn't. And you could go back and look at those reports and see how many of those that I did on old equipment and Darien didn't do, but John wasn't threatened that Darien disagreed with him and he wasn't upset. He didn't get written up. He was allowed to, what was the word John used for? Why I got written up for the pager?

Roben Casey **(26:04)**:

It was insubordination.

Martha Swann **(26:05)**:

Insubordination. So it's not insubordination if Darien refuses to do something that John tells him to do because it's stupid. And I mean arguing down there happens a lot with other people too. They like to have political arguments. That's like our pastime down there.

Nikki Ware **(26:29)**:

I'm sorry, I was going to ask if she believed that she acted insubordinate. I mean I was going to ask more about that.

Martha Swann **(26:37)**:

Yeah, I felt like Darien maybe was allowed to because he's a male and when female—

Multiple speakers at once **(26:41)**:

No, we were talking about, okay,

Roben Casey **(26:44)**:

I was just gonna say, you don't know who else has been handled. So in the instance that was described, does it fit the definition of insubordination for your event?

Martha Swann **(26:57)**:

Okay, but do the rules, should the rules be applied fairly and evenly to everyone?

Female Speaker **(27:03)**:

Absolutely. You do not know if anyone else has received any

**Martha Swann (27:07)**:

I know that he didn't get written up or fired.

**Roben Casey (27:11)**:

Also doesn't matter. It applies to your behavior specifically. I mean we're here to talk about your behavior and just because other people do things doesn't mean that you should either, so you have responsibility for your own professional behavior. And that's what we're talking about today.

**Martha Swann (27:29)**:

And I'd like to talk about when I was having these issues with John, I didn't have anyone that I could go to talk to about it because John says that he doesn't want us to talk to HR because we're taking, we're a family down there and we're taking our private business outside and speaking to other people means that we can't solve it down there. And I always felt like I would get in trouble if some of these issues I had with John if I went to HR about them. And when I went to HR I didn't even talk to HR. I just got the form for FMLA to fill out when I had mono and he got upset about it. He was pissed and he wouldn't sign it. So I had to get and the reason I got pushed all the way to the point of FMLA was I got diagnosed in March. I told him—

**Roben Casey (28:27)**:

We don't mean to cut you off, but we're not here to talk about that. We're here to talk about your termination.

**Martha Swann (28:31)**:

I feel like my termination was in retaliation for some of the things that I did that he expressly forbid us from doing that I should have been allowed to do.

**Roben Casey (28:41)**:

But we're able to look at the specific interaction that you have that resulted in your termination. That's really what we're asking.

**Martha Swann (28:46)**:

I also don't think I that John, I don't think that the way he writes things up is a fair description of the way things actually happened. And one example would be when I had mono, as far as I understood, I didn't know at the time, but he put in coachings about me being, being lazy basically. He kept pulling me in and having meetings with me about being lazy. And I have printouts from where I was telling, I texted Henry and I printed it out that John keeps making me have meetings about being lazy. And I brought him a doctor's note. I spent $30 for a copay to go to my doctor to say, look, can you write my boss a note? And they wanted to test me and make sure I still had it because it lasts for several months and it gives you extreme fatigue.

**(29:40)**:

And so I brought him a note that says Martha has mono, this causes extreme fatigue that can linger for several months. And then two weeks later, he pulls me aside again and he entered another coaching about me being lazy. And then that was when I went to HR. Well, I got the FMLA paperwork that he wouldn't sign and then got my doctor to fill it out and then it got approved because I had mono. And it just gave me a shorter work week because I was like, you're getting upset because you look at me and I look tired because I'm tired and I have a virus. And I absolutely hated being sick. And

Susan Johnston **(30:15)**:

Martha, I just want to stop you there. There's no coaching in your file about you being lazy.

Martha Swann **(30:19)**:

What coaching did he put in on? I want to say it was very late April or early May of 22. And then there was one on May 18th of 22.

Susan Johnston **(30:35)**:

There's you being on your phone. That was on May 12th, and in June of 21

Martha Swann **(30:47)**:

I ate a taco.

Susan Johnston **(30:48)**:

There was one . . .

Martha Swann **(30:49)**:

What was the late April one of 22?

Susan Johnston **(30:51)**:

There isn't one.

Martha Swann **(30:54)**:

Okay. Well, he had a meeting with me about being lazy and then, I don't know, see that's what he wrote up as being on a phone, but I'm like, he pulled me and Cody both in there actually and said that we were being lazy. And did he mention that I had mono on there? No, because that was what I spoke about with him.

Susan Johnston **(31:13)**:

No, no coachings about being lazy.

Martha Swann **(31:16)**:

So yeah, I don't feel like he was, he was pulling me in for meetings and then he's writing up stuff that I'm like, when that's not even what we discussed because I have told him I'm ill, maybe my brain wasn't even working. I was like stuttering when I was talking because my brain was working so slowly. So I don't feel like that was a fair characterization.

Susan Johnston **(31:39)**:

But remember there wasn't one in there for that.

Martha Swann **(31:42)**:

But he said that it was phone use and it wasn't phone use. It was that he said I wasn't working and then I was being lazy. And then the June what? June 18th, 2021. I had a text from that.

Speaker **(31:57)**:

We don't need it.

Martha Swann **(31:59)**:

Okay. Well, all right. I just hope that y'all are coming at this from a point of view of, I'm trying to explain that John is being dishonest on the things he's writing up about me.

Roben Casey **(32:13)**:

But you admitted that y'all had an argument that day. Correct?

Martha Swann **(32:16)**:

An argument about him treating me unfairly.

Roben Casey **(32:18)**:

An argument y'all had an argument, right?

Martha Swann **(32:20)**:

Yep.

Roben Casey **(32:21)**:

I mean you've said that.

Martha Swann **(32:23)**:

And I've said that I thought I was allowed to argue because other people are allowed to argue and I thought I was allowed to use profanity down there because other people are allowed to use profanity down there. And

Susan Johnston **(32:38)**:

Any other questions about the information? Anything else you want us to know about?

Martha Swann **(32:45)**:

Yes, the, there's two things I want you to know. When Brad Stone left, I was telling John for about a year and a half before Brad Stone left and multiple other people were telling him for a long time that Brad Stone is not doing his PMs. He's writing that.

Susan Johnston **(33:10)**:

When was this?

Martha Swann **(33:12)**:

Let's see. He left November, 2021. And I was telling him for at least a year one time, Brad told me that he wasn't doing the Zoll PMs because there's too much on there. And I go look, and he's writing "completed" as in I've done this full pm. So John knew for at least a year and a half that Brad was not properly doing his work. So he basically was falsifying documents, which the manual says is an intolerable offense. And which if I was in charge of anyone, if I found out they were falsifying documents, I would terminate them immediately because you can't trust the work they're doing.

**(33:48)**:

But he was allowed to keep working there for at least a year and a half. He was allowed to find another job. He was allowed to resign and he was allowed to leave. And his other job doesn't have to know about that. And I think that once again, I would like to have been treated fairly. And if that's the intolerable offense, the way it's applied to other people, it should be applied that way to me because I don't think it's fair that in a moment that's the type of moments that happen on a daily basis that mine was

**(34:25)**:

Three days later, immediate termination, you lose your health insurance, you lose all of your ETO. And that was another thing too, about the termination. It's not just about the termination, it's about everything else I lost and about being unemployable here again, with the quality of

the actual job I was doing, I didn't have on my review, my performance review, even the one this last year where I said I would like to have goals to move up, I said that oh, I, he didn't tell me anything like this is what you're doing wrong and this is what you need to fix. He didn't tell me that on there. So I felt like that if an employee's doing something wrong, you're supposed to give them guidelines for how to improve. I didn't get that. I just got a good review. And even all the integrity, compassion, excellence, respect, teamwork, he said, "yes, you're doing a good job." So I feel like if he really wanted to fire me which I think he obviously did, he, if I was doing anything wrong, he should have tried to correct me in the proper manner instead of pulling me in his office and then having these little conversations and then he's writing up. He can write whatever he wants on a coaching. It doesn't necessarily have to be what really happened.

Susan Johnston **(36:00)**:

Okay. So were those your two things?

Martha Swann **(36:03)**:

No. The other point that I really need to be able to tell you about, and it's really important to me, is that John shows favoritism and he needs to either be flirted with or flattered. And there was a lot of flirting down there that I wasn't comfortable with and I'm married and I wasn't willing to, there was a lot of conversations that were sexual in nature and I felt like, I'll joke around a little bit, but if John is telling a story about having sex with his ex-wife or whatever, I'm not going to offer up information about my husband or about anyone I've ever dated. I felt that was inappropriate. And so when he got a second female employee that was willing to flirt with him, that was when he started. He went from being really nice to me and liking me to, he totally turned on me.

**(37:06)**:

That was when I had that coaching in 2018 was supposed to be about my, he told me we were having a meeting about my PMs and then I get in there and he's just jumping all over me about eating a taco as a snack before lunch, and so really, "I had a really long lunch break," and I was like, he lied to me about what the meeting was going to be about. And then at some point he started, I had the ORs, which everyone comes in the middle of the night to go to ORs. He started getting mad at me for coming in early, but he's got another person coming in at like 5:30 in the morning. It's like you're the outbuilding person. You can't call anyone, you can't go anywhere, you can't do anything. But as I think that the whole reason he promoted a one to a three after 90 days was because she was flirting with him and he was showing that this is how you get rewarded. If you do what I want you to do, I'll reward you for it.

Susan Johnston **(38:02)**:

Okay.

Martha Swann **(38:04)**:

And I have another thing to talk about with that.

Susan Johnston **(38:06)**:

That's where we're going to stop.

Martha Swann **(38:08)**:

I need to play something for you if y'all don't want to hear it, but I need you to hear it. A recording.

Susan Johnston **(38:14)**:

You can send that to me.

Martha Swann **(38:17)**:

Okay.

Susan Johnston **(38:18)**:

Just you have my email. You and I have been corresponding via email. Feel free to send it to me. I'll be glad to listen to it. Are there any other questions for Martha? Martha, we appreciate you coming in. If you have something in addition to send me that you want me to hear send it to me via my email and I will be in touch with you after we have a chance to convene and review the information that you've brought us. And I will send you a letter.

Martha Swann **(38:52)**:

Okay. And I would like to feel y'all, didn't make your minds up ahead of time.

# Exhibit 2

B. GRIEVANCE PROCEDURE

◆ Step 1

East Alabama Medical Center encourages employees to resolve all complaints and problems at the lowest organizational level possible; however, if it becomes necessary to utilize a formal grievance procedure, the following should apply:

If your complaint is related to one specific employment decision or action, you should begin the grievance procedure within five (5) days of the incident. You must provide written documentation to Human Resources within five (5) days of the incident detailing the events that took place leading up to the grievance.

◆ Step 2

Human Resources will then provide your written documentation to the Vice President over your department and the Vice President or Director of Human Resources who will investigate your complaint. This step may involve meetings with your Director and/or Vice President. Human Resources will respond to you within five (5) working days of those meetings. If your complaint is not related to a suspension or termination, this decision is final.

◆ Step 3

If your complaint involves a suspension or termination and you are not satisfied with the response from your Vice President, you should file your request for a final review with Human Resources within five (5) working days. Upon receipt of your request, Human Resources will schedule a meeting for you with the Grievance Panel, which consists of EAMC's Vice Presidents, excluding the one responsible for your department.

Human Resources will notify you of the Grievance Panel's decision within five (5) working days of your meeting with the panel. This decision is final.

C. SUBSTANCE ABUSE POLICY

As a Medical Center, we are acutely aware of the adverse effects that drugs and alcohol can have on our employees' safety and health. The abuse of alcohol and drugs leads to increased accidents and medical claims. It can also lead to the destruction of an employee's health and adversely affect his or her family life. The Medical Center will help any employee who seeks help for a substance abuse problem on his or her own. It is too late, however, to request help once you have been selected for a random drug screening.

Employees who are identified through this testing program as being substance abusers may be discharged. The possession, use, transfer, manufacture or sale of alcohol, illegal drugs, or legal drugs without a valid prescription on Medical Center property or on Medical Center time will result in disciplinary action, up to and including termination. Employees who are discharged because of a positive drug or alcohol test or because they refuse to cooperate with any requirements of this policy may be ineligible, under the law of Alabama, to receive workers' compensation benefits and/or employment benefits.