IN THE UNITED STATES DISTRICT COURT
FOR MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| MARTHA SWANN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No.: 3:24-cv-00244-RAH-JTA |
| vs. | ) | |
| | ) | JURY DEMAND |
| EAST ALABAMA HEALTH CARE | ) | |
| AUTHORITY, DBA EAST ALABAMA | ) | ORAL ARGUMENT REQUESTED |
| MEDICAL CENTER, | ) | |
| | ) | |
| Defendant. | ) | |

PLAINTIFF'S BRIEF IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

COMES NOW the Plaintiff and responds to Defendant East Alabama Medical Center's [EAMC's] motion for summary judgment. By and under Rule 56 of the Fed. R. Civ. P. and applicable case law, Defendant's motion is due to be Denied. Genuine issues of – and significant disputes regarding – material fact are present in this action.

This Brief in Opposition sets forth both disputed material facts, as well as *undisputed* facts that favor the Court's denying Defendant's motion. The facts are contained in the case record and, taken in concert with the Standard of Review and relevant case law, show that this is a case in which reasonable jurors could find for Plaintiff. The more Defendant disagrees, the stronger Plaintiff's argument that genuine issues of material fact present. EAMC's motion for summary judgment is due to be denied. Plaintiff respectfully requests oral argument.

TABLE OF CONTENTS

Table of Contents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Plaintiff's Exhibits . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I. Responses to Defendant's Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II. Plaintiff's Undisputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

III. Plaintiff's Additional Disputed Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Standard of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

V. Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

    A. Plaintiff's Equal Pay Act Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

    B.  Plaintiff's Equal Pay Act and Title VII Retaliation  . . . . . . . . . . . . . . . . . 42

    C.  Title VII Gender Discrimination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

    D. The *Quigg v. Thomas County School District* Framework Applies . . . .  51

    E.  Plaintiff has presented a Convincing Mosaic of Discrimination . . . . . . . 52

    F. Plaintiff Prevails (even) under the *McDonnell-Douglas* framework . . . . 53

    G. Regarding EAMC's attempts to cherry pick facts . . . . . . . . . . . . . . . . . 55

    H. Regarding Ineffective Policies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

    I. Regarding Hearsay . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

## Plaintiff's Exhibits

Doc No.                    Document

46-1   P Exhibit 1        EAMC HR VP Susan Johnston Deposition

46-2   P Exhibit 2        EAMC VP / Strategy Ofcr Sarah Nunnelly Deposition

46-3   P Exhibit 3        EAMC VP / Gen Counsel Roben Casey Deposition

46-4   P Exhibit 4        EAMC HR Director Kelli Truitt Deposition

46-5   P Exhibit 5        Plaintiff's Response Declaration (07.14.2025)

46-6   P Exhibit 6        John Morris to Oliver Banta Email (April 2022)

46-7   P Exhibit 7        CE Technician Tom Mitch McSweeney Deposition

46-8   P Exhibit 8        P's Supp Ans to D Interrogatory (re: comparator Barnes)

46-9   P Exhibit 9        CE Dept Director John Morris Deposition

46-10  P Exhibit 10       Cody Locke Declaration (03.11.2024)

46-11  P Exhibit 11       P's Supp Ans to D Interrogatory 12 (03.18.2025)

46-12  P Exhibit 12       Nat'l Women's Law Center E-record (07.14.2022)

46-13  P Exhibit 13       EAMC Position Statement

46-14  P Exhibit 14       G. Odom, S. Johnston, K. Truitt July 26, 2022, email thread

46-15  P Exhibit 15       Truitt, Odom, Johnston email thread – November 2022

46-16  P Exhibit 16       Michael Giles Declaration (06.19.2025)

46-17  P Exhibit 17       Michael Giles Declaration (07.02.2025)

46-18  P Exhibit 18       Willie Lewis Deposition

46-19  P Exhibit 19       EAMC's Answers to P Interrogatories 23-27

46-20  P Exhibit 20       EAMC Responses to P's Amended Requests for Admission

## INTRODUCTION

Plaintiff Martha Swann (Plaintiff, or Swann) brings employment discrimination claims against her former employer, Defendant East Alabama Medical Center (EAMC) under Title VII of the Civil Rights Act of 1964, as amended, under the Equal Pay Act, and for Retaliation (prohibited under Title VII and the Equal Pay Act). EAMC employed Plaintiff from 2018-2022 – first in EAMC's Patient Transport Department, then, from November 2019, in EAMC's Clinical Engineering (CE) Dept as a Technician (Tech I). On December 30, 2022, her supervisor, CE Dept Director John Morris, fired Plaintiff less than 72 hours after they argued at the workplace, this argument including Plaintiff's accusation of workplace discrimination and gender-based pay discrimination she suffered at EAMC. Morris and EAMC dispute the fact that Plaintiff complained about workplace gender discrimination. On January 24, 2023, less than a month after getting fired, Plaintiff participated in a "grievance hearing" she requested. EAMC's grievance panel consisted of seven (7) EAMC Vice Presidents. At her grievance hearing Plaintiff brought up – or tried to bring up – gender-based double-standards (i.e., disparate treatment) in CE Department discipline and retaliation. EAMC's grievance panel refused to allow Plaintiff to discuss these things and failed or refused to conduct a thorough, good faith, investigation of same. The EAMC grievance panel upheld Swann's firing; it refused to reinstate her. Numerous genuine issues of material fact present. A reasonable juror could find in Plaintiff's favor on all counts. Defendant's motion for summary judgment is due to be Denied.

4

## I. Response to EAMC's "Undisputed Facts"

Plaintiff disputes the following EAMC "facts" –

**5.** Admitted, but misleading and incomplete. HR Vice President Susan Johnston (Johnston) confirmed the policies were reviewed annually, but lacked structured updates to ensure compliance with Equal Pay Act (EPA) requirements. EAMC VP Sarah Nunnelly (Nunnelly) testified the Employee Handbook were treated as "guidelines" rather than consistently enforced, in contrast to any EAMC inference of uniform or consistent disciplinary practices. [P EX1 / Doc 46-1 (Susan Johnston Depo) 54:18-20, 56:3-4, 59:23-61:23; P EX2 / Doc 46-2 (Sarah Nunnelly Depo) 33:4-8].

**6.** Disputed. EAMC's policy may says it "provide[s] Equal Employment Opportunity [ ] for all employees," but in Plaintiff's case, it did not. [See, e.g., Doc 42-1 (Martha Swann Depo) 76:20-79:6, 153:6-22; 165:21-166:9, 167:13-168:8, 171:1-172:16, 173:5-23, 213:20-214:20, 215:20-216:21, 218:16-220:15; Doc 42-7 (Swann, 03.05.25 Declaration) *in toto*].

**7.** Disputed as to inference. The record shows EAMC's employment critical policies are incomplete, ambiguous, and unevenly enforced. *See, e.g.*, [P EX3 / Doc46-3 (Roben Casey Depo), 96:2-97:22 (ref. Casey *Depo Ex 4*, Ee Handbook: "*EAMC investigates all reports of harassment thoroughly and promptly.*"); P EX1 / Doc46-1, 101:5-21 (Johnston Depo), *but see*, P EX3, (Casey Depo), 121:6-122:23, 143:14-19, 167:3-8].

**8.** Disputed as to inference. The record show that the policies / listed items are inconsistently and selectively enforced, no matter how they're labeled. [See, e.g., P EX1 / Doc46-1 (Johnston Depo), 154:16-157:3 (*Depo Ex 8*); P EX4 / Doc46-4 (Kelli Truitt Depo), 136:19-137-7; P EX5 / Doc46-5 (Martha Swann 07.14.2025 Declaration), ¶2, p 2-3, ¶3, p 4-6].

**9.** Agreed, but only to the extent the policy indicates a lack of consistency or continuity.

**12.** Disputed as to inference; incomplete. Before coming on full-time at CE, Plaintiff's original tasks included her being the only one maintaining AeroScout trackers (with their temperature, humidity monitoring), so she started doing calibration verifications all such monitors. Then she maintained Welch Allyn vital sign machines, and worked on what is called and an SCD pump (the machine with sleeves that blows air on a patient's leg so they don't get a blood clot. She learned the work order database (TMA) so she could track her time. She maintained suction regulators, along with large quantities of equipment all over the hospital. [Doc 42-1 (Swann Depo), 33:10-34:5].

**14.** Admitted, but disputed as to inference. While the general "generally" characterization of the CE Tech levels, the record shows Plaintiff, as a Tech (Med) I, was doing Tech (Med) III work for Tech I compensation more than half a year before EAMC fired her. [*See, e.g.*, P EX6 / Doc46-6 (April 2022 Morris to Banta email); Def EX A / Doc 42-1 (Swann Depo), 170:21-171:18].

**19.**   Disputed as to inference. Plaintiff disputes Defendant's No. 19 to the degree John Morris makes this assertion to attempt to assert Swann's replacement, Andrew Barnes, does other work because there's not enough radiology work for him. In fact, Barnes is only an assistant, a backup, for Tom McSweeney, who does the brunt of the radiology maintenance and repair at EAMC. By contrast, Barnes and Swann's work overlaps/ed by more than 91 percent. Additionally, Morris considers Barnes his / EAMC's "Surgery CE Technician [in] the OR (Operating Room) – Barnes does not disagree with Morris. [P EX7 / Doc46-7 (McSweeney Depo) 37:14-39:20; P EX8 / Doc46-8 (Pl Supp Ans to Int, Comparison of Swann and Barnes work, including Venn Diagrams) noting p 126, 127; P EX9 / Doc46-9 (John Morris Depo), 159:6-23 (and *Morris Depo P Ex 7*); 163:8-17; Def Doc 42-6 (Andrew Barnes Depo), 61:3-63:6).

**21.**   Disputed as to inference; incomplete and misleading. Swann did preventative maintenance and repair on numerous, expensive, critically important, pieces of EAMC equipment, including and particularly life safety equipment. Swann's testimony includes:   *"I was responsible for what was called life safety equipment, which is like -- it means stuff that your life·depends on.· I was responsible for a lot of·life safety equipment, and I wasn't being -- you know, I was doing it myself. I wasn't having to be supervised."* [Doc 42-1 (Swann Depo) 58:2-21; 59:4-22; 171:1-18] Swann's and her replacement's, Andrew Barne's, jobs overlapped by more than 91 percent (64+% identical work orders, 27+% comparable work orders). P EX8 / Doc46-

8, *in toto* (Pl Supp Ans to Int, Comparison of Swann and Barnes work, including Venn Diagrams, at p 126 and 127).

**22.**   Admitted but incomplete and disputed as to inference. Imaging certification was and remains irrelevant to the comparator question. [See, P EX8 / Doc46-8].

**23.**   Disputed as to inference; incomplete and misleading. Swann did preventative maintenance and repair on numerous, critically important, pieces of EAMC equipment, including and particularly life safety equipment. Swann's testimony includes:  *"I was responsible for what was called life safety equipment, which is like -- it means stuff that your life·depends on.·I was responsible for a lot of·life safety equipment, and I wasn't being -- you know, I was doing it myself. I wasn't having to be supervised."*  [Doc 42-1 (Swann Depo) 58:2-21; 59:4-22; 171:1-18; P EX8 / Doc46-8, *in toto* (Pl Supp Ans to Int, Comparison of Swann and Barnes work, including Venn Diagrams, at p 126 and 127)

**26.**   Disputed as fails to tell the entire story. Swann also testified that at the workplace, as far back as 2020, Morris raised and discussed sex and sexually inappropriate subjects, that made Swann try to get away from Morris, or change the subject; she felt threatened by one of his stories that made her think about Morris's vindictive streak.  [Doc 42-1 (Swann Depo), p 105:1-113, *in passim*; p 333:9-13].

**28.**   Admitted up to a point:  Misleading and fails to tell the whole story. Swann testified that she viewed Morris's offering her $10,000.00 for an air conditioning system as "a double-edge. It could be nice, or I could be on the hook, even if it was a gift, to

owe him." [Doc 42-1, p 283:12-285:9]. Additionally, Morris's "$10,000.00 offer" made Swann feel *"uncomfortable with the amount, and I did consider it in the context of inappropriate comments he had made in reference to nurses or other women he had been involved with at work in the past. . ."* Swann continues: *"To put an even finer point on it, at the time $10,000.00 was more than half of my entire income, before taxes, the year before (2019). I would not have been able to afford to pay him back, and I couldn't shake the feeling that I shouldn't borrow or accept a large sum from a man that bragged about his 'body count.'"* [P EX 5 / Doc46-5 (Swann 07.14.2025 Declaration), ¶15, p 22-23].

**33.**  Admitted, but disputed as to inference and, also, irrelevant. While *(a)* the pay discrimination complained of reaches back into April 2021, when Cody Locke was hired by EAMC; and, *(b)* evidence of John Morris's sexually and other professionally inappropriate behavior and/or admissions (both to / towards Swann and others) which are, in fact, relevant to this action reach back into 2020 and before, the particular workplace disparate treatment and retaliation complained of commenced in July 2022. [*See, e.g.*,  P EX 10 / Doc46-10 (Cody Locke 03.11.24 Declaration), ¶2, p 1; Doc 42-1 (Swann Depo), 104:11-113:5; P EX5 (Swann 07.14.2025 Declaration) ¶3, p 4-5; ¶5, p 9; ¶8, p 12-18; ¶12, p 21; ¶14, p 21-22, ¶15, p 22-23].

**35.**  Disputed / Disputed as to inference. The record shows "coaching" is inconsistently conducted, like other EAMC CE Dept disciplinary practices. [*e.g.*, Doc

42-1 (<u>Swann Depo</u>) 117:11-118:6, 199:8-200:1, 213:20-214:20; <u>P EX 5</u> / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), ¶11, p 20-21].

**36.** Disputed as to inference. The record shows different treatment for similar conduct between Swann and one or more male coworkers [*e.g.*, Doc 42-1 (<u>Swann Depo</u>) 117:11-118:6, 199:8-200:1, 213:20-214:20; <u>P EX 5</u> / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), ¶11, p 20-21].

**37.** Disputed as to inference, to the point of misrepresentation; irrelevant. The record shows Plaintiff's saying she scrolled through her phone "during meal breaks." [Doc 42-1 (<u>Swann Depo</u>) 155:15-16. The record shows no EAMC policy forbidding an employee from scrolling their phone during a meal break. Plaintiff did not "mindlessly" (or otherwise) scroll through her phone any more than her male coworkers. [<u>P EX 5</u> / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), ¶11, p 20-21].

**38.** Disputed as to inference. The record shows Morris became increasingly obsessed with Plaintiff's phone use, or in Morris's mind, use failures. Swann couldn't win for losing, testifying regarding Morris: *"He had told me [my phone use was] excessive and that I was ignoring my cell phones, kind of interchangeably."* [Doc 42-1 (<u>Swann Depo</u>) 96:15-23].

**39.** Admitted but incomplete. In her testimony HR VP Johnston confirmed EAMC policy enforcement depended on John Morris's discretion, and VP Nunnelly testified employee policies were treated as "general guide[s]," – in the case at bar Plaintiff was subject to John Morris's discretionary discipline. Swann's discipline

reflected inconsistent and discriminatory discipline. [*See* P EX1 / Doc46-1 (<u>Johnston</u> <u>Depo</u>), 63:12-64:6;  <u>P EX2</u> / Doc46-2 (<u>Nunnelly Depo</u>) 32:23-33:8].

**41.**     Admitted, but misleading. Swann testified she first raised pay discrimination / gender-based unequal pay directly to her Department Director on July 25, 2022, before any allegations of "insubordination" were ever launched at her during that second half of 2022. Swann testified that on <u>July 25, 2022</u>, she told Morris she believed was "*paying me less than all the men in the [CE] shop*," and that she "*specifically brought up Cody [Locke] in that conversation.*" [Doc 42-1 (<u>Swann Depo</u>) 69:2-17]. A summary of Plaintiff's opposition to gender-based pay discrimination can be found in <u>P EX 5</u> / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), ¶1, p 1-2, ¶8, p 12-18.

**42.**  Admitted by out of context and misleading. Swann testified that when she brought up pay discrimination to Director Morris on July 25, 2022 [Doc 42-1 (<u>Swann</u> <u>Depo</u>] 236:3-19]; and again on October 19, 2022, he got angry; that he didn't get angry unless she brought up pay in the context of discrimination. *"[I]f I didn't bring up the* *discrimination, it didn't make him upset."*  [Doc 42-1 (<u>Swann Depo</u>) 237:1-238:9].

**43.**     Disputed. In fact, Morris got angry when Swann brought up pay discrimination at EAMC. In the wake of her first July 2022 complaint, Morris tried to talk her out of, derail, out-of-state training. [Doc 42-1 (<u>Swann Depo</u>) 220:16-222:11]. His antagonisms only grew after July and in late September / early October 2022 he singled Swann out for discipline over "missing a call," unlike Plaintiff's male coworkers. At the end of December 2022 Morris started a confrontation with Plaintiff,

then got her fired for swearing, while male coworkers are allowed to swear at will. [P EX11 / Doc46-11 (Plaintiff's March 18, 2025, Supplement to Interrogatory Answer, p 3-6); P EX5 / Doc46-5 (Swann 07.14.2025 Declaration) ¶8, p 12-18].

**48.** Disputed as to inference. The record shows Morris becoming increasingly obsessed with Plaintiff and her phone. Swann: *"He had told me [my phone use was] excessive and that I was ignoring my cell phones, kind of interchangeably."* [Doc 42-1 (Swann Depo) 96:15-23; [P EX 5 / Doc46-5 (Swann 07.14.2025 Declaration), ¶11, p 20-21]. Additionally, in 2022, Plaintiff's productivity was the highest in the CE Dept and Morris claims he had "no complaints" about it. [Doc 42-1 (Swann Depo) 313:11-317:6 (*Pl Depo Ex 3*); See also, P EX9 / Doc46-9 (Morris Depo) 129:1-10, 131:3-132:3].

**49.** Admitted, but misleading. Morris began disciplining Swann after she complained about pay discrimination in late July 2022, and, in contrast to Swann, the record contains no evidence that Morris ever attempted to cancel training, or actually canceled it, for Locke in 2022. [P EX 5 / Doc46-5 (Swann 07.14.2025 Declaration), ¶1, p 1-2, ¶8, p 12-18].

**50.** Disputed as to inference. While true Morris / EAMC did not begin bearing down with the worst of his / its adverse acts until after Swann complained about pay discrimination in late July 2022, Morris's strange obsession, if not fetish, with Plaintiff's eating began around May 2022, *e.g.*: *"He said he didn't think I was taking bites of my food quickly enough, that he sat there and watched me through my break and didn't like the manner that I was eating."* [Doc 42-1 (Swann Depo) 313:11-317:6].

12

**51.**   Admit, but dispute as misleading. While Plaintiff did not bring up gender-based pay discrimination at this meeting, it went to poorly that she contacted the National Women's Law Center [NWLC] on July 14, 2022 (precipitating her July 21 / 25 complaints made to both Darien Thorsen and John Morris. [See, P EX12 / Doc46-12 (E-Response to Martha Swann from NWLC, 07.14.2022).

**52.**   Disputed as to inference. Swann testifies that this meeting followed-up her repeated complaints about unequal pay and that it was in this July 25, 2022, meeting that she specifically complained to Director Morris about pay *discrimination*. [Doc 42-1 (Swann Depo) 68:3-69:17; P EX5 / Doc46-5 (Swann 07.14.2025 Declaration), ¶1, p 1-2, ¶8, p 12-18].

**53.**   Disputed as to inference and/or irrelevant. The record shows that, beginning July 25, 2022, Plaintiff complained about pay discrimination to her Department Director, and did so again on October 19 and December 27, 2022. [See, e.g., P EX5 / Doc46-5 (Swann 07.14.2025 Declaration), ¶1, p 1-2, ¶8, p 12-18]

**54.**   Admitted, but incomplete. The record describes Ms. Swann's July 25, 2022 complaint about pay included her complaint about sex / gender-based pay discrimination. [Doc 42-1 (Swann Depo) 68:3-69:17].

**56.**   Disputed as to inference and/or irrelevant. The record shows Swann several times engaged in the protected activity of opposing pay and other gender-based discrimination beginning on July 25, 2022. [Doc 42-1 (Swann Depo) 68:3-69:17; P EX5 / Doc46-5 (Swann 07.14.2025 Declaration), ¶1, p 1-2, ¶8, p 12-18].

**59.**   Disputed as to inference and/or the inference should be construed against Defendant EAMC. Morris's admission, i.e.:   *"I am more concerned about the behavioral issue than monetary issue. Yes, I would like to offer her more money but at the moment her attitude is affecting the shop,"* indicates Morris's animus and "push back" towards a woman employee upset about pay discrimination, not about the discrimination itself. [Doc 42-4, Def Ex. D, ¶ 28, Ex. 9].

**60.**   Admitted but misleading. Defendant's cumulative accounts of Morris's ire towards Plaintiff for being upset about pay discrimination, rather than the discrimination itself, evidences Morris's animus, an attempt to gin-up negativity towards Martha Swann, the degree to which EAMC's policies, practices and training were lacking regarding both workplace discrimination and heading off retaliation before it could occur.  [Doc 42-4, Def Ex. D ¶ 28, Ex. 9].

**61.**   *Id.*

**62.**   Admitted, but disputed as to inference. The referenced email evidences an inflection point where HR did not intervene to:   *(a)* discourage Morris from retaliating against Swann /   and; *(b)* and demonstrated more of Morris's hostility towards a woman upset about workplace discrimination than the discrimination itself. *Id.*

**63.**   Admitted, but disputed as to inference and/or irrelevant. Following this email, Truitt gave Morris an HR-approved blank check to "write-up" / retaliate against Plaintiff, and over the coming days (see, e.g., attempted to undue Plaintiff's training), then weeks and months, he repeatedly cashed that check to negative, adverse effect

against Martha Swann. Truitt's email speaks to her "understanding" about Plaintiff, that came directly from Morris and let Morris "off the leash" to discipline Swann without <u>ever</u> talking with Swann to get her side of the story [*Id.*; Doc 42-4, Def Ex. D, ¶ 29; P EX4 (<u>Truitt Depo</u>) *Depo Ex. 5* – July 29, 2022, Truitt / Morris email exchange; P EX5  / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), ¶1, p 1-2, ¶8, p 12-18].

**64.**    Admitted, but incomplete. The late July 2022 "investigation" described never included talk with Swann; neither Truitt, nor Odom, nor Banta, ever bothered to just talk with Swann. Plaintiff provides no citation because there's no record of such.

**66.**    Disputed in part. According to EAMC's EEOC Position Statement, Defendant "did not provide much weight Locke's Bachelor's Degree in English... for purposes of his starting salary," yet for more than a year still paid him more than Plaintiff. [P EX 13 / Doc46-13 (Defendant's Position Statement), p 2].

**67.**    Admitted, but disputed as to inference. According to EAMC's Genia Odom, EAMC's Process Management Directory, as of July 26, 2022, she "would give Martha [Swann] a little over 2.7 years credit and Cody [Locke] a little over 2.2 years credit. Roughly the same rate." [P EX14 / Doc46-14 (<u>Odom, Johnston, Truitt emails</u>); *see also*, P EX5  / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), ¶16, p 23-26].

**68.**    Admit, but testimony mischaracterizes the situation:  Where Cody Locke got a bit more than 140 hours interning at St. Vincent's hospital, Martha Swann got an estimated 275 hours assisting EAMC technicians before she started full-time in the CE Dept. [Doc 42-1 (<u>Swann Depo</u>) 227-18-228:10].

**70.** Disputed to the extent it obliges Plaintiff to prove a negative and calls Susan Johnston's credibility into question; also, misleading as stated: First, in none of the reams of e-correspondence produced by EAMC during this case, no mention is made of "Covid-19" being the reason for Plaintiff being paid less than Cody Locke. There is likewise no record of either John Morris or any EAMC HR representative mentioning such a thing to Swann. Second, while EAMC eventually matched Swann's pay to Locke's, the record shows it took Swann's complaining *to* Morris about pay discrimination in order to get even a modest upward pay adjustment, beginning in late July 2022. [Doc 42-1 (Swann Depo) 67:20-69-17; 76:20-79:6; P EX5 / Doc46-5 (Swann 07.14.2025 Declaration), ¶1, p 1-2, ¶8, p 12-18].

**71.** *Id.*

**72.** Disputed. Before becoming a full-time CE Dept tech in November 2019, during that year Plaintiff completed about 275 hours on the job as a part time assistant to CE Dept techs. [Doc 42-1 (Swann Depo) 227-18-228:10].

**73.** Admitted but misleading as stated. While working in the "restaurant industry," Plaintiff was pursuing, and obtaining, her Bachelor's Degree in Biosystems Engineering from Auburn University. [P  EX5  /  Doc46-5  (Swann  07.14.2025 Declaration), ¶16, p 23-26].

75. Disputed as misleading and irrelevant as presented. *(a)* Plaintiff's Bachelor's in Biosystems Engineering provided her a full suite of engineering course [P EX5 / Doc46-5 (Swann 07.14.2025 Declaration), ¶16, p 23-26]; *(b)*, Plaintiff, as a Tech (Med)

I, was doing Tech (Med) III work for Tech I compensation more than half a year before EAMC fired her [P EX6 / Doc46-6 (April 2022 Morris to Banta email)]; and, *(c)*, Plaintiff's Department Director, John Morris, testified he had "no complaints" Swann's production, and that "she got her work done on time." [P EX9 / Doc46-9 (Morris Depo), 128:20-131:6].

**76.** Disputed as misleading and undermines the credibility of Johnston, Truitt and Defendant EAMC. *(a)* The record is bare of any evidence Johnston or Truitt possess any particular engineering background or skills required to be a competent CE Dept technician; *(b)*, on October 19, 2022, Plaintiff asked CE Director Morris whether *he* knew the difference between biosystems engineering and biomedical engineering – and Morris could not answer her [Doc 42-1 (Swann Depo) 89:12-90:12]; *(c)*, Plaintiff, as a Tech (Med) I, was doing Tech (Med) III work for Tech I compensation more than half a year before EAMC fired her [P EX6 / Doc46-6 (April 2022 Morris to Banta email)]; and, *(d)*, Plaintiff's Department Director, John Morris, testified he had "no complaints" Swann's production, and that "she got her work done on time." [P EX9 / Doc46-9 (Morris Depo), 128:20-131:6].

**81.** Disputed as incomplete and misleading as stated. In April 2022, Morris admitted Swann was doing (at least some of) the work of a Med/Tech III; and on October 19, 2022, Plaintiff asked CE Director Morris whether *he* knew the difference between biosystems engineering and biomedical engineering – and Morris could not answer her [Doc 42-1 (Swann Depo) 89:12-90:12].

**October 6, 2022 "Insubordination" (Actually: Disparate Treatment)**

    **82.**  Disputed as to inference, misleading. Swann and Locke depositions show Morris – with EAMC's blessing and support – selectively targeted Plaintiff for an infraction men do not get disciplined over, and, moreover, Morris's "concern" about Plaintiff's needing to answer calls quicker, occurred about eight (8) weeks following her complaining to Morris about pay discrimination. The record shows Swann refuted Morris's pretext to discipline her, to make her wear a pager, noting / complaining to Morris that he "had double standards for how he treated me and the men in the shop" (which, as opposition to alleged sex discrimination / disparate treatment, should have triggered an investigation beginning September 28, 2022 – there's no record evidence it did); Swann even gave examples of Morris, Darien Thorsen and Cody Locke *sleeping through* hospital calls, without suffering any adverse / disciplinary action. Cody Locke noted that on an occasion when he, Morris and Thorsen all slept through a call, it was Martha Swann who came in to do the job. [Doc 42-1 (Swann Depo) 167:17-168:8; Doc 42-5 (Lock Depo) 126:13-127:14].

    **83 – 90.** Disputed as to inference, misleading. *Id.*

    **92.**  Morris told Plaintiff if I didn't have any 'problems' for the next two weeks, she would no longer have to wear the pager. After a few weeks without incident, Plaintiff stopped wearing the pager; she had not even received a page during those few weeks, so she just put the pager in her desk drawer. [Doc 42-1 (Swann Depo) 141:11-20].

**95.**  Disputed as incomplete and lacking context. Swann reasonably presumed this was finally the meeting for her and Morris to discuss transcripts and her ongoing pay situation. [Doc 42-1 (Swann Depo) 77:2-79:6].

**100.**  Disputed, both factually and as to inference. Morris and Defendant EAMC get the situation in reverse:  Morris has admitted / testified that as far back as July 2022, Swann told Morris that, according to Morris, her 'attitude' was *because* she wasn't getting credit for work she is doing by title or pay, indicating opposition to discrimination, a protected activity. [P EX9 / Doc46-9 (Morris Depo) 66:5-67:7].

**101.**  Disputed. In 2022 Plaintiff was at the top of the CE Dept in productivity; Morris admits / testifies that Swann had "good production" and that he had "no complaints about her production." [Doc 42-1 (Swann Depo) 313:15-317:6 (and see *P Depo Ex 3*); [P EX9 / Doc46-9 (Morris Depo) 129:1-14, 131:3-19].

**102.**  Admitted, but misleading as stated. A more accurate statement would be that neither Odom nor Truitt bothered to involve Plaintiff, to talk with her, to gain her input, into pay decisions.

**104.**  Disputed as misleading and undermines the credibility of Johnston, Truitt and Defendant EAMC. By this reference Plaintiff reiterates and incorporates into her response to **No. 104**, all facts and the record cited in **No. 76 (a)-(d)**, on page 17, *supra*.

**105.**  Plaintiff admits she had experience in the department at EAMC and good work performance.

106.    Admitted, that Truitt emailed the referenced missive to Morris. <u>Plaintiff disputes</u> the alleged "behavioral issues," which, to the extent any "issues" existed, arose from Morris / EAMC's discriminatory acts (e.g., singling Swann out for discipline – and changing the terms and conditions of her employment – when male coworkers got a pass; failing to investigate – or report to HR regarding – her complaint to Morris that he had imposed a men-women double-standard against her over the September / October "pager" discipline; Morris's telling other CE technicians not to discuss pay or promotions with Plaintiff, etc.). [Doc 42-1 (Swann Depo) 167:17-168:8; P EX5 / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), ¶1, 1-2, ¶8, p 12-18; <u>P EX9</u> / Doc46-9 (<u>Morris Depo</u>) 66:5-67:7]

107.    Admitted that the record shows Morris and EAMC had Plaintiff, as a Tech (Med) I, was doing Tech (Med) III work for the lowest Tech I compensation and was working unsupervised for more than half a year before EAMC fired her. [*See, e.g.*, <u>P EX6</u> / Doc46-6 (<u>April 2022 Morris to Banta email</u>; Doc 42-1 (Swann Depo) 170:17-171:18].

108.    Disputed as to inference, which is that Truitt and HR authorized Morris the to discipline Swann as he saw fit, which included sex-based disparate treatment. [*See, e.g.,* Doc 42-1 (<u>Swann Depo</u>) 167:17-168:8; Doc 42-5 (<u>Lock Depo</u>) 126:13-127:14].

111. Disputed as to inference. A more accurately worded No. 111 would state: "Morris, Truitt, and Johnston, with actual knowledge of Swann's pay concerns, chose

not to have any input into the specific amount Swann received as related to this annual raise."

115.    Disputed as to inference. Swann complained directly to CE Director Morris on July 25, and October 19, 2022, about gender-based pay discrimination. She would complain again on December 27, 2022, and get fired in the process. [Doc 42-1 (<u>Swann Depo</u>) 67:20-69:17, 76:20-79:6, 172:17-173:12; P EX5 / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), ¶1, p 1-2, ¶8, p 12-18].

116.    Disputed as misleading. The reason Odom, Truitt and Johnston "looked into" the problem of Swann's pay again being too low, was due to *Swann* bringing it to their attention. Additionally, Johnston's admitted the pay differential needed to be "fixed," and, at the least, Swann should track with Cody Locke – who was less experienced and no Bachelor's of Engineering, like Plaintiff [P EX15 / Doc46-15 (Odom, Truitt, Johnston email thread – November 2022; Doc 42-1 (<u>Swann Depo</u>) 227-18-228:10;  P EX5 / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), ¶16, p 23-26].

124.    Admitted to the extent EAMC contradicts itself:  Defendant's Brief, **No. 76**, at page 17 [Doc. 41], states in part (and incorrectly – see Plaintiff's **No. 76**, *supra*): "*Johnston and Truitt agreed that Swann's Biosystems Engineering degree related ecological systems, forestry, and related areas, not biomedical equipment, and was therefore not applicable to her work as a CE Tech*;" while in EAMC's **No. 124** claims Odom and Truitt consider Swann's "degree in Bio-System Engineering (and other credentials and experience)" as qualifying her to be a Bio-Med II.

127.  Disputed as to inference. But for Morris's instigating an argument with Plaintiff on December 27, 2022, and firing Plaintiff within about 72 hours of her, *(a)* complaining about workplace sex discrimination; and, *(b)* swearing, which the men in CE do liberally, the referenced promotion would have, indeed, gone through and increased Swann's rate of pay to at least $21.80 per hour. [Def Ex. D, ¶44; Doc 42-1 (Swann Depo) 173:5-17, 176:3-20; Def Doc. 42-7 (Swann First Declaration), p 1-6].

128.  Disputed as to inference. The "admission" cited only reinforces Morris's fixation on Plaintiff and her phone. As Swann was one of, arguably the, most productive member of CE team, and given that Morris admits he had no problems with her productivity, Morris's phone obsession speaks suspiciously of him and his credibility as an even-handed arbiter of discipline within the CE Dept. [Doc 42-1 (Swann Depo) 313:11-317:6 (*Pl Depo Ex 3*); See also, P EX9 / Doc46-9 (Morris Depo) 129:1-10, 131:3-132:3].

129.  Disputed as to inference. Defendant seeks to change *the* subject of October 19, 2022:  away from Plaintiff's raising the issue of gender discrimination in pay again, to Plaintiff's private message to coworker about Morris trying to change the subject away *from* discrimination. [*See*, Doc 42-1 (Swann Depo) 236:23-237:11].

130.  Admitted but misleading as stated. Unlike Plaintiff, there is no record of Locke ever being disciplined for workplace phone use, or for sleeping a call.

133.  Admitted, but incomplete. The full context:

Later in the morning my husband sent me an unprompted text message while I was at work to update me on the extreme cold and the situation at

our house. Morris walked by and told me in a loud and stern tone to put down my phone. Morris's tone towards me was like that of a strict master "correcting" a misbehaving dog. I put down my phone immediately and without arguing.

Def Doc. 42-8 (Swann Third Declaration) p 17.

**136.** Admitted, but misleading and incomplete. It was 7:30 a.m. And Swann was conversing with Darien Thorsen and Cody Locke. John Morris leaned his head all the way over my shoulder and asked me what I was looking at. He had been in my personal space before but never to that extent. [Def Doc. 42-8 (Swann Third Declaration) p 18].

**138.** Disputed as to inference. Morris got unprofessionally and impermissibly into Plaintiff's personal space. [*See*, Def Doc. 42-8 (Swann Third Declaration) p 18; *and, see*, Doc 42-1 (Swann Depo) 145:2-146:17].

**139.** Admitted but incomplete. This incident occurred hours later, after noon, when Morris picked a fight with Swann about her lunch break. [*See*, Def Doc. 42-8 (Swann Third Declaration) p 18].

**140.** Disputed. While EAMC's (and Morris's) **No. 140** claims "Morris separated himself from the conversation," in his firing write-up Morris claimed Swann said "something about being sick of this and walked out of the shop saying, 'I don't have time for this shit.'" Morris and EAMC cannot keep their stories straight and their credibility suffers [P EX1 / Doc46-1 (Johnston Depo – *P Depo Ex. 6*, Morris write-up)].

**142.**    Disputed as to inference. Back in October, when Morris forced Swann to wear a pager, he said that she'd have to carry it "for the next couple weeks" and if there weren't "any more problems" she would not need to keep carrying it. After a *few* weeks, in which Plaintiff had not even received a page, she stopped wearing the thing and put it in her desk draw. There's no record that Morris ever told Plaintiff he had to affirmatively "relieve" her of her obligation to wear the pager. Almost three (3) months had gone with no "pager issue," that is, between October 6 (the Pager Date) and December 27, 2022. [Doc 42-1 (Swann Depo) 141:12-20; 142:11-20].

**144.**    Disputed. Swann disputes – and always has – the accusation that she cursed "at" Morris. She admits she used two (2) swear words, but has always maintained she worked in an atmosphere where – with one exception – everyone, including Morris, swore liberally. [P EX5 / Doc46-5 (Swann 07.14.2025 Declaration), ¶2 p 2-4, ¶9 p 19, *see also*, Attachment 13, ¶3, p 1, ¶4, p 2 (Cody Locke 07.09.25 Declaration); Def Doc. 42-7 (Swann First Declaration), p 1-6].

**145.**    Disputed as to mischaracterization and as to inference. The referenced message/s were post-firing private social media message mischacterized as misconduct. Swann's January 2023 post-firing message to Britnei McCollough neglected to include that she yelled "*back*" at Morris after he began yelling at her. The profane words she shared to a friend was, indeed, the way Plaintiff characterized Morris for how he had treated her; not a quote of anything she ever said to Morris or at work. Not even Morris accuses her of saying that January messaged words during their

our December 27 incident. <u>I never directed profane words at John Morris on December 27.</u> It's notable that when he fired Swann, he never claimed she *called him* anything profane or directed any swear word *at* him. Also, Morris never mentioned the pager or call response times, and he did not mention "insubordination" when he fired Plaintiff on December 30, 2022. [P EX5 / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), ¶9 p 19).

146.   Disputed as to mischaracterization and as to inference. *Id.*

147.   Disputed, after a fashion:   Who separated themselves from whom? This Morris-cited Ex. D, ¶53, Ex.17, contradicts  Morris's Ex. D, ¶50 (See, **No. 140**, *supra*, at page 23).

148.   Disputed as mischaracterization. Plaintiff characterized the situation as "inappropriate" – given that she's testified that she once again brought up gender discrimination when Morris was haranguing her in a way he never did to men, a reasonable person could infer that the inappropriate nature of the incident caused / instigated by her male supervisor, Morris.

### <u>EAMC Fires Martha Swann after she complains about discrimination</u>

149.   Disputed as to inference and credibility. Morris has testified that in 2022 he spoke with Swann about "being happy" at work and that any "attitude" issue with her was due to "pay and promotion." Morris has also testified that in 2022 he considered "pay" a "trigger" point for Plaintiff. While Swann and Morris disagree over whether Swann specifically complained about gender discrimination or the Equal Pay Act being part of their "pay" conversations, Morris admits that no other issues, namely

poor productivity, presented. To the extent Morris's re-cap of then-recent events with Swann at work failed to emphasize pay issues, then he, Johnston and Truitt deliberately neglected to consider or investigate Swann's side of the story. Swann claims she made a point of telling Morris on December 27 about (at least some of) her issues regarding workplace discrimination [*See, e.g.,* Doc 42-1 (Swann Depo) 173:5-17]. From the record it appears Morris failed or refused to "recap" this to Johnston and Truitt, and Johnston and Truitt failed to investigate beyond just accepting Morris's story as true. [P EX9 / Doc46-9 (Morris Depo) 66:7-20, 72:13-75:14, 129:1-10, 131:3-132:3].

150.    Admitted to the extent Johnston and Truitt relied entirely on Morris's version of the incident and failed or refused to invite Martha Swann to tell hers.

151.    Dispute as to being incomplete / inaccurate. When Morris told Plaintiff to turn in her badge, she underhand tossed it to him. [Doc 42-1 (Swann Depo) 158:13-16].

152.    Disputed as to inference and irrelevance. Aray Payne was not a witness to the December 27, 2022, incident. Additionally, the record is devoid of any evidence that Payne had any knowledge of Plaintiff's claims of pay and other workplace gender discrimination in CE over the previous five (5) months, from at least July 25 through December 27, 2022.

159.    Admitted but misleading as stated. The record contains no evidence that EAMC Vice President Oliver Banta ever read any of the thirty-four (34) pages making up the "Grievance Packet" Johnston emailed to him. The record contains no Banta notes, no list of questions he proposed to ask Swann. There's no indication Banta inquired about the

extensive pay issues raised in the emails contained in the Grievance Packet. The record contains no mention of Banta noting Morris's July 29, 2022, email to Truitt and Odom (and, in fact, Banta) told its recipients that Morris had *"requested the other Team members not to engage in conversation with her about pay or what it would take to get her a promotion. . ."* and that Morris was very likely violating the National Labor Relations Act in taking that initiative, and that, at the least, such an act regarding Plaintiff called Morris's judgment into question. [See, Def Doc 42-3, Ex. 2, *in passim*, and Morris July 29, 2022, email to Truitt, Odom and Banta (Bates No. 820)]. According to HR Director Truitt, an "unwritten" EAMC policy allows employees to discuss pay. Truitt claims she "coached" Morris about his apparent violation of this unwritten policy, but made no record of this "coaching" and Morris cannot recall Truitt doing such a thing. [P_EX4 / Doc46-4 (Kelli Truitt Depo), 102:7-105:12, 108:15-111:20; P EX9 / Doc46-9 (Morris Depo), 72:13-74:22, 75:22-78:6, 79:12-80:15]. And no record shows Banta looking into this.

**164.** Admit as to Johnston's email, but Plaintiff disputes the truth of the email. Plaintiff experienced a deeply flawed-to-broken grievance process. [*See, e.g.*, Doc 42-1 (Swann Depo) 312:14-313:10, 329:12-330:6; [P EX5 / Doc46-5 (Swann 07.14.2025 Declaration), ¶3 p 4-6].

**167.** Admitted, but dispute as to inference. Given that panel members VP Johnston and VP Casey both "lost" their grievance hearing notes, and VP Nunnelly's notes consisted of only three lines ("You use excuses to invalidate the work I do;"

"Profanity is used in CE every single day," and, "Call is apparently optional for some ppl and not for Martha"), it was fortuitous that someone, Plaintiff, archived the hearing. [P EX2 / Doc46-2 (Sarah Nunnelly Depo) 43:2-44:21]

169. Disputed as to inference. Swann deposition describes and explains language reflected frustration over discrimination, not any "misconduct" on her part. Regarding the CE Dept, she noted that "profanity is used down there every day and I felt like it was an acceptable time to use it because everyone else is allowed to and no one was even in there. It was just me and John." [P EX5 / Doc46-5 (Swann 07.14.2025 Declaration), Attachment 3, Grievance Hearing Transcript, p 4, time stamp 8:28; *see, also,* Doc. 42-7 (Swann Declaration) p 1-6].

170. Disputed, as to inference. Profanity was used daily in CE, including at Morris, but the record shows Plaintiff – who had raised discrimination issues with Morris – has been the only CE employee fired for "profanity." *Id.*; *and see*, Def Doc. 42-5 (Locke Deposition) 89:18-92:12.

171. Disputed as to inference. At least when Swann worked in EAMC's CE, most all the technicians, and Morris, swore liberally. So the "unprofessionalism" is shared by Morris. *Id.*

173. Disputed as to any EAMC assertion of good faith "consideration." The January 24, 2023, grievance hearing transcript evidences a gathering of seven (7) EAMC Vice Presidents – especially Legal Counsel Roben Casey HR Vice President Susan Johnston – bent on interrogating and bullying Swann and putting her in a corner,

not in listening to the background and context of the December 27, 2022, incident with Morris that got Swann fired. The hearing transcript shows EAMC's Vice Presidents taking a belligerent position against Swann on any issues of: *(a)* virtually all CE technicians using profanity daily; *(b)* Swann attempting to provide examples men getting to defy Morris without consequences; *(c)* retaliation; and, *(d)* Morris's need to be "flirted with" and "flattered" by women in order to gain his good favor. Additionally, the Vice President-laden grievance panel dismissed Morris's history of workplace sexual impropriety, and when, apparently, Morris denied any and all such behavior, the grievance panel took him at his word and refused to conduct a thorough, good faith, investigation of the discriminatory matters Plaintiff raised and complained about. [*See*, P EX5 / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), Attachment 3, Grievance Hearing Transcript, p 4, time stamp 8:28-8:55; p 9, time stamp 26:37-26:41; p 10, time stamp 28:31-28:41; p 13, time stamp 36:03-38:06; *and see*, P EX16 / Doc46-16 (<u>Michael Giles 06.19.25 Declaration</u>), *in toto*; P EX17 / Doc46-17 (<u>Michael Giles 07.02.25 Declaration</u>, esp. attachment; *and see*, P EX18 / Doc46-18 (<u>Willie Lewis Deposition</u>) 12:21-13:5, 20:15-22:23].

**175.** Disputed. EAMC hired Andrew Barnes to replace Plaintiff. Barnes is only an assistant, a backup, for Tom McSweeney, who does the brunt of the radiology maintenance and repair at EAMC. By contrast, Barnes and Swann's work overlaps/ed by more than 91 percent. Additionally, Morris considers Barnes his / EAMC's "Surgery CE Technician [in] the OR (Operating Room) – Barnes does not disagree

with Morris about this. [P EX7 / Doc46-7 (McSweeney Depo) 37:14-39:20; P EX8 /

Doc46-8 (Pl Supp Ans to Int, Comparison of Swann and Barnes work, including Venn

Diagrams) noting p 126, 127; P EX9 / Doc46-9 (John Morris Depo), 159:6-23 (and

*Morris Depo P Ex 7*); 163:8-17; Def Doc 42-6 (Andrew Barnes Depo), 61:3-63:6).

**176.** Disputed as to relevance. The jobs, not the individual employees holding

those job, is to be compared. Plaintiff's and Barnes's jobs were substantially the same,

i.e., more than 64% identical, plus another more than 27% comparable. See:



*From*  P EX8 / Doc46-8 (Pl Supp Ans to Int, Comparison of Swann and Barnes work,

including Venn Diagrams - p 126, 127).

**177 – 185.** *Id.*

**186.** Disputed as to mischaracterization and inference. On January 30, 2023, HR Vice President Johnston sent a letter to Plaintiff notifying her the grievance panel upheld her firing. Plaintiff does not dispute the EAMC's January 31, 2023, new-hire paperwork for Barnes. Brad Stone left EAMC around November 2021, not long after McSweeney was hired in the fall of 2021. [P EX2 / Doc46-2 (Nunnelly Depo) – P Depo Ex 4, p 61 of full document; P EX7 / Doc46-7 (McSweeney Depo) 20:12-21:11; Def Doc 42-7 (Swann Declaration) p 7-9 re:  Brad Stone].

**188.** Admit that EAMC has attempted to use a job title to cover for the reality that Caldwell was hired to replace Locke, not Swann; Dispute that Caldwell was hired to replace Swann. *(a)* Locke was the CE dialysis machine technician until he resigned around late July 2023 [Doc 42-5 (Locke Depo) 40:11-23; 43:17-44;  P EX9 / Doc46-9 (Morris Depo), 169:1-5; *(b)* Caldwell, was hired to be the dialysis technician after Cody Locke resigned [*Id.*, 164:22-167:19 – Morris:  "[Caldwell is] our dialysis person"]; *(c)* Swann was not an EAMC dialysis technician [Doc 42-1 (Swann Depo) 282:17-21]. *(d)* Swann's EEOC Charge was pending during Caldwell's hire [Plaintiff cites P EX13 / Doc46-13, EAMC's May 22, 2023, Position Statement (notwithstanding the Statement's "2022" scrivener's error), and calls the Court's attention to Plaintiff's Notice of Right to Sue, attached to the Complaint (Case Doc. 1), issued by the EEOC on January 31, 2024].

**191.** Disputed as misleading and irrelevant. The record is void of any evidence that Locke ever raised the issue of sex / gender-based pay discrimination.

**192.** *Id.*

**193.** Disputed as misleading and irrelevant. The record is void of any evidence that Finley ever raised the issue of sex / gender-based pay discrimination.

**194.** Disputed as misleading and irrelevant. The record is void of any evidence that McSweeney ever raised the issue of sex / gender-based pay discrimination.

## II. Plaintiffs' Undisputed Facts

**1.** While EAMC's Employee Handbook's "Sexual Harassment" section claims to prohibit retaliation for reporting such harassment, the section makes no mention of protecting employees who report or complain about sex-based pay discrimination. [Def Doc 42-1 (<u>Swann Depo</u>) D Ex 3, Policy Page 4, top].

**2.** EAMC HR Vice President Susan Johnston understands that at least one federal law prohibits employers from themselves prohibiting employees from discussing pay with one another. [P EX1 / Doc46-1 (<u>Johnston Depo</u>) 147:20-148:17].

**4.** On July 29, 2022, within days of Swann complaining to Morris about her rate of pay, Morris requested CE Dept technicians not discuss pay or what it would take for her to get a promotion (claiming it was a "trigger point" for her). [P EX3 / Doc46-3 (<u>Casey Depo</u>) P Depo Ex 8, doc p 136, Bates 820].

**5.** HR Director Truitt claims she later "coached" Morris his requesting team members not discussing pay with Plaintiff, but made no written record of such "coaching;" Morris has no recollection of Truitt, or anyone, "coaching" him on this subject. [P EX4 / Doc **-4 (Truitt Depo) 110:2-111:1; P EX9 / Doc **-9 (Morris Depo) 77:1-80:15].

**6.** Even though EAMC HR Director Truitt disagrees with Swann, Truitt understands that Swann contends Morris applied double standards in meting out disciplinary action towards her, compared to her CE Dept coworkers, based on her, Swann's experiences in CE. [P EX4 / Doc46-4 (Truitt Depo) 130:1-14].

**7.** Former CE technician Willie Lewis once caught Morris having sex in EAMC's CE shop. [P EX18 / Doc46-18 (Lewis Depo), 12:21-13:5, 20:15-22:23].

**8.** Neither Johnston nor any member of the grievance panel contacted Mr. Lewis to confirm what he witnessed, even though Mr. Lewis has testified he would have told any EAMC administrator about what he saw Morris doing, had they bothered to contact him. [P EX18 / Doc46-18 (Lewis Depo) 30:1-16].

**9.** In or around 2016-2017, Morris told Michael Giles, a CE Dept from 2013-2020, about getting in trouble for having sex with one of the EAMC nurses on company property. According to Giles, Morris admitted that he got chewed-out by the then-CE Director, but that was all. [P EX16 / Doc46-16 (Michael Giles 06.19.2025 Declaration)].

**10.** When Michael Giles, who worked at EAMC until around April 2020, worked with Morris, he saw Morris being "inappropriate on many occasions. Touchy feely." Giles saw Morris "make women uneasy on various occasions." [P EX16 / Doc46-16 (Michael Giles 07.02.2025 Declaration) p 3].

**11.** Former EAMC CE technician Cody Locke witnessed John Morris making at least one disparaging, and sexist, comment about Swann in or around 2022, asking Locke, "Who would want to be married to *that*!" following an argument Morris had just had with Swann. [P EX5 / Doc46-5 (Martha Swann 07.14.2025 Declaration) Attachment 13 (Locke 07.09.25 Declaration), p 2].

**12.** On another occasion in 2022, Morris told Locke, "What a waste!" regarding an EAMC employee who was a lesbian. Morris later recounted the story to other CE techs. In his July 9, 2025, Declaration, Locke contends such incidents describe "Morris's contempt for women," and how any discriminatory actions taken by Morris towards women in the workplace "are no mistake." *Id.*, at p 2-3.

**13.** During Swann's January 2023 grievance hearing, EAMC's grievance panel (seven (7) EAMC Vice Presidents) did not consider it their duty to investigate Swann's allegations of inconsistent enforcement of policies, retaliation, and discrimination at EAMC, even though she claimed these were related to her firing. [P EX3 / Doc46-3 (Casey Depo) 121:6-23].

**14.** According to EAMC Vice President Casey, it didn't matter to the grievance committee if Plaintiff alleged men in CE were not disciplined or fired for the same

actions Plaintiff was accused of and fired for. [P EX3 / Doc46-3 (<u>Casey Depo</u>) 143:14-19].

**15.** During her January 2023 grievance hearing, when Swann brought up an example of Morris's workplace (gender-based) disparate treatment, EAMC's grievance committee did not ask for any additional examples because it wasn't the purview of the committee to ask about disparate treatment once the employee has raised the issue.   [P EX3 / Doc46-3 (<u>Casey Depo</u>) 167:3-8].

**16**.  Defendant contends, under oath:

> [B]ased on individual memories of events that took place over two years ago, Johnston, Nunnelly, and Casey believe they did handwrite notes to themselves during Plaintiff's grievance hearing on or about January 24, 2023.

and:

> EAMC does not dispute that Johnston, Casey, or Nunnelly took notes during Plaintiff's grievance hearing and has no reason to dispute that Plaintiff saw them taking notes.

Defendant's February 27, 2025, Answer to Plaintiff's Interrogatories [P EX19 / Doc46-19, EAMC's Answers to P Interrogatories 23 and Ans 27].

**17.**  Neither HR Vice President Johnston nor Vice President and Chief Legal Officer Casey can find their grievance hearing notes, or have otherwise "lost" their respective notes, or in Casey's case, can now not recall whether or not she took notes during the hearing. [P EX1 / Doc46-1 (<u>Johnston Depo</u>) 188:23-190-6, 191:2-23; P EX3 / Doc46-3 (<u>Casey Depo</u>) 25:21-26:25, 28:13-20].

**18.**  Its objections notwithstanding, EAMC admits it would not change anything about Morris' behavior towards Plaintiff in the workplace on December 27, 2022 about which it has knowledge and information. [P EX20 / Doc46-20 (EAMC Responses to P's Amended RFAs) Response to RFA 15].

**19.**  Its objections notwithstanding, EAMC admits it would not change any of the formal disciplinary action issued to Plaintiff by Morris in 2022.  [P EX20 / Doc46-20 (EAMC Responses to P's Amended RFAs) Response to RFA 16].

### III.  Additional Disputed Facts Favoring Trial of this Case

**1.**  Training regarding workplace policies, such as it is, is grossly inadequate [P EX19 / Doc46-19 (Declaration of Davontino Carr); Def Doc 42-1 (Swann Depo) 303:11-304:13, 306:4-307:5, 307;16-308:23, 309:11-310:1, and P Depo Ex 1].

**2.**  On September 28, 2022, when Morris ordered Plaintiff to wear a pager and Plaintiff responded by telling Morris "had double standards for how he treated me and the men in the shop," Morris violated EAMC policy by refusing to report Plaintiff's sex discrimination complaint to HR so that it could commence and investigation.  [Doc 42-1 (Swann Depo) 167:17-168:8; P EX1 / Doc46-1 (Johnston Depo) P Depo Ex 2, p 4-5 (reporting / investigating harassment).

**3.**  EAMC claims it is "unaware of any "workplace reputation" of Morris for "flirting with women and/or sexualizing his relationships with women at the workplace," because over the  years EAMC has failed or refused to investigate Morris

for such policy violations and improprieties. [P EX5 / Doc46-5 (Martha Swann 07.14.2025 Declaration) Attachment 3 (grievance hearing transcript, p 13, time stamp 36:03-37-08), Attachment 9 (EAMC Supp Ans to Int, p 11 No. 63)].

**4.** Under penalty of perjury EAMC claims: "As explained (now multiple times), the termination of Plaintiff's employment stems from her shouting and swearing at her direct supervisor in the workplace," while Swann claims, in sum, she was fired both in retaliation for complaining about pay discrimination, and as a matter of and arising out of EAMC's agent and representative, CE Dirctor John Morris's, proclivity for discriminating against women subordinates who fail to flirt with or flatter him. [P EX5 / Doc46-5 (Martha Swann 07.14.2025 Declaration) Attachment 3, p 2, time stamp 2:53, p 4, time stamp 8:28, p 9, time stamp 26:37, p 10, time stamp 28:31 and p 13, time stamp 36:03; Attachment 9 (EAMC's Supplemental Responses to Interrogatories), p 6, No. 20; *and see*, Def Doc 42-1 (Plaintiff's Depo) 173:5-17].

## STANDARD OF REVIEW

### Regarding Title VII Claims

In a 2022 published opinion, the 11th Circuit reiterated the standard of review's requirement to view the evidence in favor of the non-moving party when it reversed the district court's granting summary judgment in Alabama's Southern District:

> At this stage of the proceedings, "we are required to view the evidence and all factual inferences therefrom in the light most favorable to [Plaintiff], and [to] resolve all reasonable doubts about the facts in [her] favor." *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir.

2013) (quotation marks omitted). We are neither required nor permitted to determine whose version of any disputed fact is actually correct, or more likely to be; our task is only to determine whether [the non-moving plaintiff's] version has evidence to support it. *Id.* at 1247–48 ("[W]e are required to credit [the plaintiff's] version if there is any evidence to support it, and it is that version we set out here.")

*Patterson v. Georgia Pacific, LLC*, 38 F.4th 1336, 1341 (11th Cir. 2022).

When considering allegations of Title VII violations, the court "must view the evidence 'cumulatively and in the *totality* of the circumstances.'" *Smelter v. S. Home Care Servs.*, 904 F.3d 1276, 1285 (11th Cir. 2018) (emphasis added). "[T]he crux of the analysis at the summary judgment stage is whether the plaintiff has offered sufficient evidence to establish a genuine issue of discrimination." See *Quigg v. Thomas County School District,* 814 F.3d 1227, 1240 (11th Cir. 2016). Thus, "the plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*

Here, to one or another degree Plaintiff disputes most of Defendant's 190 "Undisputed Facts," and offers record evidence of these disputes. The question remains: Do enough genuine issues of material fact exist so that a reasonable juror could find in favor of the Plaintiff? The answer remains: Yes.

**Regarding Equal Pay Act Claims**

At trial, a plaintiff bringing a claim under the Equal Pay Act bears the initial burden to show that her employer paid her "at a rate less than the rate at which" it paid a male employee "for equal work in jobs the performance of which requires equal skill,

effort, and responsibility," and that she and that male employee worked "in the same establishment." *Mulhall v. Advance Sec., Inc.*, 19 F.3d 586, 590 (11th Cir. 1994) (quoting 29 U.S.C. § 206(d)) (internal quotation marks omitted). That showing establishes a prima facie case under the Act. *Id.* A claim under "the EPA does not require . . . proof of intentional discrimination." *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 640 (2007), superseded by statute on other grounds. A defendant moving for summary judgment is not required to offer evidence to "negate[]" an element of the plaintiff's prima facie case. *Fitzpatrick*, 2 F.3d at 1115. Instead, the defendant may satisfy its initial summary-judgment burden by "showing – that is, pointing out to the district court – that there is an absence of evidence to support" an element of the plaintiff's *prima facie* case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). To do this, the defendant "must point to specific portions of the record in order to demonstrate that the [plaintiff] cannot meet its burden of proof at trial." *United States v. Four Parcels of Real Prop. in Greene & Tuscaloosa Cntys.*, 941 F.2d 1428, 1438 n.19 (11th Cir. 1991) (en banc). "[I]t is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id.* at 608. If a defendant moving for summary judgment succeeds in "pointing out . . . an absence of evidence to support" an element of the plaintiff's prima facie case, Rule 56 requires the plaintiff to "go beyond the pleadings" and establish that there is a material fact in genuine dispute regarding that element. *Celotex*, 477 U.S. at 324–25; see also Fed. R. Civ. P. 56(c)(1) (A). If a defendant moving for summary judgment on an Equal Pay Act claim fails to

establish that the plaintiff cannot present a prima facie case at trial, <u>the plaintiff is</u> <u>entitled to an inference of discrimination based on sex</u>. *Price v. Lockheed Space Operations Co.*, 856 F.2d 1503, 1507 (11th Cir. 1988) (emphasis added). The defendant may overcome the inference and prevail on summary judgment – but the burden becomes "a heavy one." *Mulhall*, 19 F.3d at 590.

The burden in an Equal Pay Act case does not shift to the defendant merely to produce "evidence that the differential in pay [wa]s justified" by a nondiscriminatory reason. *Id*. at 590, 592 n.12. Rather, at trial the burden shifts to the defendant to persuade the jury "by a preponderance of the evidence that the differential in pay [wa]s justified by one of the four exceptions set forth in the [Equal Pay Act]." *Id*. Those exceptions are affirmative defenses. *Id*. at 590-591.

If a defendant moving for summary judgment fails to establish that a plaintiff cannot present a prima facie case under the Equal Pay Act, the defendant must establish that no reasonable factfinder could find that the plaintiff's sex "provided [any] basis for the wage differential." *Mulhall*, 19 F.3d at 590 (emphasis in original); see *Fitzpatrick*, 2 F.3d at 1115. A defendant's testimony "in abstract terms as to what might have motivated" the difference in pay other than the plaintiff's sex does not satisfy a burden of production (let alone a burden of persuasion). *Walker v. Mortham*, 158 F.3d 1177, 1182 n.8 (11th Cir. 1998). Rather, the defendant must adduce evidence of the specific reason for the pay differential, and the differential must be "attributable solely to [a] recognized exception to the EPA." *Mulhall*, 19 F.3d at 597. When

analyzing whether the defendant has satisfied its burden, <u>the plaintiff's evidence "is to</u> <u>be believed, and all justifiable inferences are to be drawn in h[er] favor."</u> *Tolan v.* *Cotton*, 572 U.S. 650, 651 (2014) (citation and quotation marks omitted) (emphasis added). In light of these standards, the Eleventh Circuit has "note[d] the difficulty inherent" in winning summary judgment on an affirmative defense to an Equal Pay Act claim. *Mulhall*, 19 F.3d at 595. See, *in passim, Strickland v. Synovus Bank*, No. 2:19-cv-1195-AMM, ECF No. 44 at 22 (N.D. Ala. Sept. 7, 2021).

## IV. Argument

### A.  A Jury Should Decide Plaintiff's Equal Pay Act (EPA) Claim

The EPA standard requires only that jobs be substantially equal in skill, effort, and responsibility, not identical. The plaintiff need not prove that her job and those of the comparators are identical; the test is one of substantiality, not entirety. *Mulhall v.* *Advance Sec.*, 19 F.3d 586, 592 (11th Cir. 1994).  "[A] plaintiff does not have to show that the skills or qualifications of the actual male and female employees holding the positions are also substantially equivalent." See *Miranda v. B & B Cash Grocery* *Store, Inc.,* 975 F.2d 1518, 1533 (11th Cir.1992) ("Only the skills and qualifications actually needed to perform the jobs are considered."). *Miranda* reversed summary judgment, finding extra tasks automatically do *not* defeat the claim.

### *Regarding Cody Locke*

In July 2022, EAMC itself equalized Swann's pay with Locke's, effectively conceding their jobs were substantially equal. (See *supra*, at p 15, No. 67; p 21, No.

116). Swann and Locke both held the CE Dept's Tech I title and both performed core biomedical equipment work. Locke's associate's degree was not essential to the role, and EAMC assigned them both similar responsibilities, although Locke was the dialysis technician and Swann was the OR (surgery) technician. Defendant's claimed factor-other-than-sex defense fails because it was not applied consistently. EAMC's own pay corrections undermines between Plaintiff and Cody Locke constitute admissions of job and performance similarity and moot EAMC's attempts to unring the bell.

### *Regarding Andrew Barnes*

Per CE Director's own evaluation, Andrew Barnes, like Swann, is EAMC's OR technician. (<u>P EX9</u> / Doc46-9 (<u>John Morris Depo</u>), 159:6-23 (and *Morris Depo P Ex 7*); 163:8-17; Def Doc 42-6 (<u>Andrew Barnes Depo</u>), 61:3-63:6). Barnes current and Swann's past EAMC jobs overlap by more than 90% (*see*, *supra*, at No. 175, 176). In fact, EAMC needed and needs Barnes to be the OR technician:  The record shows Mitch McSweeney does the brunt of radiographic maintenance and repair, while Breanna Caldwell replaced Cody Locke to serve as dialysis tech.

## B.  A Jury Should Decide Plaintiff's EPA and Title VII Retaliation Claims

To establish a prima facie case of retaliation, "A *prima facie* case of retaliation under Title VII requires the plaintiff to show that: (1) [she] engaged in an activity protected under Title VII; (2) [she] suffered an adverse employment action; and (3)

there was a causal connection between the protected activity and the adverse employment action." *Crawford v. Carroll,* 529 F.3d 961, 970 (11th Cir. 2008)(citing *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001)). Protected activities include "oppos[ing] any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e–3(a). And causation requires only a showing that "the protected activity and the adverse action are not completely unrelated," and a plaintiff can satisfy this prong "by showing close temporal proximity between the statutorily protected activity and the adverse employment action." *Wideman v. Wal-Mart Stores, Inc.*, 141 F.3d 1453, 1457 (11th Cir. 1998) (internal citation omitted); *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007).

Swann complained about, opposed, pay discrimination based on sex on July 25, October 19, and December 27, 2022 – making these complaints to her Department Director, John Morris. *See, e.g.*, Def Doc 42-1 (Swann Depo) 67:20-69:17, 76:20-79:6, 173:5-17]. Morris's string of adverse, retaliatory, acts – which EAMC has adopted and ratified – are of record:  from telling other technicians not to discuss pay with her; to trying to (and finally succeeding) in thwarting training for Plaintiff; to the making her suffer the humiliation of The Pager (an indignity the men who missed calls never had to endure); to discomforting her in her personal space in his run-up to creating an argument he used to fire her (for saying "bad words" which the men, and women who flirted with Morris, and Morris himself, were free to enjoy in the workplace).

An employer can be held liable if a supervisor with discriminatory animus

influences the ultimate decision maker. See, *Jones v. Gulf Coast Health Care of Del., LLC*, 854 F.3d 1261, 1271 (11th Cir. 2017). The record provides evidence of Morris's discriminatory animus exists ("Can you imagine being married to *that*!" said Morris to Locke about Swann. Not "her," but "*that!*" – [P EX5 / Doc46-5 (<u>Swann 07.14.2025 Declaration</u>), Attachment 13, p 2, No. 5).

EAMC as a whole, through its other managers and administrators, shares Morris's bad faith. From Truitt's testimony that she "coached" Morris about his presumptive labor law violation – a claim Morris cannot recall; to VP Oliver Banta being AWOL on *any* kind of oversight of Morris; to Johnston and Casey not just failing, but refusing, to conduct a grievance hearing with even a modicum of neutrality; and, in the end, the seven (7) Vice Presidents who also refused to undertake even a cursory, let alone thorough, investigation of Martha Swann's concerning-to-explosive allegations during her January grievance hearing, and more, in their totality could certainly cause a reasonable juror to not just find for Plaintiff, but come down hard on EAMC.

Morris' track record of a sexist contempt for women in the workplace, including Plaintiff, shows motive, opportunity, intent, plan, absence of mistake, and the like. F.R.E. 404(b)(2).

Johnston's and Casey's conveniently "losing" their grievance hearing notes invite consideration of spoliation (here – Plaintiff asks only that the Court construe this double-loss against EAMC).

Morris "influence" the ultimate decision makers – Johnston and Truitt in EAMC HR when, with Morris, they fired Plaintiff. By his actions, especially in September, October and December 2022, EAMC allowed Morris to influence EAMC's grievance panel to uphold Plaintiff's termination and refusal to reinstate her – after refusing to even *consider* Plaintiff's point – and the law – that applying disciplinary action in a duplicitous, sexist, discriminatory and retaliatory fashion *invalidates* the action.    But grievance panel leaders like Roben Casey and Susan Johnston just plowed ahead and protected Morris. EAMC even violated its own policies by refusing to conduct a good faith investigation.

A reasonable juror could find that shutting down the aggrieved employee and taking the supervisor's word as gospel, and refusing to contact or interview *any* rank and file members of the CE Dept regarding Morris's background (about which Vice President Johnston already had a great amount of actual knowledge), and doing even a moderate dive into the facts *independent* of the two antagonists, constituted retaliation for failure to investigate.

In *Crawford,* at 961 (11th Cir. 2008), the 11th Circuit "recognized that *Burlington Northern* set out a different standard for retaliation claims. We said that under *Burlington Northern,'* in the context of a Title VII retaliation claim, a materially adverse action "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."'" *Id.* at 974. We applied the "well might have dissuaded" standard again in *Alvarez v. Royal Atl. Developers, Inc.*, 610 F.3d 1253,

45

1268 (11th Cir. 2010). *Monaghan v. Worldpay US, Inc.*, 955 F.3d 855, 861 (11th Cir. 2020)(citing *Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53 (2006)(some internal citations omitted).

### 1. Defendant wrongly claims Swann did not engage in protected activity

Plaintiff complained to a Department Director, her own Director, John Morris, about gender / sex-based pay discrimination in late July, in October and on December 27, 2022. The more EAMC disputes this, the more it admits to a triable issue.

To the extent EAMC claims Plaintiff is not "credible," that, too, is for a jury to decide. See, e.g.:

> The factfinder will ultimately have to decide whom to believe. Given the presence of a genuine issue of material fact [ ] we avoid making a credibility judgment and leave that task to the factfinder. Accordingly, we reverse the grant of summary judgment for Defendants.11

*Teresa Scott v. Macon Bibb County, Georgia, et al*, Case: 24-11388, p 12 (11th Cir. July 10, 2025).

"Where a fact-finder is required to weigh a deponent's credibility, summary judgment is simply improper." *Jenkins v. Nell*, __ F.4th __ (11th Cir. 2022), quoting *Strickland*, *Norfolk S. Ry. Co.*, 692 F.3d 1151, 1162 (11th Cir. 2012).

In fact, the record shows "credibility issues" for EAMC as it repeatedly put its thumb on the scale to protect Morris (and, increasingly, demonize Martha Swann).

Swann's unequal pay and treatment complaints triggered no substantive HR investigation. To the degree EAMC seeks to use Morris as a firewall against liability

(and accountability), only highlight's this Defendant's bad faith. Defendant's argument also ignores that Title VII permits mixed-motive claims. The Eleventh Circuit has long recognized mixed-motive theories under Title VII. Defendant's "legitimate reasons" also fail under the mixed-motive standard. Evidence shows selective enforcement of policies (Locke was not disciplined for similar conduct), HR's failure to investigate impartially, and shifting justifications, all classic pretext evidence under *McDonnell Douglas*.

### 2. The pager requirement constituted both Retaliation and Disparate Treatment

In September and October – culminating in late December 2022, Morris subjected Plaintiff to disparate treatment in the terms and conditions of her work. At the least, it's the fact-finder's job to weigh the parties' evidence and credibility and decide whom to believe. Plaintiff protested to Morris in late September that his (unprecedented – there's no evidence that this was a regular or standard punishment) pager requirement was itself discriminatory, and Morris simply refused to countenance even the possibility that it was (and either stop himself or turn over Plaintiff's discrimination complaint to Human Resources).

### 3. EAMC's willful ignorance and refusal to investigate Plaintiff's discrimination claims constituted Retaliation

The scene: A conference room full of EAMC Vice Presidents, with both its top in-house attorney and Vice President of Human Resources present and participating. One employee, a woman, tries to explain both herself and the context of her firing.

The Vice Presidents do not merely ignore the woman's pleas to consider the circumstances – that is, that she was fired for what other coworkers do daily – and allow her to return to work. . .  two or three of the ring leaders edge closer to outright ridicule:

> I hear you talking a lot about other people's behavior? Comparing your behavior to others. And Susan's asked you this a couple of times, we're here to talk about your behavior, not everybody else's.

Roben Casey to Martha Swann (P_EX5 / Doc46-5 (Martha Swann 07.14.2025 Declaration), Attachment 3, p 8, time stamp 21:45.

"Context matters," held the Court in *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006), the modern era's seminal Title VII retaliation case. This simple but powerful truth appears lost on EAMC.

In 1991 the 11th Circuit contemplated a "deliberate ignorance" jury instruction in a criminal case, *U.S. v. Rivera*, and looked to, and favorably quoted, a 1987 9th Circuit opinion for guidance:

> [T]he facts ... support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution.

*United States v. Rivera,* 944 F.2d 1563, 1572 (11th Cir. 1991), quoting *United States v. Alvarado*, 838 F.2d 311, 314 (9th Cir. 1987), cert. denied, 487 U.S. 1222, 108 S. Ct. 2880, 101 L. Ed. 2D 915 (1988) (while *Rivera* was a criminal case, the Court's opinion does not indicate this doctrine is, or should be, limited to criminal defendants). The

*Rivera* Court's description of a defendant which "purposely contrived to avoid learning all of the facts..." describes EAMC's grievance panel's steadfast refusal to investigate Swann's accusation of discrimination and retaliation – accusations that formed the foundations of Director Morris's acts and omissions leading up to and through December 30, 2022.

EAMC's grievance panel's intentional refusal to conduct a thorough, good faith, investigation of Swann's January 24, 2023, discrimination complaints evidences retaliatory motive. By consciously avoiding a thorough inquiry, EAMC insulated Morris's – and Director Truitt's and Vice President Johnston's collaborative – conduct from accountability; EAMC internally codified disparate treatment through retaliation. Any way one slices it, EAMC lived up (or down) to *Burlington-Northern's* definition of retaliation and its "well might have dissuaded" standard.

In a 2024 Northern District of Alabama case, in denying defendant's summary judgment motion on a failure to investigate-as-retaliation issue, the Court held:

> [W]hether a failure to investigate is itself an adverse employment action is irrelevant, so long as the mistreatment "might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *See Monaghan*, 955 F.3d at 861. . . Accordingly, the court **WILL DENY** the City's motion as to Count One to the extent that Mr. Sims's claim is based on the Department's investigation of his internal complaint.

*Victor Sims v. City of Homewood*, p 7, 2:22-cv-178-ACA (N.D.AL Feb. 16, 2024).

Plaintiff respectfully requests the Court consider both the totality of circumstances and context to an equal and opposite degree that EAMC refused to do.

### C. A Jury Should Decide Plaintiff's Title VII Gender Discrimination Claim

Defendant's anti-comparator argument fails. Swann and Locke held the same CE Tech I title, and worked in the same department on biomedical equipment maintenance and repair. EAMC itself eliminated the pay gap (temporarily) in July 2022, a rather admission of parity. Claims about Locke's imaging certification are post-hoc justifications. The EPA standard (and Title VII comparator analysis) requires substantial equality, not perfect identity. EAMC assigned both to core CE work and recognized Swann as a "high performer." Defendant's degree-based explanation is also pretextual. It conditioned Swann's raise and promotion on "behavioral corrections" only after her protected complaints, showing retaliatory motive intertwined with discriminatory pay decisions. There's simply no evidence that her "behavior" or "attitude" issues were anything but pay- and equity-related. To the extent phone call return time or "scrolling through her phone" are leveled at Plaintiff, such only go to ignore or attempt to distract from two (2) inarguable facts:  *(a)* Swann's productivity was outstanding, near (if not at) the top of CE; and, *(b)* men did it (missed calls, used their phones at work) and swore, too.

Defendant recites the *McDonnell Douglas* framework, but the evidence of pretext here, temporal proximity, inconsistent discipline, and shifting justifications, meets Plaintiff's burden. Swann offers ample evidence of pretext: temporal proximity between complaints and discipline, inconsistent enforcement, HR's refusal to investigate impartially, and EAMC's eventual correction of her pay. At minimum,

these disputes of fact regarding comparators, duties, and employer motive are classic jury questions unsuitable for summary judgment.

## D. The *Quigg v. Thomas County School District* Framework Applies

In 2016 the 11th Circuit held "the *McDonnell Douglas* framework – is not the proper framework for evaluating mixed-motive claims that rely on circumstantial evidence. *Quigg v. Thomas County School District*, 814 F.3d 1227 (11th Cir. 2016). In the case at bar, even accepting *arguendo* any one of Defendant's excuses for demoting, then refusing to promote, Plaintiff, makes this a mixed-motive case.

In a mixed-motive case, a Plaintiff "need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) [a protected characteristic] was *a* motivating factor for the defendant's adverse employment action." *Quigg*, at 1232, 1233. (additional citation omitted).

Plaintiff has done this. She has produced evidence of Morris's animus (when she's not behaving with proper flirtatiousness), his disparate treatment, and an inclination to lean into denials and, at times, falsehoods. The record shows that the "verbal abuse" Plaintiff was accused of does not meet EAMC's definition of "insubordination" (i.e., "Refusal to obey a direct and reasonable order given by a supervisor" Doc 42-1 (Swann Deposition), D Ex 3, Bates 00151 (Intolerable Offenses). The word "insubordination" does not even find its way into Morris's "termination" write up.  (P EX1 / Doc46-1 (Johnston Depo) *P Depo Ex 6*, 150:14-151:16, 160:12-19, 156:11-157:3).

Evidence shows – or at the *least* is vigorously disputed – that EAMC's alleged non-discriminatory reasons for its actions taken are mere pretexts. At the least genuine issues of material fact remain, and, at this stage, are to be viewed in Plaintiff's favor.

**E.  Plaintiff Presents a Convincing Mosaic of Workplace Discrimination**

"[E]stablishing the elements of the *McDonnell Douglas* framework is not, and never was intended to be, the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case. Accordingly, the plaintiff's failure to produce a comparator does not necessarily doom the plaintiff's case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011). An employee will survive summary judgment if she presents "a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination." *Lewis v. City of Union City*, 934 F.3d 1169, 1185 (11th Cir. 2019) (en banc).

All of EAMC's discriminatory and retaliatory actions aimed a Plaintiff took place against a backdrop of being pulled in multiple directions by her boss, John Morris, which included:  *(a)* Plaintiff's no less than three (3) times complaining to Director Morris, about gender / sex-based pay discrimination between late July and late December 2022; *(b)* Morris's long-running track record of disdain for or contempt of women who didn't "know their place," along with other sex-based workplace misconduct – including towards Plaintiff; *(c)* EAMC's own record, to which HR Vice President Susan Johnston was a party (going back half-a-dozen years before Morris's and EAMC's discriminatory and retaliatory acts against Plaintiff) – Johnston's own

interview team asserting Morris: was "controlling and opinionated; had "no signs of humbleness;" "doesn't find a way to solve problems;" "doesn't see gray;" *(d)*, With HR Director Truitt's knowledge, Morris flirting with, if not stepping over, the line of violating the National Labor Relations Act by getting the word out to the CE Dept that its "team members" were not to talk about pay or promotions with Martha;    *(e)* Morris's simply lying to the January 2023 grievance committee about the degree to which profanity flowed within the CE Dept (P EX2 / Doc 46-2 (Sarah Nunnelly Depo) 74:20-76:12); and, *(f)*, the grievance committee simply refusing to consider Swann's grievance hearing complaints (and doing its level best to shut-down her ability *to* complain about discrimination), along with refusing to conduct a thorough, good faith, investigation of both those complaints and Morris's repellent track record.

In sum, with both <u>actual</u> and – had an actual, thorough, good faith investigation occurred – <u>easily obtainable</u> knowledge and information regarding Morris and the context of his direct, discriminatory, actions launched at Swann, the EAMC grievance panel chose to cover for Morris and hang Plaintiff out to dry.

## F.  Plaintiff Prevails (Even) Under the McDonnell-Douglas Framework

This is a mixed motive case. As discussed on in Section D, *supra.*  The *Quigg*, not the *McDonnell-Douglas*, analysis applies. In fact, in the 11th Circuit it is now well-settled that the *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973) "burden shifting analysis" is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case" (*Quigg v. Thomas County*

*School District*, 814 F.3d 1227, 1240 (11th Cir. 2016), quoting *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011)). Nevertheless, Plaintiff would note that she has rebutted all the pretexts given by EAMC for both *(a)* disciplining her in October 2022 (EAMC has no rebuttal to Plaintiff's contention that one or more CE male coworkers violated the "phone policy" / "call return" without suffering Director Morris's wrath; *(b)* the "profanity" / "verbal abuse" violation was one violated throughout CE by Plaintiff's male coworkers with *no* disciplinary consequences; and, *(c)* EAMC violated its own policies by firing Plaintiff for "verbal abuse," which – by EAMC's policies – was not an "intolerable" offense (subjecting the wayward employee to termination).

As for Plaintiff's failure to take her "pager" with her after Morris's first confronting her on December 27, 2022, she notes that Morris's October 2022 order making her wear a pager in the first place was, in fact, a discriminatory act: An adverse and negative change in the terms and conditions of her employment, because Morris never force any man (including one or more CE techs who had slept through calls) were not forced to wear a pager. Additionally, Morris had zero problem calling / contacting and beckoning Plaintiff back to his office on December 27 using conventional means. That EAMC would try to elevate and exaggerate this petty thing to a fire-able offense smacks of desperation, and demonstrates EAMC's lack of credibility (for a jury to weigh) regarding its proffered "non-discriminatory" reason for sending Plaintiff to the unemployment line.

### *Both Pretext and Comparators exist*

The 11th Circuit defines pretext as a "purpose or motive alleged... in order to cloak one's real intention." *Cordoba v. Dillard's, Inc., 419 F.3d 1169, 1184* (11th Cir. 2005). In determining whether pretext exists, "[w]e are not interested in whether the [employer's] conclusion is a correct one, but whether it is an honest one. Therefore, the question the factfinder must answer is whether [the employer's] proffered reasons were `a coverup for a ... discriminatory decision.'" *Rojas,* 285 F.3d at 1342 (quoting *McDonnell Douglas Corp.,* 411 U.S. at 805, 93 S.Ct. 1817). Defendant knew or should have known about Morris's untoward proclivities, but HR and the Vice Presidents turned a blind eye. When Plaintiff tried, one last time, to tell her story on January 24, 2023, the Vice Presidents treated her – and their duty to investigate – with contempt.

The record shows that men got away with... all manner of on the job "unprofessional" behavior to which Plaintiff was not entitled. She she did her job, and did it well, but she declined to be submissive or flirtatious, and she dared to demand to be paid the same as a man for a substantially comparable job. This got her into trouble with Morris, and by extension those up his chain of command.

## H. Regarding EAMC's attempts to cherry pick facts

In reversing a Southern District of Alabama decision, the 11th Circuit recently noted (regarding defendant's arguments): "[ ] Georgia Pacific cherry picks the record, and cherry picking will not harvest a summary judgment." *Patterson v. Georgia Pacific, LLC*, 38 F.4th 1336, 1351 (11th Cir. 2022). EAMC's "undisputed facts" betray

its hope that the Court will not see the totality circumstances at play in this action.

## I. EAMC's ineffective policies and training

The mere existence of a policy prohibiting discrimination does not provide employers a safe harbor in discrimination claims. "Despite having a written anti-discrimination policy, an employer may be unentitled to a good-faith defense if the evidence demonstrates that the policy is 'ineffective.'" *Merard v. Magic Burgers, LLC*, No. 21-12037, 2022 U.S. App. LEXIS 21115 at *7 (11th Cir. Aug. 1, 2022). *citing Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1281-82 (11th Cir. 2008). The 11th Circuit continued:

> This evidence supports a finding that -- although Magic Burgers had implemented an anti-discrimination policy – Magic Burgers had failed to communicate and to train effectively its managers and employees on that policy. Based on this evidence, the jury could conclude reasonably that Magic Burgers's anti-discrimination policy was 'ineffective' and, thus, that Magic Burgers was unentitled to a good-faith defense. See *Goldsmith v. Bagby Elevator Co.*(citation omitted) (concluding that the evidence supported the jury's finding that a company's anti-discrimination policy was 'ineffective when the company's supervisors failed to follow or to enforce the policy and when no training was provided on the policy). *Id.*

Existence of a policy is no safe harbor for either a flawed or ineffective policy, or even a good policy that an employer, EAMC, fails or refuses to abide by.

## J.  Regarding Hearsay

"'[A] district court may consider a hearsay statement . . . if the statement could be reduced to admissible evidence at trial . . . .'" *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294-95 (11th Cir. 2012) (quoting *Macuba v. Deboer*, 193 F.3d 1316,

1322-23 (11th Cir. 1999)). To the extent any evidence, exhibits, proffered by Plaintiff contain "hearsay," Plaintiff respectfully avers that such can be overcome by reducing same to admissible evidence at trial.

CONCLUSION

Plaintiff's facts are to be taken as true and all disputed material facts are viewed in favor of the nonmoving Plaintiff. With all reasonable inferences drawn in Plaintiff's favor, genuine issues of material fact present. Defendant's Rule 56 motion is due to be Denied. Respectfully filed and served on this, the 16th day of July, 2025.

s/ *Richard R. Newton*
Richard R. Newton, Attorney at Law, P.C.
Counsel for Plaintiff Martha Swann
7027 Old Madison Pike – Ste. 108
Huntsville, AL  35806
Tel: (205) 356-2498
richardrussellnewton@gmail.com
ASB-0776-w85r

CERTIFICATE OF SERVICE

This is to certify that on this, the 16th day of July, 2025, I served the foregoing Plaintiff's Response in Opposition to Defendant EAMC's Motion for Summary Judgment on this Defendant by sending same by email to its attorneys of record via their respective emails of record, to wit:

Warren Lightfoot, Esq.    *wlightfoot@maynardnexsen.com*
Brock Phillips, Esq.      *bphillips@maynardnexsen.com*
Maynard Nexsen PC
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203

s/ *Richard R. Newton*