**IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION**

| | | |
|---|---|---|
| **MARTHA SWANN,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | Case No.  2:24-cv-00244-RAH-JTA |
| | ) | |
| **EAST ALABAMA MEDICAL** | ) | |
| **CENTER,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## DEFENDANT'S REPLY BRIEF IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant East Alabama Medical Center ("EAMC" or "Defendant"), pursuant to Federal Rule of Civil Procedure 56(a) and the Court's Text Orders (Doc. 48, 50), hereby submits this Reply Brief in support of its Motion for Summary Judgment. Because Plaintiff Martha Swann's ("Swann" or "Plaintiff") Response in Opposition ("Response") does not identify any genuinely disputed material fact, and instead floods the Court with immaterial allegations unrelated to her underlying claims, EAMC respectfully submits that its Motion for Summary Judgment is due to be granted as a matter of law and that all of Swann's claims should be dismissed with prejudice.

## <u>EAMC'S REPLY TO PLAINTIFF'S RESPONSE TO UNDISPUTED FACTS</u>

EAMC would initially highlight to the Court that a large number of Plaintiff's stated "disputes" do not identify actual disputes of the facts stated in the corresponding paragraphs in EAMC's Brief in Support of its Motion for Summary Judgment. (Doc. 41) ("Initial Brief"). On many instances, Plaintiff "disputes" a fact but includes unrelated "evidence" in support of that "dispute" that does nothing to undermine the underlying fact. Indeed, many of these disputes appear to be in bad faith, as the underlying fact is based on nothing more than Plaintiff's own deposition testimony. Plaintiff also frequently disputes alleged "inferences" that are not contained in the underlying fact. EAMC respectfully requests the Court carefully review each of Plaintiff's "disputes" in light of EAMC's reply below and against the evidentiary record, which is materially undisputed despite Plaintiff's apparent efforts to sew confusion.

5.      Plaintiff admits the facts stated in this paragraph. There is nothing "misleading" or incomplete" about these facts, which come directly from Plaintiff's own deposition testimony.

6.      This "dispute" is not genuine. Plaintiff authenticated a copy of EAMC's Employee Handbook, which contains this language verbatim. (Doc. 42-1, 39:2-18; Doc. 42-1 at 91.)

7-8.    Again, Plaintiff cannot dispute the content of a policy she already authenticated. (Doc. 42-1, 39:2-18; Doc. 42-1 at 115-117.)

12.    Plaintiff does not dispute EAMC's stated fact here, including that the work she performed in her part-time role as an assistant in the Clinical Engineering department consisting of "relatively minor tasks." (Doc. 41 at 5, ¶ 12.)

14.    Plaintiff again admits the fact stated in this paragraph. Plaintiff claims to dispute "as to inference" by claiming that she was doing the work of a CE Tech III for "more than half a year before EAMC fired her." (Doc. 47 at 6, ¶ 14.) The evidence Plaintiff cites simply does not support this claim. John Morris' ("Morris") April 2022 email to Oliver Banta ("Banta")—in which he expressly advocated for a pay raise for Swann—simply stated that Swann backfilled the operating room duties over which a former CE Tech III previously had primary responsibility. (Doc. 46-6.) This email does not indicate Plaintiff's work was limited to that of a CE Tech III as Plaintiff argues. (*Id*.) Further, the deposition testimony Plaintiff cites does not indicate that she performed any CE Tech II work. (Doc. 42-1, 170:21-171:18.)

19.    Plaintiff has no basis—and cites no evidence—to dispute the fact that there are far fewer pieces of imaging/radiographic equipment at EAMC as compared to general pieces of non-imaging biomedical equipment. Nor does Plaintiff cite any evidence to dispute that, because of this disparity, EAMC's Radiology Equipment Technicians also spend a lot of time performing preventative maintenance and repair

work on general biomedical equipment. In fact, Plaintiff simply confirms this paragraph by highlighting the time Andrew Barnes ("Barnes") spent performing such work on biomedical equipment. Barnes is not Mitch McSweeney's ("McSweeney") "assistant." For example, Barnes (not McSweeney) has primary responsibility over EAMC's Philips Cath Lab 2, which is an imaging device with which he has extensive experience. (Doc. 42-6, 45:7-46:17.)

21.    Again, Plaintiff does not genuinely dispute the underlying fact. In her half-page response to this paragraph, Plaintiff says nothing about the comparative cost between general biomedical equipment and imaging/radiographic equipment— which is the only fact stated in this paragraph of EAMC's Initial Brief. Instead, Swann uses her own terminology, arguing that she worked on "life saving equipment." (Doc. 47 at 7, ¶ 21.)

22.    Plaintiff admitted this paragraph. She is completely incorrect to claim that "[i]maging certification was and remains irrelevant to the comparator question" when she herself attempts to compare herself to Barnes, who is a Radiology Equipment Technician. Barnes had imaging certification which qualified him for the Radiology Equipment Technician position he worked. Swann did not have that experience and certification, which is why she did not have that position.

23.    This is yet another example of a disingenuous "dispute" from Plaintiff. This paragraph notes Swann's extremely limited work on <u>imaging</u> devices at EAMC,

which she herself acknowledged during her deposition. (Doc. 41 at 7, ¶ 23.) Plaintiff now attempts to dispute her own prior admission by claiming she "did preventative maintenance and repair [*sic*] on numerous, critically important, pieces of EAMC equipment . . ." (Doc. 47 at 8, ¶ 23.) EAMC's stated fact was specific to <u>imaging</u> equipment—not "life safety equipment" which appears to be a category made up by Plaintiff for her own purposes. Plaintiff does not and cannot dispute that her experience working on imaging equipment is virtually non-existent.

26.    Plaintiff again tries to dispute her own words. Despite all of the left-field allegations Plaintiff offers in response to Paragraph 26 of EAMC's Initial Brief, she still testified that she and Morris had a good relationship until things deteriorated in mid-2022. (Doc. 42-1, 285:10-17.)

28.    Plaintiff admits the fact stated in this paragraph of EAMC's Initial Brief. She includes additional commentary from her July 14, 2025 declaration (executed after EAMC filed its Motion for Summary Judgment) regarding how she allegedly felt about Morris' offer that has nothing to do with EAMC's actual stated fact.

33.    Plaintiff admits the fact stated in this paragraph. EAMC disagrees that the fact stated in this paragraph is "irrelevant" in light of Plaintiff's own baseless claim that Morris only provided favorable treatment to female employees who flirted with him (which is an idea based on nothing more than Plaintiff offering these shoot-

from-the-hip, self-serving allegations at her grievance hearing). (Doc. 47 at 37, ¶ 4.) Plaintiff does not even attempt to dispute paragraphs 118-122 of EAMC's Initial Brief, which establish that Morris provided Swann with another positive performance review in November 2022—after she made multiple complaints about her pay. (Doc. 41 at 24, ¶¶ 118-122.)

35-36.    These are more disingenuous "disputes" from Plaintiff. She specifically acknowledged during her deposition that Morris spoke to her about excessive lunch and rest breaks in June 2021. (Doc. 42-1, 113:20-115:15.) Further, Swann cannot genuinely dispute Morris' own perception. (Doc. 42-4, ¶¶ 16-18; Doc. 42-4 at 43-44.) The evidence does not support inconsistent application of phone rules in the Clinical Engineering department. Locke himself testified that Morris spoke to him often about his phone use at work, which Locke described as a "recurring topic." (Doc. 42-5, 84:19-87:12.) Even Swann acknowledged this when she texted Locke on October 19, 2022 stating that Morris was "bitching" about Swann and Locke being on their phones "again." (Doc. 42-5, 83:7-13, 84:19-87:12.)

37.    Plaintiff accuses EAMC of "misrepresentation" in its statement that "Swann admitted during deposition that she does mindlessly scroll on her phone during breaks." Here is the relevant deposition testimony: "Q.  You, of course, acknowledge that you do mindlessly scroll on your phone during meal breaks, correct?  A.  During meal breaks." (Doc. 42-1, 155:15-18.) EAMC submits that this

acknowledgment from Plaintiff is not "irrelevant" as it provides context and affirmation to Morris' perception that Swann was taking too long of breaks scrolling on her phone. (Doc. 42-4, ¶¶ 16-18; Doc. 42-4 at 43-44.)

38.     Plaintiff does not seem to grasp that the undisputed evidence shows she was not responsive when her job called for her to be (Doc. 42-1, 123:16-2, 133:12-134:11; Doc. 42-1 at 198; Doc. 42-4, ¶¶ 32-33) but that she seemed to be on her phone for non-work-related purposes when she was not supposed to be (Doc. 42-1, 96:15-99:4, 143:21-144:4, 147:12-19, 262:3-18; Doc. 42-4, ¶¶ 16-18, 21, 45-46.) These two concepts are not mutually exclusive, nor are they even inconsistent. Morris' concern was that Plaintiff was focused on work when she was at work, which is a reasonable expectation from a supervisor.

39.     Plaintiff admits the fact stated in this paragraph.

41.     Plaintiff admits the fact stated in this paragraph.

42.     Plaintiff provides no additional "context" to this April meeting and fails to explain how the fact stated in EAMC's Initial Brief is misleading in any way. Indeed, this fact comes directly from Plaintiff's deposition testimony. Here is a direct quote from Plaintiff deposition testimony:

> No, I don't know that -- I know that -- kind of, you know, when asking him about call pay back in April, I didn't bring up discrimination, I just brought up pay. In the moment, it got a little heated, but he didn't do anything after, and he recommended -- I saw in an e-mail from late April 2022, he recommended me for a raise, so that was -- that was I just talked about pay with him without bringing up discrimination, and

he didn't get angry or stay angry or go have conversations about discipline.

(Doc. 42-1, 237:17-238:6.)

43.    This is another bad-faith "dispute" of fact. Plaintiff offers no evidence to dispute Morris' testimony cited in this paragraph, nor does she even attempt to do so. Instead, Plaintiff immediately changes the subject to a later complaint about pay in July that has nothing to do with the underlying fact stated in this paragraph, which is limited to Swann's conversation with Morris in April 2022. (Doc. 41 at 10, ¶ 43); (Doc. 47. at 11, ¶ 43.) Plaintiff extends her response well beyond the scope of this stated fact is in order to manufacture a dispute where none exists—a common tactic in Plaintiff's Response.

48.    Plaintiff again disputes her own deposition testimony. (Doc. 42-1, 117:3-120:17, 121:14-122:21.) Plaintiff seeks to spin undisputed, continued coaching on excessive phone use into "Morris becoming increasingly obsessed with Plaintiff and her phone." (Doc. 47 at 23, ¶ 48.) Again, the evidence shows that Plaintiff's phone use was excessive at times and that she did not timely respond to work calls at other times. (*See, supra,* ¶ 38.) Both categories of conduct are unacceptable, and Morris provided coaching on both accordingly. Finally, EAMC does not dispute that Plaintiff was a productive employee. (Doc. 47 at 23, ¶ 48.) However, to the extent that Plaintiff argues that she should have been insulated from coaching or discipline based on her productivity, EAMC vehemently disagrees.

8

49.    Plaintiff admits that Morris spoke to both her and Locke about excessive breaks in May 2022, which is consistent with her deposition testimony. (Doc. 42-1, 117:3-120:17, 121:14-122:21.) In her deposition, Plaintiff testified that Morris tried to get her to cancel an out-of-state training in July 2022 but that she refused to do so. (Doc. 42-1, 220:19-222:11.) She also provided confusing testimony regarding anesthesia training she claims she should have attended. (Doc. 42-1, 220:19-222:11.) This appears to be the same training Plaintiff references in her July 15, 2025 declaration, where she claims without further explanation that Morris "canceled plans to send [her] to necessary training" on December 15, 2022. (Doc. 46-5 at 2.)

50.    There is no "inference" to draw from the fact stated in this paragraph, which merely quotes an authenticated document. This is another bad-faith "dispute" by Plaintiff. EAMC does not appreciate Plaintiff's inflammatory statement that Morris had an "obsession, if not fetish, with Plaintiff's eating," which is completely unsupported by the evidentiary record. (Doc. 47 at 12, ¶ 12.)

51.    This is another admission. There is no evidence that the unauthenticated email Plaintiff provided as Exhibit 12 to her Response was a result of this June 28, 2022 conversation with Morris about receiving more pay nor does this unauthenticated email indicate that the June 28 conversation went "to poorly" [*sic*]. (Doc. 47 at 13, ¶ 51; Doc. 46-12) This claim from Plaintiff has no evidentiary basis.

52.    Again, EAMC does not see what "inference" Plaintiff seeks to dispute here, but she does not and cannot dispute the fact stated in this paragraph.

53.    This is another bad-faith dispute. The evidence Plaintiff cites has nothing at all to do with EAMC's stated fact in this paragraph and fails to offer any genuine dispute of that fact.

54.    EAMC agrees that the cited testimony contains part of Plaintiff's recollection of this conversation with Morris on July 25, 2022. (Doc. 42-1, 68:3-69:17.)

56.    There is no dispute of fact here. Plaintiff and Defendant agree that July 25, 2022 was the first time Plaintiff complained of gender discrimination related to pay. Plaintiff's Response continues to reflexively "dispute" facts with which she agrees.

59.    Plaintiff does not dispute the fact stated in this paragraph. Morris' email to Kelli Truitt ("Truitt") came after they had spoken on the phone that morning. (Doc. 42-2 at 3, ¶ 7.) During that call, Morris informed Truitt that Swann had raised pay concerns to him and that he wanted to help her on that front, if possible, but that he also had concerns about her behavior and interpersonal issues. (*Id.*) Truitt told Morris that Human Resources would review both issues—Swann's pay concern and her behavioral issues—independently, and Morris agreed. (Doc. 42-2 at 3, ¶ 7.) This evidence is undisputed. (Doc. 47 at 13-14.)

60.    There is no evidence whatsoever that Morris had any "ire towards Plaintiff for being upset about pay discrimination." (Doc. 47 at 14, ¶ 60.) In fact, there is no evidence of Morris had any "ire" at all. The evidence is undisputed that Morris contacted the Human Resources Manager via phone and email the same day Swann first complained of pay discrimination, which directly led to a pay raise for Swann four days later. (Doc. 42-2, ¶¶ 7-9; Doc. 42-4, ¶¶ 26-28; Doc. 42-4 at 52); (Doc. 42-1, 66:21-67:1, 72:18-73:7.) The evidence is also undisputed that Truitt and Morris agreed to address the pay complaint and the behavioral concerns separately. (Doc. 42-2, ¶ 9; Doc. 42-4, ¶ 27.)  It is also undisputed that after reviewing feedback on Swann's behavior on July 21, 2022, Truitt recommended disciplinary action, but Morris declined to issue any disciplinary action to Truitt. (Doc. 42-2, ¶ 10; Doc. 42-4, ¶¶ 27-29.) This hardly amounts to evidence of any "ire."

61.    There is no genuine dispute regarding the content of this authenticated email.

62.    Plaintiff admits the fact stated in this paragraph. Human Resources did "intervene" to provide Swann with a raise and provide guidance on potential disciplinary action for her conduct on July 21, 2022, though Morris declined to issue any disciplinary action to Swann for that occasion, which hardly indicates any retaliatory animus. (Doc. 42-1, 66:21-67:1, 72:18-73:7; Doc. 42-2, ¶ 10; Doc. 42-4, ¶¶ 27-29.)

63. Plaintiff admits that Morris did not issue any disciplinary action to her after her July 21 argument with Thorson but claims this is "irrelevant." (Doc. 47 at 14, ¶ 63.) This is puzzling considering that Swann herself claims that Morris retaliated against her in response to her complaints of pay discrimination. It would seem highly relevant that the alleged retaliator chose not to issue any disciplinary action against Swann, who complained about alleged pay discrimination just four days prior. (Doc. 42-2, ¶ 10; Doc. 42-4, ¶¶ 27-29.) This is especially so inside the context Plaintiff misleadingly paints (*i.e.*, that "Truitt gave Morris an HR-approved blank check to 'write-up' / retaliate against Plaintiff, and over the coming days . . . then weeks and months"). (Doc. 47 at 14, ¶ 63.) Of course, this is more baseless hyperbole from Plaintiff, completely unmoored from the evidence, in an effort to avoid summary judgment. Truitt's email to Morris did not provide any "blank check." Instead, Truitt simply advised him: "I understand she was frustrated but she cannot act this way. I would recommend a Documented First Warning. If you feel *the interaction* warrants that ..." (Doc. 42-4 at 8, ¶¶ 28-29; Doc. 42-4 at 52) (emphasis added). Again, Morris did not issue any warning or other disciplinary action to Plaintiff. Doc. 42-2, ¶ 10; Doc. 42-4, ¶¶ 27-29.)

64.    Plaintiff admits the facts stated in this paragraph.

66.    There is no dispute about Locke's educational background. As explained in EAMC's Initial Brief and herein, the education, skills, and experience

relevant to biomedical equipment that Locke obtained during the coursework for his Associate's Degree was the basis, in part, for his initial rate of pay. (Doc. 41 at 14-16, ¶¶ 66-71.)

67.    Plaintiff admits the facts stated in this paragraph. Plaintiff's additional commentary (which is unrelated to the underlying facts) addresses the relative experience Swann and Locke had in July 2022—not when they were first hired into EAMC's Clinical Engineering department (*i.e.*, when their initial pay rates were set).

68.    Plaintiff bases this 275-hour figure on nothing more than her own estimation during deposition and does not account for the additional hands-on experience Locke obtained in the classroom, which also included direct work on the same types of equipment EAMC had. (Doc. 42-5, 28:15-29:10, 33:13-34:3.) Plaintiff does not dispute this additional hands-on training Locke received in the classroom that was separate from his clinical internship. (Doc. 41 at 15, ¶ 69; Doc. 47 at 15-16.)

70-71.  Plaintiff offers no genuine dispute to Susan Johnston's ("Johnston") testimony that: (i) the labor market for healthcare employees was very competitive in April 2021 due to the COVID-19 pandemic, which understandably led to an increase in wages offered to external candidates; or (ii) this trend led to some new hires receiving higher pay than existing employees in the same job position. (Doc. 42-3, ¶¶ 7-9.)

72.    Plaintiff's clarifying dispute to the fact stated in this paragraph is well-taken as to one point. Plaintiff testified that she did perform some limited work on biomedical equipment prior to transferring to the Clinical Engineering department in a full-time position. (Doc. 42-4, ¶¶ 10-11.) However, it is undisputed that Plaintiff had no technical experience or training specific to biomedical equipment prior to that part-time work for EAMC. (Doc. 42-1, 54:7-55:5.)

73.    Plaintiff admits the fact stated in this paragraph, which is not "misleading" but rather an accurate reflection of Swann's work experience prior to working with EAMC, which did not include any work with biomedical equipment.

75.    The information Plaintiff provided to Morris regarding her coursework at Auburn University in furtherance of her Biosystems Engineering degree further confirms that biosystems engineering—particularly Swann's forestry focus—was simply not relevant to the biomedical equipment on which CE Techs perform maintenance and repairs at EAMC. (Doc. 46-5 at 23-26, ¶ 16.)

76.    It does not take "any particular engineering background or skills" to see that Plaintiff's forestry education was not relevant to biomedical equipment. It is undisputed that Plaintiff had no technical experience or training specific to biomedical equipment prior to that part-time work for EAMC—including her time studying at Auburn University. (Doc. 42-1, 54:7-55:5.)

81.    Plaintiff does not (nor can she) genuinely dispute Truitt's or Morris' testimony that they reviewed the information Swann submitted related to her biosystems/forestry studies and concluded it was not relevant to the work of a CE Tech at EAMC. (Doc. 42-2, ¶ 18; Doc. 42-4, ¶ 31; Doc. 42-4 at 54-65.)

82.    Plaintiff again attempts to dispute her own deposition testimony, yet audaciously accuses EAMC of being "misleading." (Doc. 42-1, 123:16-21) ("Q. Ms. Swann, at some point did John Morris tell you in 2022 that employees had complained about not being able to reach you and that he had had trouble reaching you during the workday?  A.  He said that, yes.") Plaintiff attempts to tie her October 2022 disciplinary action related to the pager to her July 25 pay complaint (which had already been addressed within four days) simply because it happened subsequently. Of course, there is no actual evidence indicating that this October 2022 disciplinary action for insubordination was in any way related to Swann's earlier pay complaint that EAMC had already addressed. Instead, Swann's own authenticated text messages to Locke show that she was warned about not answering Morris' calls and that when it happened a second time in eight days, she flatly refused his instruction to wear a pager. (Doc. 41 at 18-20, ¶¶ 83-93.) Swann offers no evidence of any male employee being warned twice over the course of eight days about not answering calls and certainly no evidence of any male employee refusing a supervisor's direct instruction to wear a pager.

83-90.    Because these paragraphs undermine Swann's retaliation narrative, she attempts to dismiss them as "inference" or "misleading." (Doc. 47 at 18, ¶¶ 83-93.) However, she offers no actual evidence to dispute these paragraphs, which should be deemed as admitted and undisputed.

92.    Plaintiff testified: "[Morris] said I would have to carry [a pager] for the next couple of weeks, and then *if I didn't have any more problems*, I wouldn't have to keep carrying it." (Doc. 42-1, 141:17-20) (emphasis added). There is no dispute that Morris wrote in the disciplinary document: "[Swann] will wear a pager during work hours and call hours *until communication with co-workers improves*. Communication with the Team is critical." (Doc. 42-1 at 198; Doc. 42-4, ¶ 35) (emphasis added). Swann admitted that Morris did not relieve her of her obligation to wear a pager. (Doc. 42-1, 142:21-143:2; Doc. 42-4, ¶ 51.)

100.    There is no genuine dispute here. This paragraph contains a direct quote from an authenticated email. In any event, just because Swann claims that she sought to justify her behavior to Morris because of her pay (a similar sentiment to the "pay-me-like-shit-get-shit" message Swann delivered to Morris on December 27), she cannot insulate herself from the consequences of her actions simply because she took issue with her pay. *See Alvarez v. Royal Atl. Developers, Inc*., 610 F.3d 1253, 1270 (11th Cir. 2010) (explaining that Title VII's anti-retaliation provisions do not allow

employees to insulate themselves against termination or discipline by making a discrimination complaint).

101.    This is not a genuine dispute; it is a red herring. EAMC never faulted Swann for poor production or poor job performance. Indeed, Morris was forthright with Human Resources when he told them that Swann could "do the work." (Doc. 42-4, ¶ 37; Doc. 42-4 at 72.)

102.    Plaintiff admits the facts stated in this paragraph.

104.    Plaintiff cannot genuinely dispute Truitt's and Johnston's actions about which she has no knowledge. Instead, Plaintiff retreats to a credibility argument, arguing the Court should not believe Truitt's and Johnston's undisputed testimony. This is inappropriate at the summary judgment stage. *Sears v. Roberts*, 922 F.3d 1199, 1209 (11th Cir. 2019) ("The district court erred by weighing the evidence and making its own credibility determinations at the summary judgment stage.")

106.    Plaintiff admits that Human Resources recommended a promotion to CE Tech II for Swann once she obtained the experience required for that position. (Doc. 47 at 20, ¶ 106.)

107.    Plaintiff's response is bad-faith and non-sensical. The CE Tech II job description that EAMC referenced does not show or indicate that Plaintiff performed unsupervised CE Tech III level work as a CE Tech I. (Doc. 42-1 at 206-208.)

108.   This is another prime example of Plaintiff's purported "dispute" having nothing to do with the underlying fact stated. There is no retaliatory inference to be drawn from Truitt's guidance to "address behavior issues as they come." (Doc. 42-4, ¶ 38 Doc. 42-4 at 77.) Further, aside from the termination decision (for which Truitt and Johnston provided input), Morris did not issue any subsequent disciplinary action to Swann.

111.   Plaintiff again recycles her stale, inexplicable "[d]isputed as to inference" refrain. Facts are facts. Plaintiff does not and cannot dispute the fact that Morris, Truitt, and Johnson had no input into the specific amount Swann received pursuant to her November 2022 annual raise. (Doc. 42-2, ¶ 23; Doc. 42-3, ¶ 15; Doc. 42-4, ¶ 39.)

115.   Plaintiff does not dispute the fact stated in this paragraph.

116.   There is nothing "misleading" about the facts stated in this paragraph, which remain undisputed. The fact that Swann raised concerns about this November 2022 raise does not undermine EAMC's prompt adjustment. Nor is it surprising that Johnston, Truitt, and Morris had no knowledge of the amount of her raise, as they had no input into the specific amount she received. (Doc. 42-2, ¶ 23; Doc. 42-3, ¶ 15; Doc. 42-4, ¶ 39.)

118-122.   EAMC again notes that Plaintiff has nothing to say about the undisputed November 2022 performance evaluation she received from Morris that

rated her as a "high performer." (Doc. 42-4, ¶ 41 Doc. 42-4 at 79-85.) This is yet another piece of undisputed evidence that is completely contrary to Swann's retaliation narrative and her baseless, fabricated claim that Morris only provided favorable treatment to female employees who flirted with him.

127.    Plaintiff admits that she would have received a promotion and pay raise to at least $21.80 per hour but for her undisputed misconduct on December 27, 2022.

128.    Again, the fact that Swann was a productive employee did not exempt her from EAMC's rules and regulations related to her undisputed cell-phone use at work. Plaintiff does not get to pick and choose what rules she abides by based on her productivity.

129.    This is another disingenuous dispute. EAMC has not attempted to "change the subject of October 19, 2022" at all. EAMC covered Plaintiff's pay-related complaints on October 19, 2022 in its Initial Brief. (Doc. 41 at 20, ¶¶ 94-98.) Instead, it is Plaintiff who tries to "change the subject" on this stated fact, which cannot be genuinely disputed, as it is a direct quote from an authenticated text message Plaintiff sent and further illustrates the extent of Plaintiff's phone use at work. (Doc. 42-5, 83:7-13, 84:19-87:12.)

130.    There is no record of Swann ever being disciplined for workplace phone use or for "sleeping a call" [*sic*]. To be sure, Morris documented coachings he

provided to Swann regarding phone use, but she did not receive disciplinary action for the same. (Doc. 46-4, 89:14-23.)

133.  Regarding this occasion, Swann stated the following during her grievance hearing (which is undisputed): "So I looked at the text from Steve from my husband and John was walking by and he goes, put your phone down. And I was kind of like, you know what? Yeah, that's fair because he said it." (Doc. 42-1 at 213.)

136.  Plaintiff admits the fact stated in this paragraph.

138.  Like so many other responses to EAMC's statement of undisputed facts, this response fails to establish any genuine dispute on the underlying fact stated but instead detours into separate allegations.

139.  Plaintiff simply clarifies the timing of her "heated argument" with Morris. The underlying "heated argument" remains undisputed. (Doc. 42-1, 161:22-162:7; Doc. 42-1 at 194; Doc. 42-4, ¶ 50.)

140.  In Plaintiff's termination document, Morris specifically wrote that he "waited about twenty minutes for [Plaintiff] to cool down," which is consistent with his declaration testimony. (Doc. 42-1 at 201-202; Doc. 42-4, ¶ 50.) In any event, the timing of this comment is immaterial. Thorson's description of Plaintiff stating to Morris "I don't have to put up with this shit" is material and is also undisputed. (Doc. 42-4 at 90; Doc. 47 at 25, ¶ 147.)

142.   Plaintiff's own testimony confirms that Morris did not relieve her of her obligation to wear a pager as of December 27, 2022. (Doc. 42-1, 142:21-143:2; Doc. 42-4, ¶ 51.)

144.   Plaintiff expressly does not dispute that during the December 27 confrontation she: (i) yelled at Morris, (ii) told him she was "fed up," and (iii) used at least two swear words. (Doc. 47 at 24, ¶ 144.) Plaintiff delves into semantics to manufacture a dispute as to her conduct, arguing she never cursed "at" Morris. (Doc. 47 at 24, ¶ 144.) She offers no explanation as to whom she directed her profanity during this two-person conversation. (Doc. 47 at 24, ¶ 144.) In any event, these semantics are largely immaterial as Plaintiff herself has already described her conduct on December 27, 2022 in these terms: "I yelled at [Morris] for 15 minutes about how he's a fucking dick all the time and he plays favorites blah blah." (Doc. 42-2, ¶ 31; Doc. 42-2 at 59.) During the grievance hearing, Plaintiff was asked if she told Morris "if you pay me like shit, you get shit" and Plaintiff responded: "I don't think I said it exactly like that. I'm sure I said shit in there at least once. <laugh> probably more than once, but I don't think that I worded it that way. But it was basically, I guess the exact same." (Doc. 42-1, 262:3-18; Doc. 42-4 at 211.)

145.   Plaintiff cannot escape her own words. Describing the December 27 altercation with Morris, Plaintiff wrote on January 8, 2023: "I yelled at him for 15 minutes about how he's a fucking dick all the time and he plays favorites blah blah."

(Doc. 42-2, ¶ 31; Doc. 42-2 at 59.) Plaintiff spends half a page trying to mitigate this message, but the fact remains that she herself boasted to others that she "yelled at [Morris] for 15 minutes" on December 27, 2022. (Doc. 42-2, ¶ 31; Doc. 42-2 at 59.) Remarkably, Plaintiff argues that this behavior did not constitute "insubordination." (Doc. 47 at 51.)

146.   Again, Plaintiff cannot escape her own words simply by throwing out conclusory claims of mischaracterization and objecting to some unknown "inference." The fact stated in this paragraph is undisputed.

147.   Thorson's description of Plaintiff stating to Morris "I don't have to put up with this shit" is undisputed. (Doc. 42-4 at 90; Doc. 47 at 25, ¶ 147.)

148.   Plaintiff offers no evidence to dispute the fact stated in this paragraph. Here is the direct deposition testimony: "Q.   Okay. While you were having the confrontation, the heated exchange with John Morris, you knew that it was an inappropriate situation, right?  A.  I guess the situation, yes, it was an inappropriate situation." (Doc. 42-1, 156:18-23.)

149.   Plaintiff cannot dispute the undisputed testimony related to a conversation that she did not take part in or witness. Plaintiff speculates as to what was covered in that conversation, but she offers nothing more than just that—speculation. Plaintiff presents no evidence to genuinely dispute on the facts stated in this paragraph.

150.   Plaintiff was provided *multiple* opportunities to present her version of the events that took place on December 27, 2022—both to Banta and to the entire grievance panel. (Doc. 42-3, ¶¶ 21-23, 26.) Between Banta and the seven members of the grievance panel, not one person voted to overturn Plaintiff's discharge. (Doc. 42-3, ¶¶ 23, 30; Doc. 42-3 at 49.)

152.   Plaintiff again parrots her puzzling "dispute as to inference and irrelevance." EAMC remains unclear on how Plaintiff believes she can "dispute" a fact simply because she deems it irrelevant in her sole discretion. Plaintiff does not dispute the authenticity of the cited email or the content contained therein.

159.   Plaintiff admits the fact stated in this paragraph. She includes a laundry list of open questions related to the Banta meeting, but it was Plaintiff made the decision not to take Banta's deposition and leave those questions unanswered.

164.   Plaintiff's opinions on the grievance process do not dispute the fact contained in this paragraph, which Plaintiff admits. The only "flaw" Plaintiff truly sees in the grievance process is that they would not agree with her and instead unanimously upheld the termination of her employment based on her undisputed misconduct on December 27, 2022. (Doc. 42-3, ¶ 30.)

167.   Consistent with her actions this entire case, Plaintiff again baselessly attributes bad motives to EAMC and its employees, apparently insinuating that Johnston and Roben Casey  ("Casey") did not actually lose their notes—a claim

which finds no evidentiary support. Plaintiff needlessly offers this pure speculation after admitting the fact stated in this paragraph and acknowledging that she was directly insubordinate toward Johnston by recording the grievance hearing immediately after Johnston told her she was not permitted to do so. (Doc. 42-1, 263:1-6; Doc. 42-1 at 209; Doc. 42-3, ¶ 27.)[1]

169.   Plaintiff cannot dispute this paragraph, which consists of *Plaintiff's own words* during her grievance hearing. (Doc. 42-1, 262:3-18Doc. 42-1 at 211.) Plaintiff defends her actions by claiming she "felt like it was an acceptable time" to "[say] shit in there at least once. <laugh> probably more than once." (*Id*.; Doc. 47 at 28, ¶ 169.)

170.   Plaintiff does not dispute using profanity during her workplace confrontation with Morris or accusing him of "riding [her] ass." (Doc. 47 at 28, ¶ 170.)  There is no evidence of any other employee "yell[ing] at [Morris] for fifteen minutes" (Doc. 42-2, ¶ 31; Doc. 42-2 at 59) or directing multiple curse words at him

---

[1] Plaintiff offers a half-hearted spoliation argument in relation to these handwritten notes, arguing "the Court should construe this double-loss against EAMC. (Doc. 47 at 44.) "Spoliation sanctions—and in particular adverse inferences—cannot be imposed for negligently losing or destroying evidence." *Tesoriero v. Carnival Corporation*, 965 F.3d 1170, 1184 (11th Cir. 2020). Indeed, "an adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith." *Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997). And bad faith "in the context of spoliation, generally means destruction for the purpose of hiding adverse evidence." *Guzman v. Jones*, 804 F.3d 707, 713 (5th Cir. 2015). Here, Plaintiff resorts to baseless attribution of bad faith to EAMC and its employees because the evidence does not support the same.

during a "heated argument." (Doc. 42-1, 161:22-162:7 262:3-18; Doc. 42-1 at 194, 211, 219-220; Doc. 42-4, ¶ 50.)

171.    Plaintiff does not genuinely dispute the fact stated in this paragraph.

173.    Plaintiff does not attempt to dispute the underlying fact stated in this paragraph. Instead, she offers her own spin on the grievance hearing—insisting (despite a written transcript she prepared to the contrary) that Casey and Johnston "interrogat[ed]," "bullied," and "put[ ] her in a corner." (Doc. 47 at 28.) Of course, the fact stated in this paragraph is not related to the grievance hearing itself, but rather the grievance panel's unanimous vote to uphold the termination of Swann's employment, which is undisputed.

175.    This is not a genuine dispute of fact. Plaintiff's myopic focus on Barnes' work on non-imaging biomedical equipment completely ignores additional, essential functions of his Radiology Equipment Technician job (that Swann did not perform) and the context of work in the healthcare industry. (*See*, *infra*, at 38-39.) Plaintiff cannot genuinely dispute that Barnes worked a different position than she worked.

176.    Plaintiff does not dispute the fact stated in this paragraph. Instead, Plaintiff disputes the relevance of this undisputed fact, although the relevance is easy to see. Paragraph 20 of EAMC's Initial Brief (which Plaintiff did not dispute) stated: "The distinguishing characteristic of the Radiology Equipment Technician position

from the CE Tech position is the specialized training specific to imaging devices, which, in turn, qualifies those Radiology Equipment Technicians to perform preventative maintenance and repair work on EAMC's imaging equipment." (Doc. 41 at 7, ¶ 20.) Paragraph 176 states that Barnes had this "specialized training specific to imaging devices," which is the "distinguish characteristic" of his Radiology Equipment Technician position. (*Id*.) This is extremely relevant to further the point that Barnes worked a different job than Plaintiff and was not her "replacement," as Plaintiff now claims.

177-185.    Plaintiff offers no genuine dispute of the facts stated in this paragraph.

186.    Plaintiff fails (or refuses) to recognize that she, as a CE Tech I, worked a different position than Barnes, Stone, and McSweeney, all of whom were Radiology Equipment Technicians. These positions are materially different, and Swann undisputedly did not have the requisite training or expertise required for a Radiology Equipment Technician. (Doc. 42-1, 50:14-21, 53:17-20, 244:21-245:2.; Doc. 42-4, ¶ 9.). Barnes was the next Radiology Equipment Technician hired after Stone departed in 2021, which is why he was (and why he was listed as) Stone's replacement. (Doc. 42-2, ¶ 29; Doc. 42-2 at 53; Doc. 42-1 at 223-225.)

188.    Plaintiff continues to attribute conspiratorial motives to EAMC without evidentiary support. In her Response, "Plaintiff [did] not dispute the EAMC's

January 31, 2023, new-hire paperwork for Barnes," which expressly indicates he replaced Stone as a Radiology Equipment Technician. (Doc. 47 at 31, ¶ 186; Doc. 42-2, ¶ 29; Doc. 42-2 at 53.) EAMC listed this in Barnes' new-hire paperwork approximately a month-and-a-half before Plaintiff even filed her charge of discrimination with the Equal Employment Opportunity Commission. (*Id.*; Doc. 42-1 at 223-225.) There is no evidence of, or even any inference supporting, EAMC using new-hire paperwork to "cover" for some nonexistent discriminatory or retaliatory motive.

191-194.    Plaintiff offers no genuine dispute to the facts contained in any of these paragraphs.

## <u>RESPONSE TO PLAINTIFF'S "UNDISPUTED FACTS"</u>

1.    EAMC admits that its Employee Handbook does not specifically state that it prohibits retaliation against employees who report sex-based pay discrimination but disputes any implication that EAMC permits retaliation against employees who report sex-based pay discrimination. EAMC would also highlight the Handbook's commitment to "compensate . . . employees . . . based on their qualifications, without regard to . . . sex" and the Open Door Policy. (Doc. 42-1 at 91-92.)

2.    EAMC admits that Johnston, who is not a lawyer, agreed in deposition that at least one federal law restricts employers from prohibiting employees discussing pay. (Doc. 46-1, 147:20-148:17.)

4.    EAMC admits that Morris, who also is not a lawyer, stated in an email that he requested other team members not to discuss pay with Plaintiff. (Doc. 46-3 at 136.) However, there is no evidence whatsoever that Morris (or anyone else at EAMC) ever issued disciplinary action to any employee for discussing pay or enforced this one-off request. Nor is there any evidence that Morris' intention was anything other than avoiding another heated workplace confrontation like what took place between Swann and Thorson on July 21, 2022 where three different individuals reported to Morris that Plaintiff was "hostile." (Doc. 42-4, ¶ 28; Doc. 42-4 at 52.)[2]

5.    The only "undisputed fact" identified in this paragraph is that Truitt provided coaching to Morris regarding his request for team members not to discuss pay. Truitt testified that this coaching took place (Doc. 46-4, 110:2-111:1) and Morris testified he could not recall if that coaching took place. (Doc. 46-9, 77:1-78:6) ("Q.  Is that something you remember?  A.  This – no, I don't.")

---

[2] Plaintiff's Response did not include a Paragraph 3 in this section. EAMC's numbering corresponds with Plaintiff's numbering.

6.    EAMC admits that Truitt understands (and disagrees with) Plaintiff's allegations but fails to see how this supports Plaintiff's underlying allegations.

7.    Disputed and completely irrelevant to the claims at issue in this case. Lewis testified that he could not remember when this alleged incident took place, though he confirmed that he has not worked for EAMC since 2015. (Doc. 46-18, 13:6-12.) Lewis also admitted during deposition he could not confirm anyone was actually having sex. (Doc. 46-18:23:4-13.) In any event, this allegation has nothing to do with Plaintiff's claims in this lawsuit. Instead, this is merely an attempt to harass and embarrass Morris in a public filing.

8.    Admitted, but irrelevant. Plaintiff leaves one to wonder why any reasonable member of the grievance panel would dive into allegations of unrelated conduct from twenty-plus years prior that are completely unconnected to the termination of Swann's employment. The purpose of the grievance process was to examine Swann's conduct on December 27, 2022—not allegations of Morris' conduct from decades prior.

9.    Disputed. This paragraph is based solely on inadmissible hearsay testimony and otherwise objectionable. Plaintiff has never disclosed Michael Giles as an individual with information or knowledge relevant to her claims—either in her Rule 26 disclosures or in response to discovery requests. Further, Plaintiff offers Giles' recollection of what Morris allegedly said 8-9 years ago for the truth of the

matter asserted. The Court must disregard this hearsay testimony that cannot be reduced to admissible evidence. (*See*, *infra*, 54-56.)

10.     Disputed. Again, Plaintiff has never disclosed Michael Giles as an individual with information or knowledge relevant to her claims in her Rule 26 disclosures or in response to discovery requests. These scurrilous allegations have nothing to do with Plaintiff's pay-related and retaliation claims in this case.

11.     This paragraph also contains inadmissible hearsay that the Court should disregard (i.e., Locke testifying that Morris said something). Despite deposing Morris, Plaintiff did not ask any questions related to this allegation. (Doc. 46-9.) Plaintiff alleges Morris made this comment in April 2022—months before she ever complained about pay discrimination. (Doc. 1 at 8, ¶ 42.)

12.     This paragraph also contains inadmissible hearsay that the Court should disregard. Despite deposing Morris, Plaintiff did not ask any questions related to this allegation, which Plaintiff did not offer until after the close of discovery. (Doc. 46-9.) Plaintiff provides no information regarding the timing of this alleged comment and makes no effort to actually connect it to any fact relevant to this case.

13.     Disputed. Plaintiff improperly attributes Casey's testimony to the entire grievance panel without any evidentiary support. As Casey testified: "the grievance committee was there to assess whether her termination was proper. So I do believe

that her concerns were raised through and up to human resources, as they should have been." (Doc. 46-3, 122:1-7.)

14.    Disputed. Again, Casey made the point repeatedly during her deposition that "what mattered was [Swann's] behavior." (Doc. 46-3, 122:1-7.)

15.    Admitted. The grievance committee was not there to review the behavior of other employees. "What mattered was [Swann's] behavior." (Doc. 46-3, 122:1-7.)

16.    As stated, EAMC does not dispute that Johnston, Casey, and Sarah Nunnelly may have taken handwritten notes during the January 24, 2023 grievance hearing.

17.    Likewise, EAMC does not dispute that Johnston and Casey were unable to locate any handwritten notes they may have taken during the January 24, 2023 grievance hearing.

18.    Subject to the objections stated in its response to this Request for Admission, EAMC agrees that it admitted that, as of August 21, 2024, "it would not change anything about Morris' behavior towards Plaintiff in the workplace on December 27, 2022 about which it ha[d] knowledge and information." (Doc. 46-20 at 5.)

19.    Subject to the objections stated in its response to this Request for Admission, EAMC agrees that it admitted that, as of August 21, 2024, "it would not

change any of the formal disciplinary action issued to Plaintiff by Morris in 2022."

(Doc. 46-20 at 5.)

### EAMC'S RESPONSE TO PLAINTIFF'S
### "ADDITIONAL DISPUTED FACTS"

1.     Plaintiff states an opinion in this paragraph, not a "fact." *See Williams v. Hager Hinge Co.*, 916 F. Supp. 1163, 1168 (M.D.Ala.1995) ("[b]ald conclusions, opinions, and hearsay without supporting specific facts are not admissible and do not create a genuine issue of material fact").

2.     EAMC disputes the premise underlying Plaintiff's allegation in this paragraph. Plaintiff's self-serving allegation that she told Morris he had a double standard for punctuality and answering calls did not constitute a complaint of "harassment" under EAMC's policy that would obligate an investigation under the cited policy. (Doc. 46-1 at 62-63.) Moreover, EAMC's Open Door Policy states: "If your supervisor is unable to provide a satisfactory response, you should contact Human Resource." Doc. 46-1 at 63.) There is no evidence Plaintiff ever contacted Human Resources or anyone else regarding this alleged complaint.

3.     This allegation is immaterial to Plaintiff's claims of discrimination and retaliation. Even assuming EAMC "failed . . . to investigate Morris for" allegations of flirting with women, such allegations are wholly unrelated from Plaintiff's claims in this case alleging that EAMC discriminated against her in pay and retaliated against her for complaining about pay.

4.    Plaintiff's conclusory allegation that she was fired in retaliation is insufficient to create a genuine dispute of material fact. *See Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir.1997) (A plaintiff's "conclusory assertions . . . in the absence of [admissible] supporting evidence, are insufficient to withstand summary judgment.")

## LEGAL ARGUMENT

### A.    EAMC is Entitled to Summary Judgment on Plaintiff's EPA Claim.

Plaintiff greatly undersells what is required to establish that two positions are "substantially equal" under the Equal Pay Act ("EPA"). (Doc. 47 at 41.) The Eleventh Circuit has long explained that "[t]he standard for determining whether jobs are equal in terms of skill, effort, and responsibility is high." *Waters v. Turner, Wood & Smith Ins. Ag., Inc*., 874 F.2d 797, 799 (11th Cir. 1989). "When Congress enacted the Equal Pay Act, it substituted the word 'equal' for 'comparable' to show that 'the jobs involved must be virtually identical, that is, they would be very much alike or closely related to each other.'" *Brennan v. City Stores, Inc.*, 479 F.2d 235, 238 (5th Cir. 1973).[3]

---

[3] In *Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id*. at 1209.

### *Cody Locke*

In her Response, Plaintiff claims that EAMC's decision to raise her pay to $17.50 per hour in July 2022 "effectively conced[ed]" that her job was "substantially equal" to Locke's job. (Doc. 47 at 41.) To be sure, EAMC has already acknowledged that Swann and Locke performed substantially similar work as CE Tech I's. (Doc. 41 at 41.) However, this is not the end of the EPA analysis. EAMC may establish an affirmative defense by demonstration that any difference in pay between Locke and Swann was due to "any other factor than sex." *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995). Business reasons, such as experience and education, are legitimate "factors other than sex" unless a plaintiff can show that she had equal or more experience or education of the same type. *See Irby*, 44 F.3d at 955.

Plaintiff argues that Locke's Associate's Degree in Biomedical Equipment Technology was not "essential to the role." (Doc. 47 at 42.) Plaintiff misses the point here. EAMC has never argued that an Associate's Degree in Biomedical Equipment Technology is "essential" to the CE Tech I position. However, the practical knowledge and experience Locke gained from the coursework and internship related to his associate's degree were valuable and directly applicable to his work at EAMC. (Doc. 42-5, 28:15-29:10, 33:13-34:3.) Therefore, EAMC took this education and experience and education into account when it hired Locke in April 2021.

Plaintiff simply ignores her and Locke's different paths to their rates of pay at EAMC. Plaintiff started at EAMC in a Patient Transporter role making $8.12 per hour. (Doc. 42-1, 27:8-13, 29:22-23:1.) Her rate of pay in this role increased to $8.32 in December 2018 and subsequently increased to $10.00 per hour after EAMC increased its minimum wage for all employees. (Doc. 42-1, 35:8-21.) When Plaintiff transferred to the Clinical Engineering department in 2019, her only experience with biomedical equipment was the minor tasks she performed in the part-time role she worked with the department. Based on her lack of experience, training, and education relevant to biomedical equipment, Swann's rate of pay when she transferred to the Clinical Engineering department was at the low-end of the pay grade for that position—$14.08 per hour. (Doc. 42-1, 35:9-36:6.) Plaintiff received additional pay raises in January 2021 and June 2021 when EAMC increased the minimum pay rate for the CE Tech I position to $15.90 per hour and $16.38 per hour respectively. (Doc. 42-1, 65:12-66:10.)

By contrast, EAMC hired Locke as a new-hire in April 2021. Unlike Swann, Locke did not transfer into the Clinical Engineering department from another lower-paying position in the hospital. Instead, he was an external applicant who had just completed a two-year degree specific to biomedical equipment wherein he had extensive in-class and out-of-class hands-on experience performing maintenance and repairs on the same type of equipment with which he worked at EAMC. (Doc.

42-5, 21:8-14; 22:18-29:10, 33:13-34:3; Doc. 42-3, ¶ 13; Doc. 42-3 at 49.) When EAMC made its initial pay determination for Locke in April 2021, he had more formal training, relevant education, and practical experience than Plaintiff. (*Id*.; Doc. 42-1, 54:7-55:5.)   Indeed, when Plaintiff transferred to the Clinical Engineering department, her only experience with biomedical equipment was the relatively minor work she performed with the department on a part-time basis. (Doc. 42-4, ¶¶ 10-11.) Simply put, Locke had the experience, education, and expertise that justified a rate of pay above the minimum for that position. When EAMC offered Swann a full-time position in November 2019, she did not.

To be sure, by *2022*, when Plaintiff began to raise complaints about her pay, she had gained interim experience. But the individual initial pay determinations were made before 2022 and based on legitimate factors unrelated to sex. In any event, after Human Resources compared Swann's and Locke's relative experience and education in July 2022, they concluded that Swann and Locke should make the same amount of money moving forward. (Doc. 42-2, ¶¶ 11-16; Doc. 42-2 at 16-22.) This does not indicate that EAMC had discriminated against Swann because of her sex prior to this review. It simply reflects EAMC's determination that, as of July 2022, Swann had gained additional experience and should receive a pay increase accordingly.

This all took place in the context of the COVID-19 pandemic, which had a significant impact on the healthcare labor market. (Doc. 42-2, ¶¶ 7-9.) The labor market became extremely competitive, which led to an increase in wages throughout the industry. (Doc. 42-2, ¶¶ 7-9.) Indeed, Plaintiff received two pay increases over the course of six months in 2021 due to EAMC increasing the pay range for CE Techs. (Doc. 42-1, 65:12-66:10.) At times, this rapid market shift led to newly-hired employees making more money than longer-tenured employees in the same position. (Doc. 42-2, ¶¶ 7-9.) This context further cuts against Plaintiff's unsupported narrative that EAMC paid her less money because of her sex.

Plaintiff also argues (without any citation to evidence) that EAMC's "factor-other-than-sex defense fails because it was not applied consistently." (Doc. 47 at 42.) The undisputed evidence demonstrates this is demonstrably false. EAMC hired Rachel Findley ("Findley") (female), another CE Tech I, in May 2021 (less than a month after Locke). (Doc. 42-4, ¶ 64.) Like Locke, Findley was an external hire. Unlike Locke, EAMC hired Findley at an initial pay rate of $24.00 per hour (*i.e.*, 37% more than Locke—a male—received). In August 2023, EAMC hired another female CE Tech I, Breanna Caldwell ("Caldwell"), at an initial pay rate of $19.63 per hour (more than Locke made when he left EAMC). (Doc. 42-4, ¶ 63.) This evidence—which is completely undisputed—shows that EAMC does not base pay decisions on gender but rather on legitimate factors such as education, experience,

expertise, and market conditions. *See Lawson-James v. City of Atlanta*, 485 F. App'x. 374, 377 (11th Cir. 2012) (affirming summary judgment on EPA claims where evidence showed employees were compensated at a rate commensurate with their experience, education, and knowledge).

### *Andrew Barnes*

Plaintiff's one-paragraph argument related to Barnes focuses solely on the overlap in Barnes' job duties and job duties Swann performed prior to the termination of her employment. (Doc. 47 at 42.) Plaintiff argues that Barnes is an Equal Pay Act comparator because of the time he spent working on general biomedical equipment as opposed to radiographic and imaging equipment. (*Id.*) However, "a wage differential can be justified for employees who are available to perform an important differentiating task even though they do not spend large amounts of time at the task." *Marshall v. Dallas Independent School District*, 605 F.2d 191, 195 (5th Cir.1979); *Hodgson v. Golden Isles Convalescent Homes, Inc.*, 468 F.2d 1256, 1258 (5th Cir.1972). As the court of appeals explained in *Hodgson*, "this approach requires examination of equal work claims in the light of practice in the particular employment." 468 F.2d at 1258.

As one District Court within the Eleventh Circuit explained, "In the medical field the availability of skills not often used is an important component of competence, and it is an important consideration in staffing decisions." *Beall v.*

*Curtis*, 603 F. Supp. 1563, 1578 (M.D. Ga.), *aff'd*, 778 F.2d 791 (11th Cir. 1985).

That is directly applicable here. Like most hospitals, EAMC has vastly more pieces

of general, non-imaging biomedical equipment than it has pieces of imaging

equipment. (Doc. 42-4, ¶ 9.) Though there are far fewer, the imaging devices are

very important, highly specialized, and much more expensive than general

biomedical devices. (Doc. 42-4, ¶¶ 6-9.) The Radiology Equipment Technicians who

perform preventative maintenance and repair work on EAMC's imaging equipment

must have specialized training to perform this work. (*Id.*) Understandably, because

there are far fewer pieces of imaging equipment, Radiology Equipment Technicians

do not spend all day, every day performing work on imaging devices; there simply

are not enough of those devices. (Doc. 42-4, ¶ 9.) In fact, they often spend a

significant amount of time working on one or more of the nearly 10,000 pieces of

non-imaging biomedical equipment at EAMC. (Doc. 42-4, ¶¶ 6-9); *see Beall*, 603 F.

Supp. at 1578 ("The Court considers an analogy to the function of a security guard

to be appropriate. A security guard is rarely—one hopes never—called upon to use

a weapon; but when a weapon is required, he or she must have the skill to use it.").

    As one district court in the Middle District of Alabama explained:

> [W]here a plaintiff's job does not include additional significant
> responsibilities performed by the comparator[] who [is] paid more
> money, the requisite substantial identity of job functions requirement
> of the *prima facie case* is not met, and the employer is entitled to
> summary judgment.

*Butler v. Albany Intern*, 273 F. Supp. 2d 1278, 1289 (M.D. Ala. 2003). There is simply no dispute that Plaintiff did not perform the same significant work on imaging devices as Barnes did. (Doc. 42-1, 28:10-20, 48:10-53:17-20, 54:7-55:5, 244:21-245:2.)

Simply put, Barnes and Swann did not work positions that required "equal skill, effort, and responsibility." 29 U.S.C. § 206(d)(1). "Skill includes consideration of such factors as experience, training, education, and ability." *Pearce v. Wichita County, City of Wichita Falls, Tex., Hosp. Bd*., 590 F.2d 128, 133 (5th Cir. 1979) (citing 29 CFR § 800.125). Barnes had years of training and experience performing work on imaging devices in a medical setting. (Doc. 42-6, 22:6-25:19; Doc. 42-4, ¶ 48.) Swann did not. (Doc. 42-1, 50:14-21, 53:17-20, 64:11-65:11, 244:21-245:2.) "Responsibility is concerned with the degree of accountability required in the performance of the job, with emphasis on the importance of the job obligation." *Pearce*, 590 F.2d at 133. Pieces of imaging equipment are extremely expensive compared with general pieces of biomedical equipment. (Doc. 42-4, ¶¶ 6-9.) Given this relative cost and the importance of imaging equipment's functions, Radiology Equipment Technicians' obligations require more responsibility and carry more weight than that of CE Techs. Barnes had these additional obligations and responsibilities. (Doc. 42-6, 45:7-46:17; Doc. 42-4, ¶ 59.). Swann did not. (Doc. 42-1, 48:10-53:16.)

Plaintiff's citation to the Eleventh Circuit's decision in *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992) confirms that Barnes is not a valid comparator. (Doc. 47 at 41.) According to Plaintiff, the *Miranda* court held that "extra tasks automatically do not defeat" an EPA claim. (Doc. 47 at 41.) However, the court in *Miranda* more specifically explained, "Any extra duties that might be used to distinguish two jobs may not be tasks that are typically performed by other personnel at lower pay." *Id.* (citing *Jones v. Westside–Urban Health Center*, 760 F. Supp. 1575 (S.D. Ga. 1991)). This case is exactly the opposite. The "extra duties that . . . distinguish" Barnes' role from Swann's were not "tasks that are typically performed by other personnel at lower pay." *Id.* To the contrary, they were maintenance and repair duties on specialized, expensive pieces of imaging equipment that Plaintiff herself admitted she was not qualified to do.

## B.    EAMC is Entitled to Summary Judgment on Plaintiff's Title VII Retaliation Claim.

Since the Supreme Court's decision in *Burlington Northern*, an adverse employment action for purposes of a Title VII retaliation claim is an action that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Railway Co. v. Whit*e, 548 U.S. 53 (2006) (internal citations omitted). Courts consider the entire context when evaluating whether an employment decision meets the adverse action standard under the retaliation provisions. *Burlington*, 548 U.S. at 64 ("the significance of any given

act of retaliation will often depend upon the particular circumstances. Context matters."). On several occasions, for example, the Eleventh Circuit has held that a disciplinary reprimand that did not result in any tangible effect on the plaintiff's employment was not enough to constitute an adverse employment action. *See Rayner v. VA*, 684 F. App'x. 911, 915 (11th Cir. 2017) (finding that the plaintiff could not establish retaliation where she failed to "point to any evidence that her pay or promotion prospects were negatively affected by the admonishment or the reprimand"); *Barnett v. Athens Reg'l Med. Ctr, Inc.*, 550 F. App'x. 711, 715 (11th Cir. 2013).

Swann lists a number of allegedly retaliatory acts Morris took toward her after her complaints about pay. (Doc. 47 at 43.) Morris' email to Truitt stating he requested other employees not to discuss pay with Swann—albeit objectionable—is not an adverse employment action. There is no evidence of any employee ever receiving disciplinary action for discussing pay at EAMC. Indeed, there is no indication Swann even knew about this July 29, 2022 email from Morris to Truitt until after this litigation commenced. That email could not "have dissuaded a reasonable worker from making or supporting a charge of discrimination" if that reasonable worker had no knowledge of its existence. *Burlington*, 548 U.S. at 68. Moreover, the evidence is undisputed that Swann continued to discuss pay with other

employees after this July email without ever receiving any disciplinary action for doing so. (Doc. 42-1, 93:16-94:16; Doc. 42-5, 54:13-57:11.)

Swann also claims that Morris "thwart[ed] training" for her. (Doc. 47 at 43.) Plaintiff's "evidence" in support of this claim is scattered and completely unclear. She testified during her deposition that Morris tried to get her to cancel an out-of-state training in July 2022 because she did not have a plane ticket, but that she refused to cancel and drove to this training. (Doc. 42-1, 220:19-222:11.) Plaintiff also claims without further explanation that Morris "canceled plans to send [her] to necessary training" on December 15, 2022. (Doc. 46-5 at 2.) Plaintiff fails to provide any further context or explanation surrounding these allegations and provides no evidence whatsoever that indicates Morris was motivated by some retaliatory animus related to these training sessions. *See Johnson v. Miami-Dade Cty*., 948 F.3d 1318, 1328 (11th Cir. 2020) (temporal proximity alone insufficient to establish retaliation).

Swann also argues that Morris' requiring her to wear a pager constitutes a retaliatory adverse employment action. (Doc. 47 at 43.) Again, "[c]ontext matters." *Burlington*, 548 U.S. at 64. Here, it is undisputed that: (i) in 2022, Morris told Swann that other employees complained to him about not being able to reach her and that he himself had issues reaching her (Doc. 42-1, 123:16-21; Doc. 42-4, ¶ 32); (ii) Morris spoke to Swann about wearing a pager on September 28, 2022 because he was again not able to reach her, which Swann acknowledged in an authenticated text

message to Locke (Doc. 42-1, 133:12-134:11; Doc. 42-1 at 192; Doc. 42-4, ¶ 33); and (iii) Morris was again unable to reach Swann on October 6, 2022 and instructed her to wear a pager that day, which she refused to do. (Doc. 42-1, 134:12-136:17; Doc. 42-1 at 193; Doc. 42-4, ¶ 34-35; Doc/ 42-4 at 66-69.) This all took place over ten weeks after Swann's most recent pay complaint on July 25, 2022. There is simply no evidence of any retaliatory animus from Morris in requiring Swann to wear a pager or issuing her disciplinary action when she refused.[4] *See Rayner*, 684 F. App'x. at 915. By October 6, 2022, Swann had not complained about her pay for over two months. *See Johnson*, 948 F.3d at 1328 (temporal proximity of less than two months was insufficient by itself to establish pretext).

Finally, Plaintiff argues Morris "discomfort[ed] her in her personal space" on December 27 when he was called into work on his day off because Thorson was experiencing issues with Plaintiff on her cell phone. (Doc. 42-1, 143:21-23; Doc. 42-4, ¶¶ 47-48.) These facts are completely undisputed. (See Doc. 41 at 26, ¶¶ 134-135; Doc. 47 at 22-23.) Swann was admittedly on her cell phone when Morris arrived. (Doc. 42-1, 143:21-144:4; Doc. 42-4, ¶ 49.) Morris approached Swann and asked her what she was doing, and she immediately became defensive. (Doc. 42-1, 145:2-146:7; Doc. 42-4, ¶ 49.) In her Response, Plaintiff criticizes Morris' method

---

[4] Nor is there any evidence of gender-based discriminatory animus with respect to the pager, as there is no evidence of any male employee frequently and admittedly missing communications with their supervisor as Swann had.

of asking her about an admitted policy violation. At most, this was a "petty slight[ ] or minor annoyance[ ]" that Title VII does not protect against. *Burlington*, 548 U.S. at 68. As the Supreme Court has explained, Title VII is not a "civility code for the American workplace." *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).

Plaintiff's hyperfocus on any conceivable negative interaction she had with Morris after her pay complaints ignores Morris' and EAMC's *actual responses* to those complaints. The very same day Swann first made a complaint about pay discrimination, Morris called and emailed Truitt regarding a pay raise for Plaintiff. (Doc. 42-2, ¶¶ 7-9; Doc. 42-4, ¶¶ 26-28; Doc. 42-4 at 52.) This led to a pay increase four days later. (Doc. 42-1, 66:21-67:1, 72:18-73:7.) This was not the first time Morris had proactively tried to increase Swann's pay. After Swann spoke with Morris about pay in April 2022, he emailed Banta to inquire into a potential pay raise for Swann, though he did not receive a response. (Doc. 42-1, 237:12-238:9; Doc. 42-4, ¶¶ 19-20; Doc. 42-4 at 46-47.) Likewise, the morning after Swann's October 19 pay complaint, Morris again contacted Human Resources for assistance and guidance in response to Swann's complaint. (Doc. 42-4, ¶ 37; Doc. 42-4 at 46-47.) This, too, directly led to Morris seeking and receiving approval to promote Swann to a CE Tech II position, which would have increased her pay yet again. (Doc. 42-4, ¶¶ 38, 42-44; Doc. 42-4 at 77, 87-88.) Plaintiff grasps to cobble together

circumstantial evidence of retaliation in response to pay complaints despite the undisputed, direct evidence that Morris and EAMC harbored no such retaliatory animus at all. Instead, Morris and EAMC consistently responded to these complaints to Plaintiff's benefit.

Plaintiff misrepresents EAMC's argument to the Court, claiming that EAMC "wrongly claims Swann did not engage in protected activity." (Doc. 47 at 46.) This is simply not true. For purposes of summary judgment, EAMC does not dispute that Plaintiff's pay complaints on July 25, 2022 and October 19, 2022 constitute protected activity.[5] Instead, EAMC's argument is that there is no evidence of any causal connection between Swann's protected activity and any adverse employment action she suffered. Similarly, the undisputed evidence plainly shows a legitimate basis for the termination of Plaintiff's employment following her conduct on December 27, 2022, which itself was an intervening act of misconduct that severs any otherwise-existing causal connection. *See Brisk v. Shoreline Found., Inc.,* 654 F. App'x. 415, 417 (11th Cir. 2016) ("[T]here is no causal connection between a protected act and an adverse action, where the adverse action was caused by intervening act of misconduct.")

---

[5] However, in light of the undisputed facts surrounding December 27, 2022 and Eleventh Circuit case law, EAMC respectfully submits that Swann's behavior on December 27 is not protected activity as a matter of law. (Doc. 41 at 50, n.4.)

Plaintiff's Response fails to offer any evidence of retaliatory pretext. A reason is not pretext for discrimination "unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515 (1993). Plaintiff's few attempts to show pretext are unavailing. For example, Plaintiff alleges that Morris once said to Locke about her: "Who would want to be married to that?" (Doc. 47 at 43-44; Doc. 46-5 at 108, ¶ 5.) Even putting aside the double hearsay underlying this allegation (*see*, *infra*, at 54-56), Plaintiff claims this alleged comment came in "early April 2022"—well before Plaintiff ever made any complaint about alleged sex discrimination in July 2022. (Doc. 1 at 8, ¶ 42.) Morris, of course, could not retaliate against something that had not happened yet. *See Matamoros v. Broward Sheriff's Off.*, 2 F.4th 1329, 1337 (11th Cir. 2021) ("You can't retaliate against something you don't know exists."). Accordingly, this alleged comment does not show any type of retaliatory animus at all.

Plaintiff also levies more serious, baseless allegations against Morris—claiming (without support) that he has a "track record of sexist contempt for women in the workplace" (Doc. 47 at 44) and he had "untoward proclivities" that EAMC "should have known" about. (Doc. 47 at 55.) Plaintiff does not bother to explain what those "proclivities" with any non-hearsay evidence or, more importantly, how they in any way relate to her actual claims in this case. Plaintiff has offered no evidence of any "sexist contempt" toward her from Morris or anyone else.

Plaintiff then turns her attention to EAMC's grievance panel members. Plaintiff claims that the grievance panel "intentional[ly] refus[ed] to conduct a thorough, good faith, investigation" of Plaintiff's "discrimination complaints" during her January 24, 2023 grievance hearing. (Doc. 47 at 49.) As an initial matter, "Eleventh Circuit precedent indicates that a failure to investigate a plaintiff's complaint against another person is not retaliatory if there is no basis to conclude that the action is taken 'against' the plaintiff." *Ayres v. City of Birmingham*, No. 2:24-CV-01055-RDP, 2025 WL 392720, at *3 (N.D. Ala. Feb. 4, 2025) (citing *Entrekin v. City of Panama City Fla*., 376 F. App'x. 987, 995 (11th Cir. 2010). Swann herself claims that this alleged failure to investigate "insulated Morris's – and Director Truitt's and Vice President Johnston's collaborative – conduct from accountability." (Doc. 47 at 49.) This is precisely the type of failure-to-investigate argument the Eleventh Circuit has rejected. *See Entrekin*, 376 F. App'x. at 995 (holding, in the retaliation context, that an employer's failure to investigate a complaint is not an adverse employment action because the plaintiff herself suffered no harm due to the employer's failure to take action against other individuals).[6]

Plaintiff also grossly misrepresents her meeting with the grievance panel. During that hearing, Plaintiff was consistently evasive to the panel's questions and

---

[6] Unlike the *Sims v. City of Homewood* case cited by Plaintiff (Doc. 47 at 49), this case does not include any retaliatory hostile work environment claim. *See* No. 2:22-CV-178-ACA, 2024 WL 665656, at *7 (N.D. Ala. Feb. 16, 2024)

frequently changed the subject to other employees' alleged conduct instead of her own admitted conduct. (Doc. 42-1 at 209-222.) Casey and Johnston frequently asked Swann questions to re-focus the conversation on what the panel was there to do—discuss Swann's conduct on December 27, 2022. (*Id*.) Plaintiff resorts to labeling these questions as "interrogating," "bullying," and "putting [Plaintiff] in a corner."[7] (Doc. 47 at 28, ¶ 173.) Luckily, an authenticated transcript of this grievance hearing is before the Court, which completely vitiates Plaintiff's empty rhetoric and misleading narrative. (Doc. 42-1 at 209-222.)

## C.    EAMC is Entitled to Summary Judgment on Plaintiff's Title VII Gender Discrimination Claim.

Plaintiff recycles her EPA arguments under the banner of Title VII gender discrimination. As explained above, the disparity between Locke's and Swann's pay from April 2021 to July 2022 was not because of sex or otherwise motivated by sex. (*See*, *supra*, at 33-37.) Plaintiff argues that EAMC "conditioned [her] raise and promotion on 'behavioral corrections.'" (Doc. 47 at 50.) This is demonstrably false. After Swann's complaints of pay discrimination, EAMC both provided her with a pay raise and approved her for a promotion *despite* her behavioral concerns. Indeed, Truitt and Morris agreed to keep pay considerations and disciplinary action separate.

---

[7] Plaintiff offers no explanation as to why Johnston would take steps to ensure that Swann received pay raises following her complaints in 2022 and recommend her for a promotion to a CE Tech II position, only to directly retaliate against her for the same complaints that Johnston helped to address.

(Doc. 42-2, ¶ 9; Doc. 42-4, ¶ 27.) Plaintiff argues that her behavior and attitude issues came as a result of her frustrations with pay (Doc. 47 at 50); however, Plaintiff is not immune from the consequences of her actions simply because pay was allegedly an underlying motivation for her behavior. See *Rollins v. State of Fla. Dep't of Law Enf't*, 868 F.2d 397, 401 (11th Cir. 1989) ("[T]o to qualify for the protection of the statute, the manner in which an employee expresses her opposition to an allegedly discriminatory employment practice must be reasonable.").

## D. Plaintiff Has Not Established Evidence of a Mixed-Motive in this Case.

Plaintiff also devotes a page of argument to claiming that this is a "mixed-motive" case under *Quigg v. Thomas County School District*. 814 F.3d 1227 (11th Cir. 2016). Plaintiff states: "even accepting *arguendo* any one of Defendant's excuses for demoting, then refusing to promote, Plaintiff, makes this a mixed-motive case." (Doc. 47 at 51.) EAMC does not understand what Plaintiff references here, as neither a demotion nor a promotion is at issue in this case. In any event, Plaintiff's mixed-motive theory fails here. As an initial matter, "it is well-established that the mixed-motive framework does not apply to Title VII retaliation claims." *Yelling v. St. Vincent's Health Sys.*, 82 F.4th 1329, 1338 (11th Cir. 2023) (citing *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013)).

As for her Title VII discrimination claim, Plaintiff's mixed-motive theory must fail because she has not presented evidence that her gender was a motivating

factor behind the termination of her employment. Instead, the sole motivating factor behind the termination of Plaintiff's employment was her behavior on December 27, 2022. (Doc. 42-2 at 43-45.) There is no evidence of any male employee "yell[ing] at [Morris] for fifteen minutes" in a workplace confrontation that included multiple curse words directed at Morris. (Doc. 42-2 at 59.) Nor did Plaintiff identify any negative comment she ever heard Morris make toward women. (Doc. 42-1, 104:11-105:20.) Truitt and Johnston (both females) also provided input into and agreed with the decision to terminate Swann's employment. *See Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1477 (11th Cir. 1991) (holding that when the decisionmaker is in the same protected category as the plaintiff, the plaintiff faces a more difficult burden in establishing pretext). The grievance panel (which unanimously agreed with the termination decision) also consisted of five women. *Id.*

Plaintiff argues that her conduct on December 27, 2022 was not actually insubordination because it was not a "refusal to obey a direct and reasonable order given by a supervisor." (Doc. 47 at 51.) This myopic reading of "insubordination" willfully ignores another common-sense provision in EAMC's Disciplinary Procedures policy, which reads:

> These classifications are not inclusive and are only intended as a general guide to all levels of supervision. They should be modified and supplemented as circumstances and good judgment require . . . This procedure is designed to solve problems. Occasionally, situations may arise where literal application of this policy is unacceptable, and

[EAMC] reserve[s] the right to deal with such situations at its own discretion.

(Doc. 42-1 at 115.) No reasonable juror could conclude that Plaintiff's admitted behavior on December 27, 2022 did not amount to insubordination.

## E.    Plaintiff Has Not Provided Sufficient Evidence to Establish Convincing Mosaic of Workplace Discrimination.

Plaintiff begins her convincing mosaic argument by stating she complained three times about her pay in 2022. (Doc. 47 at 52.) Of course, this is unconvincing, as under this theory, any plaintiff could complain his or her way into a Title VII gender discrimination claim. Plaintiff also argues that Morris has a "long-running track record of disdain for or contempt of women who [don't] 'know their place,'" which is a serious accusation to make without any evidentiary support or reference. (Doc. 47 at 52.) Of course, there is no evidence of any such "disdain for or contempt of women" from Morris. This is all manufactured hearsay from Plaintiff.

Plaintiff also points to handwritten notes from Morris' interview for the Clinical Engineering Director position in *July 2016*—two years before Swann even worked at EAMC.[8] (Doc. 47 at 52-53; Doc. 46-1 at 94-96.) This feedback is completely gender-neutral and has nothing whatsoever to do with Swann or the facts of this case. (Doc. 46-1 at 94-96.) Plaintiff does not even attempt to explain how this interview feedback adds to a convincing mosaic of discrimination in any way.

---

[8] Plaintiff failed to provide any citation to this document, but it can be found at Doc. 46-1 at 94-96, Exhibit 5 to Johnston's deposition.

Plaintiff also fails to explain how Morris' comment via email to Truitt about encouraging employees not to discuss pay (for which he was counseled) in any way indicates gender-based discrimination. Likewise, Plaintiff offers no explanation as to how the grievance panel's (which consisted of five females) actions demonstrated gender-based discrimination. Plaintiff was unable to provide any examples of male employees who cursed and yelled at their supervisors for fifteen minutes. (Doc. 42-1 at 209-222.) Plaintiff's mosaic is extremely unconvincing.

### F.  Plaintiff's Claims Find No Support under the McDonnell Douglas Framework.

Plaintiff briefly argues that her Title VII claims should advance beyond summary judgment under the *McDonnell-Douglas* framework. (Doc. 47 at 53-55.) However, as already explained, Plaintiff's undisputed misconduct on December 27, 2022—which admittedly included fifteen minutes of yelling at Morris about how he was a "fucking dick," among other curse words—was a legitimate, non-discriminatory, non-retaliatory basis for termination. Plaintiff claims pretext because she argues (through admissible hearsay evidence) that male employees cursed and engaged in other "unprofessional behavior." (Doc. 47 at 55.) Remarkably, after over a year of litigation, Plaintiff still does not seem to comprehend the reason for her discharge. EAMC did not terminate Swann's employment merely because she used profanity at work. Instead, it terminated her employment because she engaged in a heated confrontation with her supervisor during which she yelled and swore at him

in the workplace. Plaintiff has presented no evidence—much less admissible evidence—of a male employee engaging in a similarly hostile confrontation while yelling and cursing at his supervisor for an extended period of time. This behavior was clearly insubordinate and was Plaintiff's second instance of admitted insubordination in less than three months. (Doc. 42-1 at 193, 198.)

Plaintiff simply has not identified a valid comparator who is "similarly situated . . . in all material respects." *Lewis v. City of Union City*, 918 F.3d 1213, 1224 (11th Cir. 2019) (en banc). "A plaintiff must establish that the comparator (1) will have engaged in the same basic conduct (or misconduct) as the plaintiff; (2) will have been subject to the same employment policy, guidelines, or rule as the plaintiff; (3) will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor as the plaintiff; and (4) will share the plaintiff's employment or disciplinary history." *Cook v. City of Birmingham*, No. 2:17-CV-01654-RDP, 2020 WL 136850, at *8 (N.D. Ala. Jan. 13, 2020) (citing *Lewis*, 918 F.3d at 1227–28) (internal quotations omitted) (emphasis added).

**G. The Court Should Strike, or at least Disregard, Much of the Hearsay Offered by Plaintiff, which Cannot be Reduced to Admissible Evidence at Trial.**

Plaintiff attempts to proactively side-step serious hearsay issues by declaring that the Court may consider the reams of hearsay she submitted because those hearsay statements "[can] be reduced to admissible evidence at trial." (Doc. 47 at

56-57.) Hearsay "is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). "The general rule is that inadmissible hearsay cannot defeat a motion for summary judgment where there is no indication that it is reducible to a form that would be admissible at trial." *Wyant v. Burlington N. Santa Fe R.R.*, 210 F.Supp.2d 1263, 1275–76 (N.D. Ala. 2002).

There can be no doubt that a large portion of Plaintiff's evidence is inadmissible hearsay. For example, in her first declaration, Plaintiff spends over five pages recounting instances where male employees allegedly used profanity. (Doc. 42-7 at 2-7.) In other words, she offered alleged words of other employees to prove that those statements actually happened. Sensing these obvious evidentiary issues, in her first declaration, Plaintiff included an introduction in which she stated: "To the extent anyone claims that any of the matters I attest to in this Declaration are 'hearsay,' I hold out that such alleged 'hearsay' matters are not offered or described for the truth of the matter – or quote – asserted." (Doc. 42-7 at 2.) If this is true, then there is no evidence of other employees using profanity around Morris in the workplace, as Plaintiff claims she is not offering those alleged quotes to prove they actually happened. Likewise, Plaintiff offers two declarations from Locke—each of which is filled with hearsay attributed to Morris. (Doc. 46-10 at 1-4; Doc. 46-5 at 107-109.)

Plaintiff urges the Court to consider this textbook hearsay because she claims it "[can] be reduced to admissible evidence at trial." (Doc. 47 at 56-57.) However, she does not explain how. *See Riley v. Univ. of Alabama Health Servs. Found., P.C.*, 990 F. Supp. 2d 1177, 1192 (N.D. Ala. 2014) ("The plaintiffs argue that 'this evidence can be made admissible at trial,' but do not explain how.") Importantly, "[i]t is [Swann's] statement, in her declaration, as to what [other employees] said, that [she] must show could be made admissible at trial." *Id.* But if Swann testified at trial about what these other employees allegedly said, that still would be inadmissible hearsay testimony. Plaintiff has identified no basis for contravening the Federal Rules of Evidence and permitting herself to testify about what others allegedly said to Morris. *Id.*; *see also Pritchard v. Southern Co. Servs.*, 92 F.3d 1130, 1135 (11th Cir. 1996) (rejecting hearsay in a deposition as evidence because "Pritchard cannot use inadmissible hearsay to defeat summary judgment when that hearsay will not be reducible to admissible form at trial."). EAMC respectfully submits the Court should not consider this hearsay testimony that cannot be reduced to admissible evidence at trial.

## CONCLUSION

The evidence and Plaintiff's Response do not present any triable issue of material fact and EAMC is entitled to judgment as a matter of law on all of Plaintiff's

claims. Therefore, EAMC respectfully submits that its Motion for Summary Judgment is due to be granted in full.

Respectfully submitted,

*/s/ Warren B. Lightfoot, Jr.*
Warren B. Lightfoot, Jr.
W. Brock Phillips
Maynard Nexsen, PC
1901 Sixth Avenue North
1700 Regions Harbert Plaza
Birmingham, AL  35203
Telephone:  (205) 254-1000
Facsimile:  (205) 254-1999
Email: wlightfoot@maynardnexsen.com
          bphillips@maynardnexsen.com
*Attorneys for East Alabama Medical Center*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 30, 2025, I electronically filed a copy of the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Richard R. Newton
2100 Southbridge Parkway, Suite 650
Birmingham, AL 35213
(205) 356-2498
richardrussellnewton@gmail.com


*/s/ Warren B. Lightfoot, Jr.*
OF COUNSEL